TERRENCE A. BEARD, State Bar No. 98013
LAW OFFICES OF TERRENCE A. BEARD
P. O. Box 1599
Sutter Creek, CA 95685
(925) 778-1060
Tbeard1053@aol.com

Attorneys for Plaintiffs LANE LABBE', LISA LABBE', JANE LABBE'
and APRIL TOMCZAK

Krsto Mijanovic (Bar No. 205060)
    kmijanovic@hbblaw.com
Leah B. Mason (Bar No. 240425)
    lmason@hbblaw.com
HAIGHT BROWN & BONESTEEL LLP
555 South Flower Street, Forty-Fifth Floor
Los Angeles, California 90071
Telephone:   213.542.8000
Facsimile:   213.542.8100

Erica W. Rutner (Admitted *Pro Hac Vice*)
    e.rutner@mooreandlee.com
MOORE & LEE, LLP
110 SE 6th Street, Suite 1980
Fort Lauderdale, FL 33301
Telephone:   703.506.2050
Facsimile:   703.506.2051

Counsel for Defendant
DOMETIC CORPORATION

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| LANE LABBE'; LISA LABBE'; JANE LABBE'; APRIL TOMCZAK,<br><br>Plaintiffs,<br><br>v.<br><br>DOMETIC CORPORATION, a Delaware corporation, and DOES 1 to 50, inclusive ,<br><br>Defendants. | Case No. 2:20-CV-01975-KJM-DMC<br><br>**JOINT STATEMENT RE: DISCOVERY DISAGREEMENT, VOL. 1 (Local Rule 251)** |

The parties, through their respective attorneys of record undersigned, hereby submit this Joint Statement re: Discovery Disagreement ("Joint Statement") pursuant to Local Rule 251.

## I.     OVERVIEW OF JOINT STATEMENT

The parties' Joint Statement is divided into two volumes to make the statement more accessible and less duplicative.

Volume 1 contains the factual and procedural history of the discovery dispute; a recitation of the parties' efforts to meet and confer to resolve the dispute; the legal standards governing the dispute; and the parties' respective positions on how the legal standards should apply to discrete discovery issues that are common to a number of different discovery requests in the same or similar way.

Volume 2 contains a verbatim recitation of each discovery request at issue[1], along with Dometic's objections, responses and supplemental responses, pursuant to Local Rule 251.    Volume 2 also includes a summary statement of both parties' positions regarding each discovery request at issue, with appropriate references to the legal standards and discussions contained in Volume 1.

## II.     FACTUAL BACKGROUND OF DISCOVERY DISPUTE

The present action arises from an RV fire on October 25, 2019.     Plaintiffs allege that the origin and cause of the fire was a defective Dometic-branded RM 2652 gas absorption refrigerator, and seek damages - including punitive damages - under a variety of theories, including strict product liability, negligence, post-sale duty to warn/conduct

---

[1]     The specific discovery that is the subject of this motion is by no means the only discovery issues in dispute between the parties, and by limiting the issues presented, plaintiffs reserve their right to pursue existing discovery disputes not covered herein. However, the plaintiffs have to start somewhere.     It is hoped that by resolving the issues presented in this motion, the parties will have sufficient guidance to resolve their other discovery disputes without the need for further Court intervention. Defendant Dometic Corporation ("Dometic") reserves its right to object to, and respond to, any future discovery disputes raised by Plaintiffs.

adequate recall, and fraud.[2]    Dometic denies any allegation that their gas absorption refrigerators were ever defective;    questions whether the refrigerator installed in plaintiffs' RV was actually designed, manufactured, imported, sold, distributed, etc. by Dometic - or if the refrigerator was even one of theirs - and further denies that, even if the fridge was one or theirs, that it was the origin or cause of the fire.[3]    All issues of liability, causation and damages are therefore at issue.

### III.    PROCEDURAL BACKGROUND

### A.    PLAINTIFFS' PROCEDURAL BACKGROUND OF DISCOVERY DISPUTE

Dometic filed a motion to dismiss/strike various portions of plaintiffs' original complaint on October 30, 2020.   (Doc. 11, 12)    The motion to dismiss was heard and denied on March 22, 2022, and a number of paragraphs ordered stricken.    (Doc. 38) Plaintiffs filed a First Amended Complaint on April 22, 2022 (Doc 40), and Dometic filed their Answer on May 6, 2022 (Deoc. 42).

Plaintiffs' propounded written discovery to Dometic in April and October, 2021.[4] Dometic responded to the original round of discovery[5], but refused to provide substantive responses to some discovery requests on the grounds that a protective order had not yet been entered in the case.    A stipulated protective order was entered August 9, 2021 (Doc. 35)    Dometic thereafter served additional discovery responses, including further document production, on November 3, 2021 and November 11, 2021.[6]

---

[2]    See, generally, First Amended Complaint (FAC), ECF No. 40, at ¶¶ 22 - 34; 50 - 60; 66 - 106.    Dometic's attempt to obtain dismissal of the fraud and punitive damage claims were denied.   See, ECF No. 38.
[3]    See, generally, Dometic's Answer (Doc. 42), at ¶¶ 9; 23; 26; 28 - 29; 32 - 37; 46 - 49; 73.
[4]    Interrogatories, Set No. 1 (4/7/21); Requests for Production of Documents (RFPs), Set No. 1 (4/1/21); RFP, Set No. 2 (4/4/21); and RFP No. 3 (10/4/21).
[5]    Dometic served Objections and Responses to the First Set of Interrogatories, and to the First and Second Sets of RFPs on May 21, 2021.
[6]    Dometic served Supplemental Responses to the First Set of RFPs, and Responses to

Plaintiffs noticed a 30(b)(6) deposition of Dometic on April 27, 2022, limited to 12 documents produced by Dometic in discovery, including the material produced on November 3 and 11, 2021.    Dometic refused to go forward with the deposition, and served written objections on May 12, 2022.

On April 29, 2022, plaintiffs filed a Notice of Hearing regarding Dometic's responses to plaintiffs' Interrogatories, Set No. 1, and Requests for Production of Documents, Sets 1 - 3.    (Doc. 41)    Plaintiffs rescheduled the hearing date from June 8th to July 13th.   (Doc. 43)   On May 24, 2022, Dometic filed a motion for administrative relief to move the July 13th hearing date.    (Doc. 44)    Dometic's motion was granted and the parties stipulated to move the hearing date to July 20, 2022.    Plaintiffs filed a Stipulated Second Amended Notice of Motion reflecting the new hearing date on June 2, 2022, and adding Dometic's objections to proceeding with the 30(b)(6) deposition as an issue in dispute. (Doc. 47).

There is currently no Scheduling Order in place.

## B.    DOMETIC'S PROCEDURAL HISTORY

The history and background of this and other related litigations is critical to understanding the context for the present discovery disputes. This case does not exist in a vacuum. Over six years ago, Plaintiffs' counsel brought suit against Dometic in the Northern District of California raising virtually identical allegations on behalf of a nationwide and California putative class that included the Plaintiffs in this case— along with millions of other putative class members dating back to 1997. *See Papasan et al. v. Dometic Corp.*, Case No. 1:16-cv-02117 (N.D. Cal.). After various rulings in other related class actions,[7] this case was transferred to the Southern District of Florida as part of a

---

the Third Set of RFPs on November 3, 2021.    Dometic also provided a further document production on November 11, 2021.
[7] This included a summary judgment decision finding that the plaintiffs' experts had not presented sufficient evidence of a common defect. *See Varner et al. v. Dometic*

consolidated class action. A consolidated class action was then filed by Plaintiffs' counsel, again on behalf of a putative nationwide and California class that included the Plaintiffs in this case as well as millions of other putative class members dating back to 1997. *See Papasan et al. v. Dometic Corp.*, Case No. 1:17-cv-22482 (S.D. Fla.). The complaint in *Papasan* raised (nearly verbatim) the same allegations as are alleged in this individual products liability case. *See* Ex. 1[8]  (*Papasan* Consolidated Complaint).

Extensive discovery, both class and merits, proceeded in the *Papasan* action. Given the size and scope of the putative class and the amount at issue, Dometic willingly produced over 400,000 documents related to Dometic-branded gas absorption refrigerators dating back to 1997. Dozens of depositions took place. Numerous expert reports were disclosed. And several discovery disputes arose, including as to Dometic's privilege assertions over documents that Plaintiffs' counsel is again pursuing in this litigation.

Following the close of discovery in *Papasan*, Plaintiffs' counsel sought certification of a California class that included the Plaintiffs in this case. Plaintiffs' counsel also disclosed a lengthy expert report on behalf of the putative class members asserting that all Dometic-branded refrigerators suffered from an allegedly common design defect. *See* Ex. 2 (Jan. 28, 2019 Amended Expert Report of AEGI ("AEGI Report")). The allegations contained in the AEGI Expert Report are repeated verbatim in the operative complaint in this action.[9]  AEGI also acted as the Plaintiffs' expert in this case thus far and conducted

---

*Corp.*, Case No. 1:16-cv-22482 (S.D. Fla.) [ECF No. 219].

[8] Plaintiffs' Exhibits referenced in this Joint Statement and attached hereto are marked Exhibits A – H, inclusive. Dometic's Exhibits referenced herein and attached hereto are marked with Arabic numerals 1–17.

[9] *Compare* Ex. 2 (AEGI Expert Report) § I.D.1 ("The heating and cooling cycles are managed through electronic controllers … . [T]he metal components of the boiler tube assembly—the heater pockets, welds, and boiler tubing—expand and contract at different rates due to temperature differences, introducing cyclic stress into the assembly."), *with* Pls.' Am. Compl. ¶ 25 ("The heating and cooling cycles are managed through electronic controllers … . [T]he metals of each component of the boiler tube assembly - the heater pockets, welds, and boiler tubing - expand and contract at different rates, introducing cyclic stress into the assembly.").

1    the examination referenced in the Complaint. *See* Complaint ¶¶ 59-60. Following it

2    submission, Dometic moved to exclude the AEGI Expert Report as unreliable under

3    *Daubert*. Dometic also opposed class certification, presenting expert testimony from both

4    a statistician and an engineer establishing that the refrigerators at issue were not common

5    and did not suffer from any common defect. A 2-day live evidentiary *Daubert* hearing was

6    held, during which time Plaintiffs' counsel defended the AEGI experts. Following the

7    hearing, the magistrate judge found that the AEGI experts had not employed a reliable

8    methodology, and she determined that their testimony should be excluded under *Daubert*.

9    *See* Ex. 3 (*Papasan* Feb. 2, 2022 Order on *Daubert* Mtn. [DE 553]). The magistrate judge

10   also concluded that Dometic's statistician (whom the plaintiffs had moved to exclude) did

11   employ a reliable methodology and she therefore denied the plaintiffs' *Daubert* motion in

12   that regard. *See Papasan*, ECF. No. 559.

13          The *Papasan* plaintiffs then appealed the magistrate judge's decision to the district

14   court. After considering their arguments, the district court issued a decision agreeing with

15   the magistrate judge. The district court found that—after years of discovery and the

16   production of hundreds of thousands of documents related to Dometic-branded

17   refrigerators over a more than two-decade period—plaintiffs' expert had not presented any

18   reliable or admissible evidence of a common defect. *See* Ex. 4 (*Papasan*, Apr. 26, 2022

19   Order on Pls.' Objections to *Daubert* Order [DE 560]). In reaching that conclusion, the

20   district court independently observed that the AEGI experts never sought to validate their

21   hypothesis of a common defect and failed to conduct any relevant or reliable testing. *Id*. at

22   3–4. Instead, the AEGI experts relied on "broad principles of engineering" and employed

23   a method of "backtracking," which does not "comport with the scientific method." Ex. 3

24   (*Papasan* Feb. 2, 2022 Order on *Daubert* Mtn. [DE 553]) at p. 4, 6–7.

25          Plaintiffs in this case—who are represented by the same counsel as in *Papasan* and

26   who are members of the same putative class as in *Papasan*—now contend that they should

27

28

be entitled to all the same discovery *and more* that was produced in a class action brought on behalf of millions of consumers. They claim they are entitled to all this discovery because (as alleged in *Papasan*) every single Dometic-branded refrigerator made since 1997 shares an identical design defect. Ironically, however, the discovery they seek is largely the same discovery their counsel has already had for years but that was patently insufficient to establish the same alleged common defect. While Plaintiffs may not be precluded from relitigating the issues decided in *Papasan* (given that a class has never been certified), they should not be permitted to access the same broad swath of discovery in asserting a single products liability claim against Dometic. That is especially so because their counsel—who was acting on their behalf—was already unsuccessful in establishing a common defect based on that same discovery.

Dometic acknowledges that the burden of re-producing documents already produced in the *Papasan* action is minimal. However, requiring Dometic to reproduce this discovery establishes a dangerous precedent both here and elsewhere when both all-purchaser class actions and single product liability claims are pending. Indeed, under the theories espoused by Plaintiffs, a single plaintiff can pursue a single claim against a defendant and yet be entitled to the exact same volume of discovery that is appropriate in a nationwide class action asserting a common design defect. Moreover, discovery in the class action was produced in 2018 and requiring Dometic to go back, search for and produce those same broad categories of discovery from the past 4 years would be incredibly burdensome and wholly disproportionate to the needs of this single case.

## IV.      ATTORNEY CONFERENCE RE: DISCOVERY DISPUTE

**April 27, 2022** – Plaintiffs' counsel serves a Notice of 30(b)(6) Deposition on Dometic. The notice stated that the deposition would occur on May 16, 2022 and demanded that Dometic designate a witness to testify on its behalf and produce certain documents.

**April 28, 2022 -** Dometic objects to the "unilateral" setting of Dometic's 30(b)(6) deposition for May 16, 2022 and requests that Plaintiffs' counsel work with Dometic's counsel to find a mutually convenient date for both parties.     Plaintiffs' counsel agreed..[10]

**May 9, 2022** - telephonic meet and confer between counsel for the parties regarding the Notice of Hearing re Discovery Disagreement (Doc. 41), filed April 29, 2022, and the 30(b)(6) deposition notice plaintiffs served on April 27, 2022, and noticed for May 16, 2022.     The parties discussed the scope of the discovery at issue, and the draft of the Joint Statement plaintiffs' counsel was working on.     Dometic's counsel advised that they intended to file an objection to the 30(b)(6) deposition, and would be providing written objections at a later date.     Dometic's counsel proposed that plaintiffs agree to use a deposition from prior litigation in lieu of the 30(b)(6) deposition noticed. Plaintiffs counsel agreed to consider the proposal, but rejected it the next day. Plaintiffs' counsel suggested that the parties agree that all depositions from prior litigation be deemed produced and used in the present case.     Dometic did not agree. The parties discussed the issue of the difference between the serial number used to describe the refrigerator in the discovery requests (the "wrong" serial number), with the serial number used to identify the refrigerator in the First Amended Complaint (FAC) (the "correct" serial number).     Plaintiffs requested that Dometic provide supplemental discovery responses based on the "correct" serial number.     Because the "wrong" serial number was included in a defined term ("REFRIGERATOR") that affected other defined terms and discovery requests utilizing those defined terms, Dometic countered and instead requested that Plaintiffs reissue their discovery requests with defined terms using the "correct" serial number.     Plaintiffs thereafter re-served the discovery requests

---

[10]    See, Ex. A-1 - A-2.

1  affected by the serial number issue (Interogs, Set 2; RFP, Set 4) the next day.[11]

2      **May 10 - 24, 2022** - counsel for the parties exchange almost daily emails

3  regarding the 30(b)(6) deposition and Dometic's objections thereto; plaintiffs' draft Joint

4  Statement; the schedule for serving the objections and Dometic's input into the Joint

5  Statement; and the hearing date for the discovery dispute.[12]

6      **May 26, 2022** - counsel for the parties conduct another meet and confer session by

7  way of Zoom.      The parties discuss and Dometic agrees to the withdrawal of all but one

8  of the General Objections asserted to plaintiffs' discovery.[13]      The parties also agreed

9  that Dometic would withdraw three of their objections to the definitions used in

10  plaintiffs' discovery, and that Dometic would produce - without condition - further

11  documents and deposition transcripts from other litigation, subject to the protective order

12  in the present action.      The parties also discussed other ways to reorganize the draft

13  Joint Statement to make it less cumbersome, and further agreed to the general categories

14  to be addressed in the Joint Statement.      The parties also discussed the fact that

15  plaintiffs' moved the hearing on the discovery dispute from June 8th to July 13th;

16  Dometic's motion for administrative relief, filed May 24, 2022 (Doc. 44, 45); the fact that

17  plaintiffs would oppose the motion; and the fact that, regardless of the outcome of the

18  motion, the parties would have more time to work on the Joint Motion based on the new

19  hearing date.[14]

20      **June 1, 2022** - the Court granted Dometic's motion for administrative relief and

21  directed the parties to meet and confer on a new hearing date for the discovery motion.

22  (Doc. 47)      The parties agreed to July 20, 2022 for the new hearing date, and plaintiffs

23  _____

24      [11]    See, Ex. A-3 - A-7.
         [12]    See, Ex. A-8 - A-19.

25      13 Concerning Interrogatories, Dometic agreed to withdraw all but two of the
    General Objections. General Objection 1 was determined necessary after Plaintiffs'
    counsel reasserts the right to propound more than 25 interrogatories on Dometic.

26      [14]    See, Ex. A-20 - A-24.

27

28

1  filed a Stipulated Second Amended Notice of Motion reflecting the new hearing date on

2  June 2, 2022 (Doc. 48).

3          **June 9, 2022** - Dometic produces 69 additional documents in response to

4  plaintiffs' RFP 1, along with their responses to Plaintiffs' RFP, set No. 4.      The

5  additional material includes documents and deposition transcripts from other Dometic

6  refrigerator fire litigation, pursuant to the agreement of the parties during their May 26,

7  2022 meet and confer.[15]

8          **June 10, 2022** - Dometic serves supplemental responses to Plaintiffs' First Set of

9  Interrogatories. Plaintiffs' counsel alerts Dometic's counsel to the fact that all 5,497

10 pages of material produced the day before is stamped "Confidential", notwithstanding the

11 stipulated protective order entered in the case precluded "mass, indiscriminate

12 confidentiality designations", and many of the documents were not designated

13 confidential in the first place when produced in other litigation.      Dometic's counsel

14 promised to look into the situation, correct any inadvertant errors, and re-produce those

15 documents that had been mistakenly designated confidential.[16]  Dometic's counsel

16 subsequently confirmed that the June 9, 2022 production had been inadvertently marked

17 "Confidential" and stated that Dometic would make the production again with proper

18 designations.

19                          **V.      LEGAL STANDARD**

20 **A.    PLAINTIFFS' LEGAL STANDARD**

21          "The purpose of discovery is to provide a mechanism for making relevant

22 information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes,

23 1983 Amendment.      Fed. R. Civ. P. 26 provides in relevant part as follows:

24          "Parties may obtain discovery regarding any nonprivileged matter that is
            relevant to any party's claim or defense and proportional to the needs of the
            case, considering the importance of the issues at stake in the action, the

25

26      [15]   See, Ex. A-25.
        [16]   See, Ex. A-26 - A-27.

27

1

amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable."

2

3

4   The scope of discovery includes "...the existence, description, nature, custody, condition,

5   and location of any books, documents, or other tangible things and the identity and

6   location of persons having knowledge of any discoverable matter." .      Fed. R. Civ. Proc.

7   26(a)(1).

8         ""Relevance for purposes of discovery is defined very broadly.""      *Duncan v.*

9   *Primerica Life Ins. Co.*, 2:21-CV-1106-JAM-DMC, at *2 (E.D. Cal. Mar. 23, 2022)*,

10   citing   *Garneau v. City of Seattle*, 147 F.3d 802, 812 (9th Cir. 1998).      "Information is

11   relevant to the subject matter if it might reasonably assist a party in evaluating the case,

12   preparing for trial or facilitating settlement."   *Hickman v. Taylor*, 329 U.S. 495,

13   506-507 (1947)   Importantly, however, "Information within this scope of discovery

14   need not be admissible in evidence to be discoverable ." Fed.R.Civ.P. 26(b)(1).

15   "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than

16   it would be without the evidence; and (b) the fact is of consequence in determining the

17   action." Fed.R.Evid. 401.   *D.M. v. Cnty. of Merced*, 1:20-cv-00409-JLT-SAB, at *3

18   (E.D. Cal. May 4, 2022).

19         The concept of "proportionality" is not new, but has been part of Rule 26 since at

20   least 1983.      In the 2015 Amendments to Rule 26, the proportionality language of Rule

21   26(b)(2)(C)(iii) was moved to Rule 26(b)(1).      As the Committee Notes to the 2015

22   Amendments make clear, "Restoring the proportionality calculation to Rule 26(b)(1) does

23   not change the existing responsibilities of the court and the parties to consider

24   proportionality, and the change "...does not place on the party seeking discovery the

25   burden of addressing all proportionality considerations..." nor does it "...permit the

26   opposing party to refuse discovery simply by making a boilerplate objection that it is not

27

28

proportional...".

"The scope of discovery under the Federal Rules is extremely broad," and "the question of relevancy should be construed 'liberally and with common sense' and discovery should be allowed unless the information sought has no conceivable bearing on the case." *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995) (quoting *Miller v. Pancucci,* 141 F.R.D. 292, 296 (C.D. Cal. 1992)).    While the party seeking discovery has the burden to establish its relevancy and proportionality , the party objecting has the burden of showing the discovery should not be allowed and doing so through "clarifying, explaining and supporting its objections with competent evidence.*"* *Wilson v. Decibels of Or., Inc*., No. 1:16-cv-00855-CL, at \*4 (D. Or. May 9, 2017) , citing *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (internal citations omitted).

Fed. R. Civ. P. 33 governs interrogatories and provides in relevant part as follows: "[e]ach interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable." Further, all objections "must be stated with specificity."

Fed. R. Civ. P. 34 governs requests for production and responses thereto, and provides in relevant part as follows: "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Further, "[a]n objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest."

## B.    DOMETIC'S LEGAL STANDARD

In accordance with the 2015 amendments to the Federal Rules of Civil Procedure,

the scope of discovery is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense *and proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1) (emphasis added). "The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1)." *Bryant v. Ochoa*, No. 07-cv-200-JM, 2009 WL 1390794, at *1 (S.D. Cal. May 14, 2009) (internal citation omitted). However, relevance has its "ultimate and necessary boundaries." *Hall v. Marriott Int'l, Inc.*, No. 319CV01715JLSAHG, 2021 WL 1906464, at *4 (S.D. Cal. May 12, 2021). Under the 2015 amendments to the scope of discovery, it is clear that "not all relevant information must be discovered." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617 LHK (NC), 2016 WL 11505231, at *1 (N.D. Cal. Apr. 8, 2016). Specifically, "a party seeking discovery of relevant, non-privileged information must now show, before anything else, that the discovery sought is proportional to the needs of the case." *Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 13–04057–BLF, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016). If the court determines "the proposed discovery is outside the scope permitted by Rule 26(b)(1)," the court must limit the frequency and extent of the discovery. Fed. R. Civ. P. 26(b)(2)(C).

## VI.    DISCOVERY ISSUES IN DISPUTE

The parties have a dispute over Dometic's objections/responses to the following discovery:

    1).    Plaintiffs' Interrogatories, Set No. 1;[17]

---

[17]    Interrogatory Nos. 2 - 13; 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45.

2).     Plaintiffs' Requests for Production, Set No. 1;[18]

3).     Plaintiffs' Requests for Production, Set No. 2;[19]

4).     Plaintiffs' Requests for Production, Set No. 3;[20]

5).     Plaintiffs' 30(b)(6) deposition of Dometic.

The discovery requests, and Dometic's objections, responses and supplemental responses, along with the positions of each side regarding the particular discovery request at issue, are set forth verbatim in Vol. II of this Joint Statement.      However, there are a number of common issues that are intertwined throughout the discovery that can best be understood by separating them into the following categories.

## A.     GENERAL OBJECTIONS - INTERROGATORIES, SET NO. 1[21]

Dometic asserted the following General Objections to each Interrogatory at issue:

Defendant asserts the following General Objections to the Requests, which are incorporated by reference in each specific answer as though set forth fully therein:

9. Dometic objects to each and every Interrogatory to the extent that the Interrogatories themselves, the definitions, and the instructions set forth therein seek to impose obligations upon Dometic beyond the requirements of the Federal Rules of Civil Procedure, the Local Rules of this Court and any other applicable law, rules or statutes.

## REASONS TO OVERRULE DOMETIC'S GENERAL OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES:

Parties must engage in discovery in good faith, without gamesmanship.      See, *Bruner v. City of Phx.*, No. CV-18-00664-PHX-DJH, at *17 (D. Ariz. Feb. 4, 2020)

---

[18]    RFP Nos. 1, 5, 6, 7, 10, 11, 15 - 20, 22 - 36, 38 - 46, 48 - 61.
[19]    RFP No. 62.
[20]    RFP Nos. 63, 64.
[21]    Dometic initially asserted 14 General Objections to plaintiffs' interrogatories, but agreed during the meet and confer process to withdraw all of them, with the exception of General Objection No. 9.    Dometic asserts similar general objections to each of plaintiffs' requests for production at issue herein, and plaintiffs' request that those general objections be overruled as well.

[parties and attorneys both have obligation under Rule 26(g) to "pause and consider the reasonableness of [their] . . . response" or their "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37."    Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment. See, also *Mills v. East Gulf Coal Preparation Co., LLC*, 259 F.R.D. 118, 130 (S.D. W. Va. 2009) ("The civil discovery process is to be engaged in cooperatively."); *Wagner v. St. Paul Fire & Marine Ins. Co*., 238 F.R.D. 418, 422 (N.D. W. Va. 2006) (observing that "[g]amesmanship" in discovery "is not allowed").    Accordingly, parties must respond with specificity to discovery requests, including by making particularized objections. *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002) ["The party who resists discovery has the burden to show that discovery should not be allowed , and has the burden of clarifying, explaining, and supporting its objections ." citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)].    Such a burden is not met by relying on "boilerplate , generalized, conclusory, or speculative arguments.*"    F.T.C. v. AMG Servs., Inc*., 291 F.R.D. 544, 553 (D. Nev. 2013);    *EnvTech, Inc. v. Suchard*, 2013 U.S. Dist. LEXIS, 2013 WL 4899085, at 4 (D. Nev. Sept. 11, 2013);    see also *Aevoe Corp. v. AE Tech Co.*, 2013 U.S. Dist. LEXIS 124591, at *2 (D. Nev. Aug. 30, 2013). Arguments against discovery must be supported by "specific examples and articulated reasoning. *Bendure v. Star Targets, Justin Hardy, TLD Indus. LLC*, CV 14-89-BLG-SPW-CSO, at *9 (D. Mont. Dec. 9, 2015); see also, *Covad Communications Co. v. Revonet, Inc.*, 258 F.R.D. 17, 19 (D. D.C. 2009) (answers to discovery must be "true, explicit, responsive, complete, and candid");    *United States EEOC v. Caesaers Ent., Inc*.237 F.R.D. 428, 432 (D. Nev. 2006).    Boilerplate objections are therefore disfavored and may be summarily overruled by the Court.    *Brookins v. Acosta*, 1:19-cv-00401-JLT-HBK, at

1 | *1 (E.D. Cal. Apr. 5, 2022).[22]

2 |     Here, Dometic has made no meaningful effort to demonstrate the application of

3 | their one remaining General Objection to any particular interrogatory, and the objection

4 | is  therefore of no consequence and should be overruled in its entirety, and not

5 | incorporated into any specific discovery response to Plaintiffs' First Set of

6 | Interrogatories.

7 | **Dometic's Position on Discovery Issue:**

8 |     Dometic's general objections should not be overruled. Plaintiffs' argument to the

9 | contrary is premised entirely on their assertion that Dometic's objections are "boilerplate."

10 | For the reasons discussed below, this is simply not the case. *See* Joint Statement, Vol. 1,

11 | Sec. VI(E). In any event, Dometic's objection to any Interrogatory, definition, or

12 | instruction that violates or exceeds the applicable rules is not boilerplate. To the contrary,

13 | that objection is necessitated by the issues that pervade Plaintiffs' Interrogatories, including

14 | Plaintiffs' definition of "DOCUMENT," which is defined with reference to what that term

15 | "includes, but is not limited to[.]" *See* Plaintiffs' First Set of Interrogatories, Definitions ¶

16 | 2. Dometic lodged this objection to preserve what it considers to be an obvious position:

17 | that discovery requests issued by Plaintiff may not violate the rules of the Court.

18 | **B.    OBJECTIONS TO DEFINITIONS - INTERROGATORIES, SET NO. 1[23]**

19 |     Plaintiffs incorporated the following definitions into their First Set of

20 | Interrogatories relevant to the current Discovery Disagreement between the parties:

21 |     12.   "REFRIGERATOR"   refers to the Model RM 2652
Dometic-branded gas absorption refrigerator, Serial Number 24503181,

22 | designed, manufactured, sold, distributed or otherwise placed into the

---

23 | [22]    For an eloquent denunciation of the use of general objections, see *Smash Tech. vs.*

24 | *Smash Sols.* 2:19-cv-00105-TC-JCB(Ut. June 30, 2020).
[23]    Dometic initially asserted 11 General Objections to the Definitions plaintiffs used in

25 | their interrogatories, but agreed during the meet and confer process to withdraw Objections 1, 2
and 10.   Dometic asserts similar general objections to the same definitions in their response to

26 | each of plaintiffs' document production requests at issue herein, and plaintiffs request that those
general objections be overruled as well.

27 |

28 |
**JOINT STATEMENT RE: DISCOVERY DISAGREEMENT, Vol. 1   (Local Rule 251)**
**Labbe'/Tomczak vs. Dometic Corporation, et al.**
**No.: 2:20-cv-01975-KJM-DMC**

stream of commerce by Dometic, and installed as original equipment in the RV.

19.    "INCIDENT LOG", as used in these discovery requests, refers to the document(s) and/or electronic databases maintained and updated by DOMETIC of all incidents and/or claims involving Dometic-branded gas absorption refrigerators, including, but not limited to, claims alleging that a Dometic-branded gas absorption refrigerator    was the origin and/or cause of a fire.

20.     "INCIDENT FILES", as used in these discovery requests, refers to the paper files and/or electronic databases DOMETIC opens, creates, maintains and updates regarding INCIDENT LOG entries.

21.     "DOMETIC-BRANDED GAS ABSORPTION REFRIGERATORS" or "DGAR"    refers to Dometic-branded gas absorption refrigerators designed, manufactured, sold, distributed or otherwise placed into the stream of commerce since January 1, 1997, including, but not limited to, Models RM 2620, RM/DM 2652, RM/DM 2662, RM/DM 2663, RM 3762, DMR/DMC 7-Series, RM 2820, DM 2852, DM 2862, RM 3862, RM 3863, RM 3962.

22.     "DGAR    DATA" refers to information collected by YOU regarding the design, manufacture, assembly, sales, marketing, performance, FIRE CLAIMS HISTORY, PRODUCTION RUN TEST RESULTS, POST PRODUCTION TEST RESULTS, failure, defects, product safety recalls and retrofit campaigns of DGARs and COOLING UNITS between January 1, 1997 and the date of YOUR responses to these Requests

23.     "FIRE CLAIMS HISTORY", as used in these discovery requests, refers to claims received by DOMETIC, either directly or indirectly, and regardless of whether the claim is in the form of an insurance demand, warranty claim, consumer complaint or any other form, wherein a DGAR and/or COOLING UNIT is alleged to be involved in or the cause of a fire resulting in property damage and/or bodily injury.

24.     "PRODUCTION RUN TEST RESULTS", as used in these discovery requests, refers to any testing or inspection of DGARs, including COOLING UNITS, during manufacture, including, but not limited to, pressure tests, frost tests, electrical tests, mass spectrometer tests, and further including DOMETIC's practice of recording the test results by refrigerator or COOLING UNIT serial number.

25.     "POST PRODUCTION TEST RESULTS", as used in these discovery requests, refers to any testing, by DOMETIC or at DOMETIC's direction, of DGARs and/or COOLING UNITS after they are manufactured, or components thereof, and DOMETIC's recording of test results, including, but not limited to, life cycle testing, reliability testing, high ambient performance testing, stress testing, and failure testing, and further including, but not limited to, computer modeling, simulation, finite element analysis (FEA) and other computer tests and/or analysis, including, but not limited to, all tests conducted by or in conjunction with outside

17

entities and/or consultants, including, but not limited to, Anram Asher, R. Craig Jerner, J.E.I Mettalurgical, Inc., Elizabeth Bus and/or Jaime Petty-Galis.

Dometic asserted the following objections to the above definitions:

3.      Defendant objects to the definition of "Incident Log" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

4.      Defendant objects to the definition of "Incident Files" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

5.      Defendant objects to the definition of "Dometic-Branded Gas Absorption Refrigerators" or "DGAR" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

6.      Defendant objects to the definition of "DGAR Data" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

7.      Defendant objects to the definition of "Fire Claims History" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

8.      Defendant objects to the definition of "Production Run Test Results" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

9.      Defendant objects to the definition of "Post Production Test Results" as vague, ambiguous, overbroad, unduly burdensome, unintelligible, and oppressive.

## REASONS TO OVERRULE DOMETIC'S OBJECTIONS TO DEFINITIONS IN PLAINTIFFS' FIRST SET OF INTERROGATORIES:

Dometic's objections to the above definitions consist entirely of boilerplate recitations of the usual "vague, ambiguous, burdensome, oppressive" variety, and are therefore invalid.      See,   *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002) ["The party who resists discovery has the burden to show that discovery should not be allowed , and has the burden of clarifying, explaining, and supporting its objections ." citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)].      Such a burden

1   is not met by relying on "boilerplate , generalized, conclusory, or speculative

2   arguments*." F.T.C. v. AMG Servs., Inc.*, 291 F.R.D. 544, 553 (D. Nev. 2013);

3   *EnvTech, Inc. v. Suchard*, 2013 U.S. Dist. LEXIS, 2013 WL 4899085, at 4 (D. Nev. Sept.

4   11, 2013);   see also *Aevoe Corp. v. AE Tech Co.*, 2013 U.S. Dist. LEXIS 124591, at *2

5   (D. Nev. Aug. 30, 2013). Arguments against discovery must be supported by "specific

6   examples and articulated reasoning." *United States EEOC v. Caesaers Ent., Inc*.237

7   F.R.D. 428, 432 (D. Nev. 2006).     Boilerplate objections are therefore disfavored and

8   may be summarily overruled by the Court.     *Brookins v. Acosta*,

9   1:19-cv-00401-JLT-HBK, at *1 (E.D. Cal. Apr. 5, 2022).

10       The objections further border on sanctionable misconduct, in that they ignore the

11   fact that the definitions at issue are clearly understood in reference to the allegations of

12   the complaint (e.g. INCIDENT LOG and INCIDENT FILES described in detail at ECF

13   No. 1-2, pages 25 - 27, ¶¶ 37, 38; Dometic Branded Gas Absorption Refrigerators,

14   DGARs and DGAR Data described in detail at ECF No. 1-2, page 17, ¶¶ 25, 26; pages 28

15   - 31, ¶¶ 39 - 47).

16       Plaintiffs' use of definitions in their discovery requests are clearly intended and

17   designed to make the requests more specific and understandable - not less.     Rather than

18   accept the definitions in a commonsense manner, and meet its obligation to exercise

19   restrain in making objections that are proportional to the needs of the case[24], Dometic

---

[24]     Rule 26 provides that "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26 advisory committee notes (2015 amendments). Thus, there is "a shared responsibility on all the parties to consider the factors     bearing on proportionality before propounding discovery requests, ***issuing responses and objections***, or raising discovery disputes before the courts." *Salazar v. McDonald's Corp.,* 2016 WL 736213, at *2 (N.D. Cal. Feb. 25, 2016) (emphasis added); *Goes Int'l, AB v. Dodur Ltd.*, 2016 WL 427369, at *4 (N.D. Cal. Feb. 4, 2016) (citing advisory committee notes for proposition that parties share a "collective responsibility" to consider proportionality and requiring that "[b]oth parties . . . tailor their efforts to the needs of th[e] case").

1  has instead chosen to engage in a ludicrously tortured exercise of feigned ignorance in

2  order to assert meritless objections to confuse and complicate the discovery process.

3  Nowhere in this barrage of boilerplate objections is there any claim that Dometic can't

4  decipher what the various Definitions mean. Rather, Dometic is asserting these meritless

5  objections in an effort to avoid responding to legitimate discovery, and drive up the cost

6  and complexity for the plaintiffs in the bargain.      This conduct is not only in direct

7  violation of Fed. R. Civ. P. 1, but is the kind of "gamesmanship" that the parties are

8  supposed to avoid.

9      Dometic's objections to the Definitions in plaintiffs' interrogatories and document

10  production requests should be overruled in their entirety, and not incorporated into any

11  discovery response.

12  **Dometic's Position on Discovery Issue:**

13      Dometic's definitional objections should not be overruled. Like Plaintiffs' argument

14  concerning Dometic's general objections discussed above, Plaintiffs' argument here is

15  premised entirely on their assertion that Dometic's definitional objections are

16  "boilerplate." Here again, this is simply not the case. *See* Joint Statement, Vol. 1, Sec.

17  VI(E).

18      Plaintiffs' claims that Dometic is engaging in "a ludicrously tortured exercise of

19  feigned ignorance" and that Dometic's objections "border on sanctionable misconduct" are

20  similarly mislaid and patently intended to be inflammatory. Indeed, Plaintiffs' argument

21  that their definitions of the terms "INCIDENT LOG," "INCIDENT FILES," and "DGAR"

22  can be understood by reference to the Complaint is simply not true. First, none of those

23  terms appear in either the Complaint or the Amended Complaint. Even if they did,

24  Plaintiffs intentionally employ overbroad definitions for those terms in an effort to force

25  Dometic to either make a concession or lodge an objection. For example, despite the fact

26  that this case involves the causation of a single fire allegedly arising in a single refrigerator,

27

28

1  Plaintiffs define "DGAR" to include all Dometic refrigerators designed, manufactured,

2  sold, distributed, or otherwise placed into the stream of commerce in the last twenty-five

3  years, including some refrigerators neither made nor sold by Dometic. Dometic properly

4  objected to these terms on the grounds that those refrigerators are irrelevant to Plaintiffs'

5  claims and, in any case, are not properly referred to as "Dometic's" refrigerators.

6  **C.   WITNESSES**

7  **Plaintiff's Position on Discovery Issue:**    The identity of witnesses likely to have

8  knowledge of discoverable information is always relevant.    Fed. R. Civ. P.

9  26(a)(1)(A)(I).    See, also,    *Ross v. The Superior Court*, No. D079278, at *22 (Cal.

10 Ct. App. Apr. 19, 2022) [one valid purpose of discovery is to "obtain[ ] the identity and

11 location of persons having knowledge of any discoverable matter." (Code Civ. Proc, §

12 2017.010; see *Gonzalez v. Superior Court* (1995) 33 Cal.App.4th 1539, 1546 ["the

13 identity of witnesses must be disclosed if the witness has 'knowledge of any discoverable

14 matter,' including fact, opinion and any information regarding the credibility of a witness

15 (including bias and other grounds for impeachment)"].)

16     Here, plaintiffs seek. discovery that would reveal the identity of a variety of

17 witnesses with knowledge relevant to the claims and defenses of the parties, including

18 corporate witnesses[25], other victims of fires involving Dometic gas absorption

19 refrigerators[26], and witnesses with knowledge of Dometic's two recalls of their defective

20 gas absorption refrigerators[27].   Plaintiffs are alleging that Dometic is not only

21 responsible for placing dangerously defective gas absorption refrigerators into the stream

22 of commerce, but that Dometic concealed the defects from federal regulators and

23 consumers, including the plaintiffs.[28]    Dometic is a corporation, and cannot act except

---

[25]    See, e.g. Interrogtory No. 2; RFP No 1.
[26]    See, e.g. Interrogatories 3 - 9; RFPs 16 - 20.
[27]    See, e.g. RFPs 25 - 30; 32 - 53.
[28]    See, generally, ECF No. 40, at ¶¶ 46 - 49.

through their officers, directors and shareholders.    The identity of those individuals is therefore relevant to discover the person or persons responsible for directing Dometic's actions.    The identity of officers and directors is also relevant to establish that Dometic authorized, ratified, directed, condoned the actions of other Dometic employees and/or agents in misrepresenting/concealing safety-related defects and risks in Dometic-branded gas absorption refrigerators, which is in turn relevant to plaintiffs' punitive damage claims.   See, *White v. Ultramar, Inc.*, 21 Cal.4th 563, 572 (1999) (quoting Cal . Civ. Code § 3294(b)) - [to establish corporate punitive damages liability , the plaintiff must prove "the wrongful act giving rise to the exemplary damages [were] committed by an 'officer, director, or managing agent.'"].

Plaintiffs' discovery seeks the identity of Dometic officers, directors and managing agents responsible for the various facets of Dometic gas absorption refrigerators, i.e. the design, manufacture, sale, importation, resale, distribution, failure, recall, retrofit, etc.[29]    This discovery is relevant, proportional, and therefore discoverable.

**Dometic's Position on Discovery Issue**:

Plaintiffs seek far more than "the identity of Dometic officers, directors and managing agents responsible for the various facets of Dometic gas absorption refrigerators." Indeed, Plaintiffs have asked Dometic to "IDENTIFY"[30] every single one of its officers, directors, and shareholders from 2001 to the present without any limitation relating to responsibility "for the various facets of" Dometic's refrigerators." *See* Plaintiffs'

---

[29]    See, e.g. Interrogatory No. 2.
[30]    Plaintiffs define "IDENTIFY" to mean providing a person's "name, employer, job title, current business address and telephone number" and an entity's "name, form of business organization (sole proprietorship, partnership, corporation , LLC, etc.), state of incorporation, location of current headquarters or principal place of business, and current business address and telephone number." *See* Plaintiffs' First Set of Interrogatories, Definitions ¶ 7.

First Set of Interrogatories, Interrogatory No. 2; *see also* Plaintiffs' First Request for Production of Documents, RFP No. 1 (requesting "All DOCUMENTS which identify the current owners and shareholders of DOMETIC"). [31] In other words, Plaintiffs seek information concerning the identity of all of Dometic's "officers, directors and shareholders"—regardless of whether they have personal knowledge—during the course of a twenty year period of time. The identity of all of Dometic's officers, directors, and shareholders over a two decade period has nothing to do with Plaintiffs' claims.

This issue is further compounded by the fact that Dometic is a wholly owned subsidiary of Dometic Holding AB, which is a wholly owned subsidiary of Dometic Group AB (publ), a publicly owned company with over 300 million shares of stock outstanding that is traded through the Nasdaq Exchange of Stockholm Sweden. *See* Dometic's Rule 7.1 Corporate Disclosures [ECF No. 4]. The identity of each person or entity that is or has been a shareholder of Dometic since 2001 clearly has no bearing on the claims or defenses in this individual case, and bears little to no proportionality to the needs of the case. Dometic did not even produce this information in the *Papasan* class action.

With respect to Dometic's officers and directors, the apex deposition doctrine bars Plaintiffs from taking the deposition of Dometic's high-ranking officers and directors, especially where those individuals have little or no knowledge of the specific claims made by a plaintiff. *See Cannavan v. Cnty. of Ventura*, No. CV2010012, 2021 WL 4945186, at *6 (C.D. Cal. July 16, 2021) (quoting *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012)). This protection applies even after a company's executives leave office. *Id.* (citing *Sargent v. City of Seattle*, No. C12-1232, 2013 WL 1898213 at *3 n.2 (W.D. Wash. May 7, 2013). Put simply, Plaintiffs acknowledge that the scope of

---

[31] The other discovery requests identified by Plaintiffs above do not request information concerning the identity of prospective witnesses. *See* Plaintiffs' First Set of Interrogatories, Interrogatories Nos. 3–9; Plaintiffs' First Request for Production of Documents, RFP Nos. 16–20, 25–30, 32–53.

discovery is limited to the identity of witnesses who are likely to have knowledge of discoverable information (*see* Fed. R. Civ. P. 26(a)(1)(A)(I)) but fail to recognize that their discovery requests go far beyond that scope.

## D.    FIRE CLAIM HISTORY - SUBSTANTIAL SIMILARITY

**Plaintiffs' Position on Discovery Issue:**    Plaintiffs allege that their refrigerator shares common design defects with other models of Dometic-branded gas absorption refrigerators, and that Dometic has had notice and knowledge over the last 20 years of similar fires in those refrigerators caused by the same defect.[32]    Evidence of similar fires - *both before plaintiffs' fire and after* - is not only relevant to establish the existence of the defect in plaintiffs' refrigerator, Dometic's notice and knowledge of the defect, and causation, but is admissible at trial - and therefore certainly discoverable.    See, Fed. R. Civ. P. 26, Committee Notes on Rules - 2000 Amendment [other incidents of the same type or involving the same product discoverable].    See, also, *Elsworth v. Beech Aircraft Corp.* (1984), 37 Cal.3d 540, 555 ["Evidence of prior accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the circumstances of the other accidents are similar and not too remote."] ; *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal. App. 3d 341, 365 [in product liability cases, evidence of a subsequent accident may be as relevant as a prior accident to show the existence of a defect or causation];    *Donlen vs. Ford Motor Company* (2014), 217 Cal. App. 4th 138, 154 [evidence of other vehicles with defects similar to plaintiffs discoverable in CA lemon law case];    *Perkins v. Superior Court* (1981) 118 Cal. App. 3d 761;    *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal. App. 4th 967, 974-87, 993, 996 (reversing the lower court for not imposing a terminating sanction for manufacturer's failure to comply with discovery orders in a Song-Beverly case where manufacturer was

---

[32]    See, generally, ECF No. 40, ¶¶ 21 - 36 [commonality of design, defect and safety risk];    ¶¶ 46 - 49 [Dometic's knowledge of common defect/risk and concealment].

repeatedly ordered to produce evidence of other similar incidents); *Gillig v. Bymart-Tintair, Inc.* (S.D.N.Y. 1954) 16 F.R.D. 393 (allowing plaintiff suing for damages from use of defendant's product discovery of records relating to prior claims of similar nature); *Culp v. Devlin* (E.D. Pa 1978) 78 F.R.D. 136 (allowing plaintiff that was victim of police brutality discovery of prior reports of police brutality received by defendants and disposition thereof); *United Oil Co., Inc. v. Parts Associates, Inc.* (D.Md. 2005) 227 F.R.D. 404 (allowing discovery of information as to other claims, complaints, and lawsuits against dye manufacturer since such information was probative of what manufacturer knew or show have known about dyes' liver toxicity and could be evidence of causation); *Kozlowski v. Sears, Roebuck & Co.* (D.C.Mass. 1976) 73 F.R.D. 73 (allowing discovery of records of similar suits brought against defendant because such records might contain facts that lead to discovery of admissible evidence); *Josephs v. Harris Corp.* (3d Cir. 1982) 677 F.2d 985 (allowing discovery of information of prior accidents involving printing press which injured plaintiff since such information may have led to relevant evidence of the existence of a defect).

"The defendant is not the final arbiter of substantial similarity" for the purpose of determining the scope of plaintiffs' discovery requests.    *Smith vs. Gorilla, Inc.*, Case No. CV-10-17-M-DWM-JCL, 20120 WL 4286246, at *3 (D. Mont. Oct 21, 2010).    To justify discovery of other incidents, a plaintiff must make only a threshold showing that the other incidents bear some relationship to the issues of "notice, the magnitude of the danger involved, the opposing party's ability to correct a known defect; the product's lack of safety for its intended uses...standard of care or causation."    *Derosiers vs. MAG Indus. Automation Systems, LLC*, 675 F. Supp. 2d 598, 602 (D. Md. 2009) (quoting 3 LOUIS R. FRUMER & MELVIN I. FRIEDMAN, PRODUCTS LIABILITY § 18.02[1][B]).    In determining the scope of discovery, "Courts look to see whether the 'salient characteristics' of the subject incident and prior incident are the same, or whether

1  'the accidents have occurred under similar circumstances or share the same cause,' or

2  whether 'different models of a product...share with the accident-causing model those

3  characteristics pertinent to the legal issues raised in the litigation"     *Desrosiers*, 675 F.

4  Supp. 2d at 602 (citations omitted).

5          Evidence of other failures is also directly relevant to the Plaintiffs' negligence

6  claims, particularly their claims for post-sale failure to warn and negligent recall/retrofit.

7  Notice - what did the Defendants know and when did they know it - is an essential

8  element of any negligence case. See, e.g. *Stevens v. Parke, Davis & Co.* (1973), 9 Cal. 3d

9  51, 64-65 [one who supplies a product directly or through a third person for another to

10  use is liable if the supplier knows or has reason to know that the product is or is likely to

11  be dangerous for its intended use]; see also . See also, *Hernandez v. Badger Construction*

12  *Equipment Co.*, 28 Cal. App. 4th 1791, 1831 [manufacturer liable for failing to

13  communicate or conduct adequate post-sale recall/retrofit regarding dangers in the use of

14  the product of which manufacturer was aware].

15          Finally, knowledge of other failures in their gas absorption

16  refrigerators - particularly the number, extent, and continuing nature of the fire claims,

17  which necessarily involve serious risks to life and property - is relevant to the Plaintiffs'

18  claim for punitive damages.      See, *Colonial Life and Accident Ins. Co. Vs. Superior*

19  *Court* (1982), 31 Cal. 3d 785 [indirect evidence of elements of punitive damages may be

20  established by pattern of defendant's conduct indicating a general business practice];

21  *Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191, 1207 (Cal. 2005) [defendants' knowledge

22  of wrongful conduct and recidivism relevant to consideration of constitutional

23  reasonableness of punitive damage award].

24  **Dometic's Position on Discovery Issue:**

25      **PLAINTIFFS CANNOT ESTABLISH "SUBSTANTIAL SIMILARITY"**

26          As Plaintiffs concede, a party in an individual products liability case can only obtain

27

28  JOINT STATEMENT RE: DISCOVERY DISAGREEMENT, Vol. 1    (Local Rule 251)
Labbe'/Tomczak vs. Dometic Corporation, et al.
No.: 2:20-cv-01975-KJM-DMC

discovery involving other products made by the defendant if (among other things) they can establish that the other products are substantially similar. In evaluating substantial similarity for the purposes of discovery, courts generally "undertake a fact specific determination of the extent of the similarities and dissimilarities" to determine whether various models are substantially similar. *Gibson v. Ford Motor Co.*, 510 F. Supp. 2d 1116, 1120 (N.D. Ga. 2007). While "[d]ifferent models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation," "conclusory statements of alleged similarity are not enough." *Id. See also Piacenti v. Gen. Motors. Corp.*, 173 F.R.D. 221, 225 (N.D. Ill. 1997). Plaintiffs' Requests for Production, Interrogatories, and Position set forth above clearly fail this evaluation. Indeed, while Plaintiffs spend a great deal of time making summary allegations of similarity, they fail to identify facts establishing—or even creating the illusion of—substantial similarity. Plaintiffs do not identify such facts because no such facts exist. Indeed, Plaintiffs are seeking documents about numerous different refrigerator models manufactured over more than two decades—amounting to millions of refrigerators. These refrigerators vary significantly in size, construction, design, and manufacturing—differences that all bear directly on Plaintiffs' defect theory.

Plaintiffs' counsel in this case has been pursuing litigation against Dometic for years. This includes a sprawling consolidated class action that has been pending for over six years and that brings claims on behalf of millions of consumers based on the same purported defect alleged in this individual Complaint. *See Papasan et al. v. Dometic Corp.*, Case No. 1:16-cv-22482-RNS (N.D. Cal.). But despite having possession of hundreds of thousands of documents, dozens of depositions, and extensive written discovery responses, Plaintiffs' counsel and his class action co-counsel have never been able to establish the common defect they allege here. In fact, their attempts at doing so have failed time and time again.

In the predecessor class action, *Varner et al. v. Dometic Corp.*, the court granted summary judgment in Dometic's favor on the grounds that the plaintiffs' expert had not presented evidence of a common manifest defect in all the refrigerators at issue. *See* Case No. 0:16-cv-22482 (S.D. Fla.) [ECF No. 219]. Following that ruling and yet another round of extensive discovery, the plaintiffs were given a second opportunity to establish the alleged defect. They failed again. In particular, in the *Papasan* class action, Plaintiffs' counsel submitted an expert report from Orion Keifer and Peter Layson of AEGI—the same experts that attended the metallurgical inspection of Plaintiffs' refrigerator in this case and the same experts that Plaintiffs' counsel has relied on in every case he has litigated against Dometic. *See* Ex. 2 (AEGI Report); Pls.' Am. Compl. ¶¶ 59-60. AEGI's 31-page report alleged that all Dometic refrigerators were defective because they are all subject to a propensity for corrosion-induced leaks and potential fires. Ex. 2 (AEGI Report) at p. 6, 22, 26. In an effort to avoid the multitude of differences in the various refrigerators and their impact on the propensity for corrosion, leaks, and fires, AEGI attributed the alleged defect to what they termed a common "single weld design"—meaning that the cooling units transfer heat from one area to another area through a single weld. *Id.* at 18-19; *see* Ex. 5 (*Papasan* Feb. 16, 2022 Pls.' Objections to *Daubert* Order [ECF No. 555]) at p. 8. The common design defect theory identified in the AEGI report was alleged on behalf of a putative class that includes Plaintiffs here and is identical to the common design defect alleged by Plaintiffs here. *Compare* Pls.' Am. Compl. ¶¶ 27-30, with Ex. 2 (AEGI Report) at p. 6, 18-19.

Notwithstanding AEGI's conclusory allegations, neither AEGI, Plaintiffs' counsel, or the *Papasan* putative class members (including Plaintiff) have ever been able to show *any connection whatsoever* between the so-called "single weld design" and any adverse consequences—much less the risk of leaks and fires on which the allegations are premised. First, in April 2019, Dometic filed a *Daubert* motion seeking to exclude the AEGI Report

on the grounds that the AEGI's opinions were predicated on invalid, unreliable and untested conclusions. The *Papasan* court agreed. First, after hearing extensive testimony from both Mrs. Keifer and Layson during a 2-day live evidentiary hearing, the Magistrate Judge excluded AEGI's opinions about the alleged common "single weld design" as unreliable. *See* Ex. 3 (*Papasan* Feb. 2, 2022 Order on *Daubert* Mtn. [DE 553]). The Magistrate Judge reasoned that AEGI "backtracked" to reach their conclusions and failed to apply "scientific testing standards" in reaching this opinion. *Id.* at 4, 6. Indeed, they had opined that a common design defect existed in millions of refrigerators despite only examining and relying on an inspection of *14* refrigerators. *Id*. at 4, 5. The plaintiffs then proceeded to appeal this decision, but they were squarely rejected by the district court. *See* Ex. 4 (*Papasan*, Apr. 26, 2022 Order on Pls.' Objections to *Daubert* Order [DE 560]). Consistent with the Magistrate Judge's findings, the district court found that AEGI had not presented any reliable evidence of a common design defect. *Id.* That, by itself, should be sufficient reason to deny Plaintiffs' request for the hundreds of thousands of documents they seek on the conclusory allegations of a common design defect.

But that is not all. Beyond failing to establish any reliable evidence of a common design defect (despite ample opportunity to do so), all the evidence establishes just the opposite: that the refrigerators for which Plaintiffs seek discovery are not common—especially as it pertains to Plaintiffs' defect theory of corrosion-induced leaks and fires. Plaintiffs' refrigerator was part of the 2006 recall that Dometic conducted on certain models of its gas absorption refrigerators. The recall was performed because of a potential safety defect in the relevant refrigerators—namely, the potential risk of fire caused by leaks in the cooling unit of the refrigerator. *See* Ex. 6 (Aug. 28, 2006 Potential Defect Notification, Dometic_Labbe_0171 ("2006 Defect Notification")). This issue was addressed through a safety remedy provided to owners of the affected refrigerators, which was intended to (and did) prevent the risk of a safety-related fire caused by a cooling unit

leak. This same safety remedy was installed on all similar models of Dometic refrigerators made after the recall as part of the manufacturing process.

Importantly, the safety remedy prevents safety-related fires regardless of the underlying cause of the leak. Indeed, the fire claims rate (*i.e.*, unverified claims) on recalled retrofitted refrigerators is statistically significantly lower than the claims rate on recalled non-retrofitted refrigerators. *See* Ex. 7 (Feb. 4, 2019 Report of Sonya Kwon ("Kwon Rep.")) at p. 19. The fire claims rate (*i.e.*, unverified claims) on post-recall refrigerators containing a factory-installed safety remedy is also statistically significantly lower than the claims rate on recalled non-retrofitted refrigerators. *Id.* at p. 23-24. Plaintiffs' refrigerator, however, was never retrofitted with the safety remedy. Pls.' Am. Compl. ¶¶ 50-51. Accordingly, as it pertains to the risk of fire, there is no question that Plaintiffs' refrigerator is not substantially similar to any refrigerator that contains either a field-installed or factory-installed safety remedy.

Putting aside this fundamental difference, there are also critical differences in the various refrigerators with respect to the potential for corrosion-induced leaks. Although the recall and the safety remedy were intended to address the risk of fires—not the risk of corrosion or leaks— various changes were made to both the design and manufacturing of the refrigerators to prevent such leaks. Specifically, in 2003 (which post-dates the production of Plaintiffs' refrigerator), the heating element was changed in response to an initial determination by Dometic that the original, higher wattage heating element introduced in April 1997 caused abnormal fatiguing of the boiler tube weld. *See* Ex. 6 (2006 Defect Notification) at p. 3. As Dr. Rick Baron discussed in his expert report, this change mitigated the abnormal fatigue performance potentially associated with the higher wattage heating element and thereby reduced the risk of corrosion and leaks. *See* Ex. 8 (Feb. 4, 2019 Report of Rick Baron ("Baron Rep.")) at p. 7. *Id.* AEGI even confirmed that fact, testifying that a decrease in wattage would decrease the operating temperatures. Ex. 9

1  (Jan. 29, 2019 Dep. of Orion Keifer ("Keifer Dep.")) at 126:10-127:3. And as AEGI has

2  repeatedly asserted, "it is significant that the corrosion is occurring near the hottest location

3  of the cooling unit, in that the corrosion rate is generally exponential with temperature[.]".

4  Ex. 2 (AEGI Report) at p. 19.

5  Subsequently, in 2006 (which also post-dates the production of Plaintiffs'

6  refrigerator), significant changes were made to the way in which the refrigerators were

7  manufactured. Prior to 2006, the refrigerators were made with manual welds. As Dr. Baron

8  explains, manual welding creates a risk of anomalies, such as undercutting, melt through,

9  and over penetration. Ex. 8 (Baron Rep.) at p. 14, 21. These can lead to stress

10 concentrations and irregular heat transfer in the boiler tube, which can eventually result in

11 cracking and corrosion induced leaks. *Id.* AEGI agrees. Ex. 9 (Keifer Dep.) at 17:11-19,

12 111:14-23, 114:22-115:1. Indeed, AEGI readily acknowledged that poor welds containing

13 anomalies can lead to a less uniform heat transfer, increased hotspots, and increased

14 susceptibility to localized cyclic stresses—the precise corrosion-related issues identified in

15 the AEGI Report and in the Amended Complaint. Ex. 9 (Keifer Dep.) at 113:10-25, 136:11-

16 12.

17 However, in 2006, the refrigerators began to be made with automated welding.

18 Automated welding eliminates the inherent variability associated with manual welds and

19 therefore substantially reduces the risk for cracking and corrosion-induced leaks. Ex. 8

20 (Baron Rep.) at p. 9. Then, in 2007, ISO welding specifications were implemented to

21 ensure that the welds were not only consistent but were done in a manner that minimized

22 the potential for systemic welding deficiencies. *Id.* AEGI admitted that a consistent, well-

23 made weld will be less susceptible to irregularities and anomalies and that thereby reduces

24 the risk of corrosion-induced leaks. Ex. 9 (Keifer Dep.) at 17:11-19, 111:14-23, 114:22-

25 115:1, 111:24-113:9; Ex. 10 (Mar. 1, 2019 Dep. of Peter Layson) at 117:11-19.

26 In addition to these differences, other changes were made as well, including (i)

27

28

31

introduction of the universal electronic power module in January 2003 to limit the liquid propane gas ignition to three start attempts to avoid potential flame ignition under improper conditions; (ii) increasing the ammonia concentration from 31.2% to 33.5% in May 2003 to permit lower operating temperatures and thus reducing corrosion kinetics; and (iii) changing from two heater pockets to one in March 2007 to reduce the number of welds from three to two. Ex. 8 (Baron Rep.) at p. 11. Indeed, contrary to Plaintiffs' conclusory allegation that a "single weld design" is a common design defect, *decreasing* the number of welds (as opposed to increasing them) decreases the potential for weld anomalies and, by extension, for corrosion. Ex. 9 (Keifer Dep.) at 127:19-128:3. There is also no better way to transfer heat than through the use of welding. Ex. 8 (Baron Rep.) at p. 9.

The impact of these changes is not only confirmed by scientific expert testimony, it is also confirmed by real-life outcomes. Specifically, the evidence shows that there is a statistically significant lower warranty claims rate on refrigerators made after the recall (*i.e.*, with automated welding and with the welding specifications) as opposed to those made before. Ex. 7 (Kwon Rep.) at p. 8. Plaintiffs' refrigerator, however, was made with manual welding, it was not made pursuant to the ISO welding specifications, and it was made with the lower wattage heating element. Accordingly, as it pertains to the risk of corrosion-induced leaks—the relevant issue in this case—Plaintiffs' refrigerator is not substantially similar to any of the refrigerators made after 2003 (and especially those made after 2006).

Despite this abundant evidence and Plaintiffs' counsel's wholesale failure to establish a common design defect after years of discovery, Plaintiffs continue to contend that they are entitled to all this same discovery because the refrigerators are substantially similar with respect to the "accident-causing model characteristic.". But the "accident-causing model characteristic" is a corrosion-induced leak leading to a fire in a gas absorption refrigerator. Pls.' Am. Compl. ¶¶ 50-51. For all the reasons discussed above,

the evidence shows that Plaintiffs' refrigerator is not similar (much less substantially so) to the millions of Dometic-branded refrigerators made from 2003-present as it pertains to corrosion-induced leaks and associated fires. Nor can Plaintiffs circumvent all these differences by finding one similarity amongst all the refrigerators (*i.e.*, the so-called "single weld design) and claiming—*without any evidentiary support whatsoever*—that this similarity is connected to the "accident-causing model characteristic" and therefore justifies discovery into every single refrigerator.

In light of the above, "[a]llowing discovery based on [Plaintiffs'] unsupported, conclusory statements [of similarity] would be a fishing expedition justified only by the bald assertion that the information sought is believed to be relevant"—which is a "belief [that] has no factual basis." *Gibson*, 510 F. Supp. 2d at 1121 (finding plaintiffs' claims of substantial similarity too conclusory to support discovery of a different vehicle model); *see also Piacenti v. General Motors Corp.*, 173 F.R.D. 221, 225 (N.D. Ill. 1997) (denying plaintiff's discovery request because vehicle models did not share "several pertinent characteristics"); *Reising v. Toro Co.*, 2018 WL 5489568, at * 4 (S.D. Oh. Oct. 29, 2018) (limiting discovery in scope of model and time due to a lack of substantial similarity). Accordingly, Plaintiffs' request for voluminous discovery concerning millions of refrigerators made over the last two decades is wholly unjustified and should be readily denied.

## E.      PROPORTIONALITY - "SINGLE FRIDGE/SINGLE FIRE"

**Plaintiffs' Position on Discovery Issue:**      Dometic repeatedly asserts the boilerplate objection that they should be relieved of providing substantive responses to plaintiffs' discovery requests, because the case involves a "single refrigerator" and a "single fire". While this bald assertion is yet another boilerplate objection - completely ignoring the overwhelming authority in support of discovery of similiar accidents cited in Section E, supra., it also represents an improper application of Rule 26's proportionality standard.

1    As cited in more detail above,    "Restoring the proportionality calculation to Rule

2  26(b)(1) does not change the existing responsibilities of the court and the parties to

3  consider proportionality, and the change "...does not place on the party seeking discovery

4  the burden of addressing all proportionality considerations..." nor does it "...permit the

5  opposing party to refuse discovery simply by making a boilerplate objection that it is not

6  proportional...".    Committee Notes to the 2015 Amendments.    While the party

7  seeking discovery has the burden to establish its relevancy and proportionality , it is the

8  party objecting to discovery that bears the burden of establishing a lack of proportionality

9  through "clarifying, explaining and supporting its objections with competent evidence."

10  *Wilson v. Decibels of Or., Inc*., No. 1:16-cv-00855-CL, at *4 (D. Or. May 9, 2017) ,

11  citing *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485

12  (N.D. Cal. 2012) (internal citations omitted).    Dometic's boilerplate objections have

13  completely failed to meet their burden.

14    Further, Dometic's proportionality arguments ignore the peculiar circumstances of

15  discovery in this case.    Plaintiffs are not "shooting in the dark" with their discovery

16  requests, hoping to unearth relevant information that may or may not exist.    Rather,

17  plaintiffs are seeking discovery - or updates of discovery - already produced by Dometic

18  in other refrigerator fire litigation.    Dometic's discovery disclosures in other

19  refrigerator fire litigation necessarily concedes 1) that they have possession, custody and

20  control of the material; 2) that the material is relevant to the claims and defenses in a

21  refrigerator fire case; and 3) that the discovery of such material is proportional to the

22  needs of the case, i.e. relevant and proportional to a determination of whether "this

23  refrigerator caused this fire".    Indeed, Dometic's prior production of the same

24  discovery material sought by plaintiffs in this action means that they have already

25  collected the material; reviewed it for relevance/privilege; organized it into accessible

26  electronic format; and Bates-stamped it.    Adding another "Labbe" Bates stamp number

27

28

1    and producing that same material in this case imposes *de minimus* burden/cost,

2    eliminating the "undue burden/cost" component of the entire proportionality analysis that

3    Dometic seeks to rely upon.

4         Dometic's boilerplate "single fridge/single fire" objections should be overruled.

5    **Dometic's Position on Discovery Issue:**

6         Dometic has detailed why Plaintiffs' discovery requests are overly broad and do not

7    seek discovery regarding substantially similar products. As a result, the discovery

8    requested is not proportional to the needs of the case. Dometic has also explained that

9    Plaintiffs' counsel has previously failed to obtain the same discovery. *See supra* III(B),

10   V(B), VI(D).

11             **DOMETIC'S OBJECTIONS ARE NOT "BOILERPLATE"**

12         Furthermore, throughout the Joint Statement, including in this section, Plaintiffs

13    repeatedly mischaracterize Dometic's objections to the document requests and

14    interrogatories as "boilerplate objections." Dometic's objections are not "boilerplate" and

15    more than meet the requirements under the Federal Rules of Civil Procedure to state

16    objections to discovery requests with "specificity."

17         An objection is considered "boilerplate" when it merely states the legal grounds for

18    the objection *without* specifying why the discovery request is deficient. *St. Paul*

19    *Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 512 (N.D. Iowa 2000). Only

20    "unexplained and unsupported boilerplate objections are improper." *Duran v. Cisco Sys.,*

21    *Inc.*, 258 F.R.D. 375, 379 (C.D. Cal. 2009) (citing *Burlington N. & Santa Fe Ry. Co. v.*

22    *United States Dist. Ct. of Mont.,* 408 F.3d 1142, 1149 (9th Cir.)). Yet, none of Dometic's

23    objections are boilerplate because they all specify and explain precisely why the discovery

24    requests are objectionable.

25         For example, Interrogatory No. 2 asks for the identification of "the officers,

26    directors and shareholders of DOMETIC CORPORATION from 2001 to the date of

27

28

JOINT STATEMENT RE: DISCOVERY DISAGREEMENT, Vol. 1   (Local Rule 251)
Labbe'/Tomczak vs. Dometic Corporation, et al.
No.: 2:20-cv-01975-KJM-DMC

[Dometic's] responses to these interrogatories, INCLUDING their respective capacities."
In response, Dometic objected on the grounds that the Interrogatory is "irrelevant,
overbroad and not proportional to the needs of the case" because the "case involves the
causation of a single fire allegedly arising in a single refrigerator." Dometic further
explained the basis for its objections by stating the "identities of Dometic's 'officers,
directors and shareholders' over a nearly two-decade period have no bearing on the claims
or defenses in this individual case, and bear little to no proportionality to the needs of the
case." In other words, Dometic specified precisely why the interrogatory is deficient and
explained the legal grounds for its objections.

As another example, Request for Production No. 11 seeks "ALL DOCUMENTS,
CORRESPONDENCE and COMMUNICATIONS regarding the design, manufacture,
sales, marketing, FIRE CLAIM HISTORY, defects, product safety recalls and retrofit
campaigns relating to the REFRIGERATOR between the date of manufacture of the
REFRIGERATOR and the date of [Dometic's] responses to this request." In response to
explaining its relevance and proportionality objections consistent with the explanation
identified above, Dometic objected "to the extent, the Request seeks documents, in part,
that are not in its possession, custody, or control." Dometic then provided the following
detailed explanation: "Dometic does not market refrigerators directly to consumers and
does not possess marketing documents related to the specific Refrigerator at issue in this
case. In addition, Dometic did not design or manufacture any gas absorption refrigerators
prior to 2009, including the Refrigerator at issue." Again, Dometic specified why the
document request is deficient and explained the legal grounds for its objections. Plaintiffs'
assertions that the objections are "boilerplate" simply do not comport with either the law
or the facts at hand.

F.     **BUC TESTING MATERIAL**

**Plaintiffs' Position on Discovery:** The BUC TESTING MATERIAL[33] is relevant and proportional to the needs of the case, and therefore discoverable. Elizabeth Buc was hired by Dometic's outside counsel in 2005 to conduct a series of tests on Dometic-branded gas absorption refrigerators to prove that the refrigerators could not cause fires.     Buc's testing included controlled releases to simulate a boiler tube leak, and proved just the opposite - a leaking cooling unit boiler tube could in fact ignite a fire.[34]     According to Buc's declaration, filed as Doc. 51-5 in *Bowman vs. Dometic Corp.*, No. 4:15-cv-00089 (S.D. Iowa), her investigation resulted in 21,000 pages of documents, reports, correspondence, photographs and video.[35]     Buc stated in her declaration and again testified at deposition that she boxed all of this material up and sent it to Dometic's General Counsel, Dan Fuller, in 2016, and did not keep a copy.[36]     Dometic's 2006 Recall was based almost exclusively on the BUC TESTING MATERIAL, and the results of that testing.[37]     The BUC TESTING MATERIAL is directly relevant to the claims

---

[33]     The BUC TESTING MATERIAL was specifically requested in Plaintiffs' RFP, No. 62, and its discoverability is an issue in the majority of the discovery in dispute.     See, e.g. Dometic's response to Interrogatories Nos. 4 - 9, 11 - 13; RFP Nos. 22, 24, 33, 36.     The term "BUC TESTING MATERIAL" was specifically defined in plaintiffs' discovery responses as follows:
> "25.   "BUC TESTING MATERIAL", as used in these requests, refers to all DOCUMENTS, COMMUNICATIONS, reports, spreadsheets, data, photographs, and or video regarding testing and/or analysis of DGARs by Dr. Elizabeth Buc, including, but not limited to, all material identified by Dr. Buc in her declaration filed as Doc. 51-5 in   Bowman vs. Dometic Corporation   (SD, Iowa), No. 4:15-cv-00089."

[34]     See, ECF No. 40 [FAC], at ¶¶ 35(c); 42.     See, also, Exhibit B [Dieterly Depo], at 66:22 - 87:13; Exhibit C [Buc Depo], at 146:25 - 149:20.

[35]     See, Ex. D [Buc Declaration - Bowman].     The 21,000 figure is an estimate based on a review of Dometic's privilege log, filed in the Papasan action.

[36]     See, Ex. D [Buc Declaration - Bowman], at ¶6; Ex. C [Buc Depo], at 56:6 - 62:14. This portion of the Buc Depo was retroactively designated confidential in the Papasan Action. Copies of this excerpt will be produced at the hearing for the Court's *in camera* review.

[37]     Buc testified that the Chronology of Events Dometic submitted to NHTSA was based on her testing and disclosed the results of that testing regarding the conditions necessary for a leaking boiler tube to cause a fire, with one exception.     The Chronology cited as a factor "...the temperature of the ammonia vapor has to be in flammable range of ammonia...".     Buc denied that this factor came from her, and further could not explain how that language ended up in the Chronology filed with NHTSA.     See, Ex. C [Buc Depo], at 160:19 - 161:22.

1    and defenses of the parties, including the central issues of whether Dometic-branded gas

2    absorption refrigerators contained dangerous safety-related defects; at what point in time

3    did Dometic receive notice and knowledge of those defects; and, what Dometic did in

4    response to that knowledge, specifically including the accuracy and credibility of

5    Dometic's representations to NHTSA regarding the testing BUC conducted and the

6    results of that testing, in initiating the 2006 Recall.

7        Dometic asserts that all of the BUC TESTING MATERIAL - and any document

8    referring to the BUC testing at all - is either protected by the attorney-client privilege,

9    covered by the attorney work product doctrine, or both, and therefore not subject to

10   discovery.38    Dometic's assertions are without merit.

11       First, the attorney client privilege only extends to communications between an
     attorney and client - not to the underlying facts:

12
13       "[T]he protection of the privilege extends only to communications and not to facts.
         A fact is one thing and a communication concerning that fact is an entirely
14       different thing. The client cannot be compelled to answer the question, `What did
         you say or write to the attorney?' but may not refuse to disclose any relevant fact
15       within his knowledge merely because he incorporated a statement of such fact into
         his communications to his attorney." *Upjohn Co. v. United States*, 449 U.S. 383,
16       395-96 (1981), citing   *Philadelphia v. Westinghouse Electric Corp.*, 205 F. Supp.
         830, 831 (ED Pa. 1962).
17

18   See, also, *Shreves v. Frontier Rail Corp.*, No. 1:19-cv-03012-SMJ, at *12 (E.D. Wash.

19   Mar. 23, 2021) ["Moreover, "[t]he privilege only protects disclosure of communications;

20   it does not protect disclosure of the underlying facts by those who communicated with the

21   attorney." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). And "a party cannot

22   conceal a fact merely by revealing it to his lawyer." *Id.* at 365; see also E.E.O.C. v.

23   Caesars Ent., Inc., 237 F.R.D. 428, 433 (D. Nev. 2006) ("The attorney-client privilege

24   does not prevent the disclosure [of] facts communicated to an attorney, and the work

25   _____

26   38   **Error! Main Document Only.**See, e.g. Dometic's response to RFP No. 62, consisting entirely of boilerplate
     attorney-client and work product objections.   Dometic has not filed a privilege log regrding this material in this
     case.

27

28

product doctrine does not prevent the disclosure [of] facts communicated by an attorney to a client that the attorney obtained from independent sources." (citing Upjohn, 449 U.S. at 395-96 and Hickman v. Taylor, 329 U.S. 495, 508 (1947)].

Here, plaintiffs are not seeking discovery of communications between Dometic's attorneys and Dometic, or the impressions, opinions and legal advice given to Dometic by its attorneys.     Rather, plaintiffs seek the underlying facts and data developed through the Buc testing - the reports, photographs, video, DVDs, etc. that Buc herself generated through her independent examination of Dometic-branded refrigerators.     The BUC TESTING MATERIAL is therefore not an attorney-client "communication" in the first place, and the attorney-client privilege cannot be used to avoid its discovery.

Even if the BUC TESTING MATERIAL is deemed a communication covered by the attorney-client privilege or work product doctrine, Dometic has waived any such protection by failing to file a privilege log, or assert anything other than boilerplate objections.     Dometic asserts general boilerplate attorney-client privilege and work product objections to the production of the BUC TESTING MATERIAL in both its original and supplemental responses to plaintiffs' discovery   requests.[39]   Dometic has not filed a privilege log regarding any material.     A party withholding information otherwise discoverable by claiming privilege or work product protection must "...describe the nature of the documents, communications, or other tangible things not produced or disclosed..."   F. R. Civ. P. 26(b)(5)(A).     "Boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege."   *Burlington Northern Santa Fe Ry. Co. vs. U.S. Dist. Court for the Dist. of Montana*, 408 F. 3d. 1142, 1149 (9th Cir., 2005).     Failure to identify documents or provide a privilege log notwithstanding the opportunity to do so results in waiver of privilege/work product claims.   *Id.*

---

[39]   See, e.g. Dometic's response to RFP No. 62.

1   Dometic has waived any attorney-client or work product protection by disclosing

2   the fact, methodology and findings arising from the BUC TESTING MATERIAL

3   pursuant to F. R. Civ. Proc. 502(a). [40]    Dometic intentionally waived any privilege by

4   filing a Chonology of Events with NHTSA - a federal agency - that contained the fact of

5   the Buc testing, the methodology used, and the results obtained from the testing.    The

6   disclosed information in the Chronology of Events     and the undisclosed BUC

7   TESTING MATERIAL both concerned the same subject matter, i.e. Buc's testing of

8   Dometic gas absorption refrigerators to determine if they contained a safety-related

9   defect that caused fires.    Fairness dictates that Dometic cannot on the one hand

10  selectively disclose the methodology and results of Buc's testing, yet claim that the BUC

11  TESTING MATERIAL itself - which would confirm the accurracy of the represenations

12  made by Dometic to NHTSA in their Chronology - remain privileged and off-limits to

13  discovery.    Dometic's claims of privilege regarding the BUC TESTING MATERIAL

14  have been waived pursuant to F. R. Civ. Proc. 502(a).

15      Dometic has impliedly waived the attorney-client privilege with regard to the

16  BUC TESTING MATERIAL.    The attorney-client privilege may be waived if a party

17  makes assertions in the litigation or "asserts a claim that in fairness requires examination

18  of the protected communications."    *United States vs. Bilzerian*, 926 F 2d. 1285, 1292

19  (2nd Cir. 1991), cert. Denied, 502 U.S. 813, 112 S. Ct. 63 (2992).    See also, *In re*

20  *Bairnco Corp Securities Litigation*, 148 F. R. D. 91, 101 (S.D.N.Y. 1993) ["To permit

21  [defendant]to offer the fact of counsel's conclusions where such conclusions serve

22  [defendant's] purposes without permitting plaintiffs access to all the communications

23  between counsel and [defendant] would prejudice plaintiff in the prosecution of their

24      [40]    **F. R. Civ. Proc. 502(a)** sets forth the scope of waiver of the attorney-client privilege
25  or work product doctrine when privileged material is disclosed to a federal office of agency, such
    as NHTSA.    The waiver extends to undisclosed communications or information if 1).    The
26  waiver is intentional; 2).    the disclosed and undisclosed communications or information concern
    the same subject matter; and 3).    they ought in fairness to be considered together.

27

1  action".];        *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir.1987)

2  (Implicit waiver " can occur when a holder relies on a legal claim or defense, the truthful

3  resolution of which will require examining confidential communications." )        An

4  implied waiver of the attorney/client privilege occurs when (1) the party asserts the

5  privilege as a result of some affirmative act, such as filing suit; (2) through this

6  affirmative act, the asserting party puts the privileged information at issue; and (3)

7  allowing the privilege would deny the opposing party access to information vital to its

8  defense. *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975). The doctrine of waiver by

9  implication reflects the notion that the attorney-client privilege " was intended as a shield,

10  not a sword." *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d at 1418, citing, *GAB

11  Business Services, Inc. v. Syndicate* , 809 F.2d at 762.        In other words, " [a] defendant

12  may not use the privilege to prejudice his opponent's case or to disclose some selected

13  communications for self-serving purposes." *Id.*, citing, *United States v. Bilzerian*, 926

14  F.2d 1285 (2nd Cir.1991); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982) ("

15  Selective disclosure for tactical purposes waives the privilege." ). When confidential

16  communications are made a material issue in a judicial proceeding, fairness demands

17  treating the defense as a waiver of the privilege. *Conkling v. Turner*, 883 F.2d 431, 435

18  (5th Cir.1989).

19        Here, Dometic has put the BUC TESTING MATERIAL at issue by, among other

20  things, affirmatively asserting in its Answer that Dometic-branded gas absorption

21  refrigerators are free of dangerous safety-related defects, and that the 2006 and 2008

22  recalls, including the development of the SBH retrofit device - all of which were based

23  exclusively on the BUC TESTING MATERIAL -   were timely, reasonable and

24  effective.[41]        By making these assertions, Dometic is attempting to claim that they were

25  ───────────────

26  [41]        See, ECF No. 42, at ¶ 35 ["Dometic also admits that it has retained outside
experts, ***though Dometic denies any conclusions, representations, or characterizations***

27

acting reasonably when they initiated their recalls and instituted their SBH retrofit campaign - thereby creating a defense to plaintiffs' negligence causes of action - including the cause of action for negligent recall - while at the same time cloaking the BUC TESTING MATERIAL, which formed the basis of the recalls, from scrutiny.   The BUC TESTING MATERIAL is crucial to establishing what Dometic knew and when they knew it about dangerous safety-related defects in their refrigerators, and whether Dometic truthfully and accurately disclosed the defect and safety risks to federal regulators, and through them, to the general public.   The Court should therefore find an implied waiver of the attorney-client privilege and work product claims asserted by Dometic, and order the BUC TESTING MATERIAL produced in this action.

The BUC TESTING MATERIAL is discoverable pursuant to the crime-fraud exception to the attorney-client privilege.   "Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud or other misconduct."   *In re Grand Jury Proceedings*, 87 F.3d 377, 380 n.4 (9th Cir. 1996) citing *In re Sealed Case*, 754 F.2d 395 (D.C. Cir. 1985).   Generally, the crime-fraud exception reaches communications or work product with a "relationship" to the crime or fraud.   *In re Sealed Cases, supra*, at page 399 [requiring "some relationship between the communication at issue and the prima facie violation"].   With respect to work product, the crime-fraud exception applies where "some valid relationship" between the work product at issue and the prima facie violation

---

*regarding such experts and/or their findings* the allegations in Paragraph 35 seek to make. Dometic further admits that it conducted Recall Nos. 06E-076 and 08E-032 to address the remote potential for a safety-related fire in a Dometic-branded gas absorption refrigerator, *by virtue of which Dometic provided a safety remedy that adequately addressed and remedied this remote risk*.];   ¶ 37 [Dometic otherwise denies the allegations of Paragraph 37, *specifically including any allegation that the safety remedy provided as part of the recalls did not adequately address and remedy the potential safety defect*.];   ¶ 41 [Dometic admits that it has not recalled gas absorption refrigerators manufactured after September 2006, but states that there has never been any need to do so. *Dometic otherwise denies the allegations of Paragraph 40, including that the use of a "Single Weld Design" constitutes a defect in design or otherwise')*

42

1    is present.    *Id.*, at 814 - 815.

2        Here, plaintiffs allege that Dometic concealed material facts, and made materially

3    false, misleading and fraudulent statements or representations to NHTSA regarding the

4    existence, nature, scope of defects and safety-risks in their Dometic-branded gas

5    absorption refrigerators.[42]    Plaintiffs further allege that the false and misleading

6    statements include the Chronology of Events Dometic filed with NHTSA as part of their

7    2006 Recall, which incorporated the facts, methodology and results of the testing

8    contained in the BUC TESTING MATERIAL.[43]    Making false or misleading

9    statements to NHTSA is a federal crime.[44]    Dometic's use of their attorneys to hire

10   Buc and generate the BUC TESTIING MATERIAL -   which Dometic thereafter

11   selectively disclosed to create a false and misleading picture of the safety risks of their

12   gas absorption refrigerators to NHTSA - establishes sufficient relationship between the

13   privileged/work product material at issue (the BUC TESTING MATERIAL) and the

14   violation (false/misleading statements to NHTSA) to invoke the crime-fraud exception,

15   and overrule any claims of privilege to production of the BUC TESTING MATERIAL in

16   discovery in this action.

17       Dometic is solely and exclusively in possession and control of the BUC TESTING

18   MATERIAL.    Dometic has never produced the material to date in any other litigation.

19   Plaintiffs cannot obtain the documents    from any other source.    Given the specific

---

[42]    See, ECF No. 40 [FAC], at ¶¶ 35 - 36; 37 - 45;47; 91 - 95.

[43]    *Id.*

[44]    See, 18 U.S. Code § 1001 [person guilty of federal crime who knowingly and willfully 1).    "falsifies, conceals or covers up by any trick, scheme or device a material fact; 2).   makes any materially false, fictitious, or fraudulent statement or representation; or 3).   makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry".];    See, also, 49 U.S.C. § 30170 [criminal liability for a person who "...violates section 1001 of title 18 with respect to reporting requirements of section 30166 [including reporting safety defects and initiating recalls pursuant to section 30166(l(1)], with specific intention of misleading the Secretary with respect to...motor vehicle equipment safety related defects that have cause death or serious bodily injury to an individual...".]

factzs surrounding the BUC TESTING MATERIAL - and its crucial connection with the claims and defenses asserted in this action - a fair application of the discovery rules requires that the Court compel Dometic to produce this material.      In determining any privilege or work product claim over the material, Dometic should be compelled to produce the entirety of the BUC TESTING MATERIAL for *in camera* review by the Court.[45]

**Dometic's Position on Discovery Issue:**

### THE BUC TESTING DOCUMENTS ARE NOT RELEVANT TO PLAINTIFFS' CLAIMS

Plaintiffs request all documents and analyses related to the testing that led to the 2006 and 2008 recalls (the "Buc Testing Documents"). But these documents are wholly irrelevant in this case. Plaintiffs' refrigerator was included in the 2006 recall. *See* Pls.' Complaint ¶¶ 40, 53. Pursuant to that recall, Dometic openly disclosed to NHTSA and the public that it had conducted testing which revealed there was a potential risk of fire in Plaintiffs' refrigerator and other refrigerators like it. *See* Ex. 6 (2006 Defect Notification). As such, information about the testing would not add anything to Plaintiffs' claims or advance any additional theory of liability. Simply put, Plaintiffs do not need testing documents to establish a fact that is not in dispute.

Notably, another federal court reached that precise conclusion in an individual products liability case previously brought against Dometic, *Bowman et al. v. Dometic Corp.*, Case No. 4:15-cv-00089 (S.D. Iowa). The *Bowman* litigation involved a plaintiff whose gas absorption refrigerator was part of the recalls. *See* Ex. 11 (*Bowman* Discovery

---

[45]      See, *United States v. Zolin*, 491 U.S. 554, 562 (1989) [well-established practice in federal courts to require disclosure of communications covered by an assertion of the attorney-client privilege for *in camera* review to determine whether the privilege applies].

1    Order) at p. 6. The plaintiff sought documents related to the testing of model No. RM 2652

2    (the same model owned by Plaintiffs in this case). *Id.* In addition to privilege objections,

3    Dometic argued that the documents were not relevant because it had "stipulated to the

4    presence of a product defect which 'could cause fires under certain circumstances." *Id.* at

5    7. The plaintiffs argued otherwise, claiming that the testing documents would be relevant

6    to causation given that the recall notice identified certain elements required for a fire to

7    occur. *Id.* However, "defense counsel stated defendant's experts have never seen the testing

8    documents; defendant did not intend to provide the documents its experts; and defendant

9    expected the expert's testimony would be based on their review and investigation of the

10   fire scene." *Id.* at 8. Based on these representations, the court concluded there was no need

11   to produce the testing documents as they were "of tenuous relevance at present." *Id.* at 9.

12         The same is true here. Pursuant to the disclosures made to NHTSA and the public,

13   Dometic has stipulated to the presence of a potential defect in Plaintiffs' refrigerator which

14   could cause fires under certain circumstances. Dometic has no intention of relying on the

15   testing documents at issue, and it has never disclosed these documents to its experts in this

16   case or any other case (including the *Papasan* class action). It also has no intention of

17   relying on the elements identified in the recall notices as a basis for arguing that the

18   refrigerator did not cause the fire. Accordingly, just as in *Bowman*, the testing documents

19   are—at best—of tenuous relevance and should not be deemed discoverable in this case.

20         Documents and communications related to the testing of the recall remedy and the

21   efficacy thereof are likewise irrelevant. As discussed in more detail in Section IV.D,

22   Plaintiffs never took advantage of the recall remedy and did not have one installed on their

23   refrigerator at the time of the fire. Thus, the efficacy of the recall remedy has no possible

24   bearing on the claims and defenses in this case. *Cheng*, 2013 WL 12140160, at *3.

25         <u>**THE BUC TESTING DOCUMENTS ARE PROTECTED BY THE WORK**</u>
     <u>**PRODUCT DOCTRINE AND ATTORNEY-CLIENT PRIVILEGE**</u>

26

27                                                45

Attorney-Client and Work Product Background

By early 2005, at least 39 lawsuits had been filed against Dometic alleging failures in Dometic-brand refrigerators, many of which involved alleged fires. Ex. 12 (Nov. 1, 2016 Decl. of Bruce Boxum) ¶ 6. In response to these lawsuits and other claims already commenced, Dometic retained attorneys from the law firm Barnes & Thornburg LLP. Ex. 13 (Nov. 1, 2016 Decl. of Douglas Dieterly ("Dieterly Decl.")) ¶ 4. Upon being retained, Barnes & Thornburg LLP advised that Dometic should conduct investigation and testing of certain Dometic-brand refrigerators. *Id.*; Ex. 14 (Apr. 29, 2019 Dep. of Douglas Dieterly ("Dieterly Dep.")) at 22:4-13. As part of this investigation, Barnes & Thornburg attorneys hired and directed a third-party consultant, Dr. Elizabeth Buc, to perform this testing. Ex. 13 (Dieterly Decl.) ¶ 5; Ex. 14 (Dieterly Dep.) at 65:7-19. Barnes & Thornburg also took a lead role in coordinating and overseeing the examination and testing. Ex. 13 (Dieterly Decl.) ¶¶ 4-6, 9. The testing, done at the explicit direction of counsel, was performed to assess Dometic's potential exposure and liability associated with pending and anticipated future litigation and to assist Dometic in defending itself against such litigation. *Id.* at ¶¶ 6, 11; Ex. 14 (Dieterly Dep.) at 9:22-23, 75:24-76:11. Dometic's attorneys even attended testing performed by Dr. Buc. Ex. 14 (Dieterly Dep.) at 80:8-9.

Given the purpose of this testing and the fact that it was done at the direction of counsel and overseen by counsel, Dometic and its attorneys intended that the testing and associated material be protected by the work product doctrine and the attorney client privilege. Ex. 13 (Dieterly Decl.) ¶¶ 9, 11.[46]

The Buc Testing Documents are Non-Discoverable Work Product

---

[46] For example, Mr. Dieterly of Barnes & Thornburg, stated in his deposition that "[a]s defense counsel responsible for the defense of pending litigation and in anticipation of future litigation, I wanted to know, precisely, what was going on." Ex. 14 (Dieterly Dep.) at 53:5-8.

The work product doctrine is governed by Federal Rule of Civil Procedure 26(b)(3), which states that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). The Supreme Court has long recognized the work product doctrine not only applies to documents created by attorneys, but also to documents created by investigators and other agents working for attorneys, provided the documents were created in anticipation of litigation. *United States v. Nobles*, 422 U.S. 225, 239 (1975). The Supreme Court explained the following reasoning in extending the work product doctrine to investigators and other agents:

> One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238-39.

To determine whether the work product doctrine prevents disclosure of specific documents, the Ninth Circuit utilizes the "because of" test, which "considers the totality of the circumstances and affords protection when it can fairly be said that the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation." *In re Grand Jury*, 23 F.4th 1088, 1091-92 (9th Cir. 2021) (quoting *In re Grand Jury Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2004). The "because of" test "does not consider whether litigation was a primary or secondary motive behind the creation of a document." *Id.* Importantly, the work product doctrine does not require that litigation be ongoing when the challenged documents were created. Rather, to assert the work product doctrine, there only must be "an identifiable prospect of litigation or specific claims have already arisen." *Arfa v. Zionist Org. of Am.*, No. CV 13-2942-ABC, 2014 WL 815496, at *4 (C.D. Cal. Mar. 3, 2014)

1  (quoting *Fox v. Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 525 (N.D. Cal. 1988)).

2      Here, as explained above, the Buc Testing Documents are non-discoverable work
3  product because it is indisputable that Dr. Buc was retained by Dometic's counsel in
4  anticipation of litigation to investigate, test and analyze Dometic's ammonia absorption
5  refrigerators.[47] Indeed, Dr. Buc has stated, in a sworn declaration, she always acted at the
6  request of Dometic's legal counsel. *See* Doc 51-5 in *Bowman v. Dometic Corp.*, No. 4:15-
7  cv-00089 (S.D. Iowa). Thus, the Buc Testing Documents satisfy the "because of" test.

8      Importantly, the "because of" test still applies even if the Buc Testing Documents
9  are considered "dual purpose," *i.e.*, documents prepared both in anticipation of litigation
10  and because of a dual business purpose. *In re Grand Jury Subpoena (Torf)*, 357 F.3d at
11  909-10; *U.S. Inspection Servs., Inc. v. NL Engineered Sols., LLC*, 268 F.R.D. 614, 620, 623
12  (N.D. Cal. 2010). As the Ninth Circuit has held, the work product doctrine still prevents
13  disclosure of such "dual purpose" documents. For example, in *In re Grand Jury Subpoena*
14  *(Torf)*, the documents at issue were prepared by a consultant at the direction of counsel and
15  were also submitted in response to an information request from the Environmental
16  Protection Agency ("EPA"). 357 F.3d at 908. The opposing party argued the work product
17  doctrine did not apply because the withheld documents would have been created in a
18  substantially similar form to comply with the EPA information request. *Id.* at 908-09.
19  However, the Ninth Circuit rejected that argument and held (while applying the "because
20  of" test) that the "dual purpose" documents were non-discoverable work product because
21  they were prepared in anticipation of the threat of litigation and to avoid anticipated
22  litigation. *Id.* at 907-10.

23      Furthermore, in *U.S. Inspection Servs.*, a party sought production of "dual-purpose"
24  documents that were both (i) generated by a third-party testing agency retained by counsel

---

[47] Notably, Plaintiffs agree Dr. Buc was "hired by Dometic's counsel in 2005 to conduct a series of tests on Dometic-branded gas absorption refrigerators." *See supra*, Plaintiffs' Position on Discovery.

to research allegations of a defective component in semi-trucks, and (ii) utilized to assist with a product recall of that defective component. 268 F.R.D. at 619-20. The court held that such "dual-purpose" documents were work product because the testing was done, at least in part, to assist counsel in providing legal advice regarding pending and potential future litigation. *Id.* at 623.

Just like *In re Grandy Jury Subpoena (Torf)* and *U.S. Inspection Servs.*, it is indisputable that the Buc Testing Documents were prepared under the direction of counsel who was providing legal advice to Dometic in anticipation of litigation. Regardless of whether the Buc Testing Documents are classified as "dual-purpose" (*i.e.*, because they were also ultimately also the impetus for the recalls), the work product doctrine prohibits their disclosure. *In re Grand Jury Subpoena (Torf)*, 357 F.3d at 907-10; *U.S. Inspection Servs.*, 268 F.R.D. at 623.

The Buc Testing Documents are Protected by the Attorney-Client Privilege

In addition, any and all communications by and between Dometic's attorneys and Dometic's third-party testing agencies, including Dr. Buc, are also protected by the attorney-client privilege. In California, the attorney-client privilege extends to communications between a party's attorney and a third party when "disclosure is *reasonably necessary* for the transmission of the information or the accomplishment of the purpose for which the lawyer was consulted." Cal. Evid. Code § 952 (emphasis added). Thus, "'[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice,' as well as to communications with third parties 'acting as agent[s]' of the client." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (quoting *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978) (internal citation omitted)); *see also Eastman v. Thompson*, No. 822CV00099-DOC, 2022 WL 894256, at *13 (C.D. Cal. Mar. 28, 2022).

In accordance with the above principles, California courts routinely recognize that

49

**JOINT STATEMENT RE: DISCOVERY DISAGREEMENT, Vol. 1   (Local Rule 251)**
**Labbe'/Tomczak vs. Dometic Corporation, et al.**
**No.: 2:20-cv-01975-KJM-DMC**

the attorney-client privilege extends to communications by and between a party's attorneys and any outside agents hired at the direction of counsel. *S. Cal. Reg'l Rail Auth. v. Hyundai Rotem Co.*, No. CV1608042-JAK, 2019 WL 13036412, at *2 (C.D. Cal. Oct. 3, 2019); *OXY Res. Cal. LLC v. Superior Ct.*, 115 Cal. App. 4th 874, 890 (2004), *as modified* (Mar. 4, 2004) (The "privilege extends to communications which are intended to be confidential, if they are made to attorneys, to family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interest of the litigant."); *Ins. Co. of N. Am. v. Superior Ct.*, 108 Cal. App. 3d 758, 767 (1980); *Cooke v. Superior Ct.*, 83 Cal. App. 3d 582, 588 (1978). Accordingly, regardless of the application of the work product doctrine, any and all communications between Dometic's attorneys and Dometic's third-party testing agencies, including Dr. Buc, are protected from discovery by the attorney-client privilege.

<u>The Crime-Fraud Exception Does Not Apply to the Buc Testing Documents.</u>

Under California law, the crime-fraud exception is "a very limited exception to the [attorney-client] privilege" and the "*proponent* of the exception bears the burden of proof of the existence of crime or fraud." *Action Performance Cos., Inc. v. Bohbot*, 420 F. Supp. 2d 1115, 1119 (C.D. Cal. 2006) (quoting *Geilim v. Superior Court*, 234 Cal. App. 3d 166, 174 (1991) (emphasis in original)). First, as the proponent, Plaintiff "must make a prima facie showing that the communication at issue furthered a crime or fraud." *Id.* (quoting *Freedom Trust v. Chubb Group of Ins. Cos.*, 38 F. Supp. 2d 1170, 1171 (C.D. Cal. 1999)). The proponent must "prove a false representation of material fact, knowledge of its falsity, intent to deceive and the right to rely [on the representation]." *Id.* (quoting *BP Alaska Exploration, Inc. v. Superior Court*, 199 Cal. App. 3d 1240, 1262 (1988)). Courts have held a "[m]ere assertion of fraud is insufficient; there must be a showing the fraud has some foundation in fact." *Id.* (quoting *BP Alaska Exploration,* 199 Cal. App. 3d at 1262). Second, the proponent "must also establish a reasonable relationship between the fraud and the

50

JOINT STATEMENT RE: DISCOVERY DISAGREEMENT, Vol. 1   (Local Rule 251)
Labbe'/Tomczak vs. Dometic Corporation, et al.
No.: 2:20-cv-01975-KJM-DMC

attorney-client communication." *Action Performance*, 420 F. Supp. 2d at 1119 (quoting *Cunningham v. Conn. Mut. Life Ins.*, 845 F. Supp. 1403, 1412 (S.D. Cal. 1994)). If the proponent fails to meet both requirements, then courts will not apply the crime-fraud exception. *Id.* at 1120.

Here, Plaintiffs have failed to make a prima facie case, let alone prove, that the Buc Testing Documents "furthered a crime or fraud." *Action Performance*, 420 F. Supp. 2d at 1119. Indeed, Plaintiffs' reliance on the crime-fraud exception in the context of this individual products liability case is wholly unwarranted and unjustified, and Plaintiffs have provided absolutely no basis for establishing that the testing was performed to further a crime or fraud. Plaintiffs have also failed to provide any argument, much less meet their burden of establishing, a "reasonable relationship" between the alleged fraud and the Buc Testing Documents. As a result, the crime-fraud exception cannot be applied. *Id.* at 1120.

Dometic Did Not Waive Its Privilege Assertions Over the Buc Testing Documents

Plaintiffs argue that Dometic has waived its claims of attorney-client privilege and work product protection concerning the Buc Testing Documents by asserting "boilerplate" objections and by failing to file a privilege log. This is not the case.

As an initial matter, Dometic had no obligation to produce a privilege log because it asserts—first and foremost—that the Buc Testing Documents are irrelevant. When a party asserts both relevance and privilege objections, no privilege log is required. *See Schuman v. Microchip Tech. Inc.*, No. 16CV05544HSGEDL, 2019 WL 8333737, at *2 (N.D. Cal. Jan. 8, 2019) (finding relevant documents "should be produced <u>or, if Defendants still contend they are privileged … included in the privilege log … .</u>") (emphasis added); *Maria Del Socorro Quintero Perez, CY v. United States*, No. 13CV1417-WQH-BGS, 2016 WL 362508 at *1 (S.D. Cal. Jan. 29, 2016) (discussing "counsel's error of improperly listing irrelevant documents" in privilege log and stating, "[a]s counsel should know, when a party produces a privilege log, information on that log is presumed to be 'otherwise

discoverable.'"). Instead, Dometic is obligated to provide a privilege log only if it "withholds information *otherwise discoverable* by claiming that the information is privileged … ." Fed. R. Civ. P. 26(b)(5) (emphasis added).

In addition, even if Dometic's objections were boilerplate (they are not) and even if a privilege log was required (it is not), these issues do not give rise to a waiver of the privilege under California law.[48] California courts have made clear:

> a responding party preserves its objections based on the attorney-client privilege and work product doctrine by serving a timely written response asserting those objections. **It is irrelevant that the objections are asserted as part of a generic or boilerplate response, or that the responding party failed to serve a timely and proper privilege log**. Once the objections are timely asserted, the trial court may not deem them waived based on any deficiency in the response or privilege log.

*Catalina Island Yacht Club v. Superior Ct.*, 195 Cal. Rptr. 3d 694, 703 (Cal. Ct. App. 2015) (emphasis added); *see also Moriarty v. Am. Gen. Life Ins. Co.*, No. 17-CV-1709, 2019 WL 1559143, at *8 (S.D. Cal. Apr. 10, 2019) ("[A] court may not impose a waiver of the attorney-client privilege or work product doctrine as a sanction for failing to provide an adequate privilege log.") (quotation and citation omitted).

Nor has Dometic somehow automatically waived any claim of work product protection. Indeed, in the sole case cited by Plaintiffs, the Ninth Circuit explicitly "reject[ed] a *per se* waiver rule that deems a privilege waived" if a privilege log is not produced contemporaneously with discovery responses. *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005). Instead, in evaluating the sufficiency of a privilege assertion, the Court will engage in a holistic analysis, taking into account, *inter alia*: (1) the degree to which the assertion enables evaluation; (2) the timeliness of the

---

[48] Plaintiffs apparently assume federal law applies to these issues. However, because jurisdiction in this case is based on diversity of citizenship, California law controls issues concerning attorney-client privilege, (*see* Fed. R. Evid. 501; *In re California Pub. Utilities Comm'n*, 892 F.2d 778, 781 (9th Cir. 1989)) and federal law controls application of the work product doctrine (*Kandel v. Brother Int'l Corp.*, 683 F. Supp. 2d 1076, 1083 (C.D. Cal. 2010)).

assertion; (3) the magnitude of the production; and (4) other circumstances. *See Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, No. 2:10-CV-0389-WBS-KJN, 2011 WL 2433655, at *2 (E.D. Cal. June 14, 2011). These factors should be applied in a manner that avoids the "needless waste of time and resources, as well as tactical manipulation of the rules and the discovery process" *Id.* at *3 (quoting *Burlington*, 408 F.3d at 1149).

As explained above, the Buc Testing Documents are non-discoverable for a number of reasons, including because they are irrelevant to this case <u>and</u> subject to attorney-client privilege and work product protection. In the event that the Court determines that the Buc Testing Documents are relevant—*i.e.*, otherwise discoverable and being withheld by claim of privilege—Dometic will produce a privilege log in accordance with Rule 26(b)(5).[49]

<u>Dometic Has Not Impliedly Waived Its Privilege Claims</u>

Plaintiffs incorrectly argue that Dometic has impliedly waived attorney-client privilege and work product protection applicable to the Buc Testing Documents by putting those materials at issue in this case. Plaintiffs claim that Dometic did so by "affirmatively asserting" in its Answer that (1) its refrigerators "are free of dangerous safety-related defects," and (2) the 2006 and 2008 recalls "were timely, reasonable and effective." Plaintiffs have not, however, actually identified any purported link between the Buc Testing Documents and Dometic's denial that its refrigerators share a common design defect. Instead, Plaintiffs baldly assert that Dometic's Answer constitutes an attempt to create a defense—based on the Buc Testing Documents—to Plaintiffs' negligence-based causes of action. Dometic's Answer does not, however, put the Buc Testing Documents at issue. In fact, the Answer does not even mention Dr. Buc's name. Moreover, as in *Bowman*, Dometic has no intention of relying on the Buc Testing Documents for any purpose in this matter.

---

[49] It is also worth noting that Plaintiffs did not raise this issue until they provided Dometic with the first draft of this joint statement, more than eleven months after Dometic served its original discovery responses and objections.

Regardless, in *Lorenz v. Valley Forge Ins. Co.*, a case cited by Plaintiffs, the Seventh Circuit made clear that a defendant's mere denial of an allegation does not provide grounds for an at issue waiver:

> To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case. Most often, this occurs through the use of an affirmative defense.

815 F.2d 1095, 1098 (7th Cir. 1987). Plaintiffs cite three paragraphs from the Answer [ECF 42] in which Dometic: (1) denied Plaintiffs' characterizations of Dometic's experts and their findings and admitted that the product recalls provided a safety remedy that adequately addressed and remedied the remote potential for a safety-related fire (Dometic's Answer to Am. Compl. ¶ 35); (2) denied Plaintiffs' allegation that the safety remedy provided as part of the recalls did not adequately address and remedy the potential safety defect (*id.* ¶ 37); and (3) denied Plaintiffs' allegation that the use of a "Single Weld Design" constitutes a defect (*id.* ¶ 41). These denials do not put the Buc Testing Documents at issue. *See Lorenz*, 815 F.2d at 1098.

Even if Dometic had made some assertion concerning the Buc Testing Documents in its Answer, those documents would still be privileged. Under California law,[50] there is no at issue waiver of attorney-client privilege unless the otherwise privileged document lies "at the heart of" an issue raised by the party invoking the privilege. *In re Superior Nat. Ins. Gr.*, 518 B.R. 562, 569 (Bankr. C.D. Cal. 2014) (applying California law). "Clearly, the documents must be *more than relevant* to the litigation, because privilege is an exception to the rule requiring discovery of relevant material." *Id.* 570 (emphasis added). Indeed, an at issue waiver occurs "only when the client tenders an issue touching directly upon the substance or content of an attorney-client communication—*not when the*

---

[50] Here again, Plaintiffs apparently fail to recognize that California law controls issues concerning attorney-client privilege. *See* Fed. R. Evid. 501. Plaintiffs have not cited any California case—or any case applying California law—to support their implied waiver argument.

1   *testimony sought would be only 'one of several forms of indirect evidence' about an issue*."

2   *In re Geothermal Res. Int'l, Inc.*, 93 F.3d 648, 653 (9th Cir. 1996) (quoting *Rockwell Int'l*

3   *Corp. v. Superior Ct.*, 32 Cal. Rptr. 2d 153, 161 (Cal. Ct. App. 1994)) (emphasis added).

4   Here, it is clear that the Buc Testing Documents do not lie at the heart of Dometic's

5   denials of or affirmative defenses to Plaintiffs' claims. It is equally clear, notwithstanding

6   Plaintiffs' assertions to the contrary, that the Buc Testing Documents are not "crucial" to

7   establishing anything. Plaintiffs' refrigerator was part of the recall population and was not

8   retrofitted with the safety remedy provided as part of the recall. As such, the content of the

9   recall testing documents could not plausibly uncover information concerning Dometic's

10   knowledge—or lack thereof—about issues pertaining to Plaintiffs' refrigerator and others

11   like it. As such, even if Dometic had put the Buc Testing Documents at issue (it did not),

12   they would still be protected by attorney-client privilege. *See In re Geothermal Res. Int'l,*

13   *Inc.*, 93 F.3d at 653.

14   For many of the same reasons, Dometic has also not impliedly waived the work

15   product protection applicable to the Buc Testing Documents. *See In re Superior Nat. Ins.*

16   *Gr.*, 518 B.R. 562, 575 (Bankr. C.D. Cal. 2014) (collecting cases) ("[An] at issue waiver

17   of work product requires more than at issue waiver of attorney-client privilege."); *Republic*

18   *of Ecuador v. Mackay*, 742 F.3d 860, 869 n.3 (9th Cir. 2014) (characterizing opinion work

19   product as "virtually undiscoverable"). Plaintiffs cannot satisfy the requirement of Rule 26

20   of making an extraordinary showing that (1) the Buc Testing Documents are otherwise

21   discoverable, (2) Plaintiffs have a substantial need for the materials, and (3) Plaintiffs

22   cannot without undue hardship, obtain their substantial equivalent by other means. Fed. R.

23   Civ. P. 26(b)(3)(A).

24   Dometic Did Not Waive Privilege Under Fed. R. Evid. 502(a)

25   Plaintiffs' argument that Dometic has waived attorney-client privilege and work

26

27

product protection over the Buc Testing Documents pursuant to Fed. R. Evid. 502(a)[51] similarly fails. In essence, Plaintiffs argue that the disclosure of a single document (the Chronology of Events) to NHTSA constitutes a blanket waiver of the subject matter contained therein. But Plaintiffs fail to cite to any other authority supporting its argument besides Fed. R. Evid. 502(a). Plaintiffs do not because no such authority exists. In fact, Plaintiffs' argument is directly defeated by the Advisory Committee's Notes to Fed. R. Evid. 502(a), which state that:

> [A] subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. *See, e.g., In re United Mine Workers of America Employee Benefit Plans Litig.*, 159 F.R.D. 307, 312 (D.D.C. 1994) (waiver of work product limited to materials actually disclosed, because the party did not deliberately disclose documents in an attempt to gain a tactical advantage). Thus, *subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner.*

Fed. R. Evid. 502(a) advisory committee's note (emphasis added). Dometic has not put the Buc Testing Documents at issue. Plaintiffs' argument fails for this reason alone.

In addition, case law regarding "subject matter" waiver also supports rejection of Plaintiffs' argument. Courts have found there to be a "subject matter" waiver only when a party attempts to use the privileged documents as both as a sword and a shield. *First Nat'l Bank in Sioux Falls v. Warner Bros. Entm't, Inc.*, No. 09-cv-8887-GAF, 2011 WL 13213998, at *4 (C.D. Cal. Sept. 14, 2011) (rejecting a party's argument that there was a "subject matter" waiver when the opposing party disclosed a single letter because the disclosing party did not use the document as a sword and a shield); *see also Trireme Medical, LLC v. Angioscore, Inc.*, No. 14-cv-2946-LB, 2016 WL 4191828, at *3 (N.D. Cal. Aug. 9, 2016) (finding there was no "subject matter" waiver because the disclosing

---

[51] Plaintiffs cite to "F.R. Civ Proc. 502(a)" in their argument. Dometic believes Plaintiffs meant to cite to Federal Rule of Evidence 502(a).

1    party was not "selectively disclosing privileged material to gain a tactical advantage" by

2    using the privilege as "both shield and sword"). Here, Dometic has not put the Buc Testing

3    Documents at issue and has no intention of relying on them for its defenses in this case.

4    Because Dometic has not used such materials as a shield or sword, no subject matter waiver

5    applies.

6    **G.    POSSESSION, CUSTODY AND CONTROL OF DOCUMENTS**

7    **Plaintiffs' Position on Discovery**:    Dometic repeatedly asserts a boilerplate objection

8    that they do not have possession, custody and/or control of information or documents -

9    including information and documents from their affiliate companies - and therefore

10   cannot provide a substantive response to plaintiffs' discovery.[52]    These boilerplate

11   objections are not only invalid (see, Section A, supra.), but are also belied by the facts

12   admitted in their Answer.

13          For example, Dometic admits that they began manufacturing gas absorption

14   refrigerators in the United States in 2009.    See, ECF No. 42, at ¶ 22 ["Dometic further

15   admits that, for a period of time after 2009, it manufactured gas absorption refrigerators

16   in the United States."]    Given this fact, it strains credulity to the breaking point for

17   Dometic to assert that they are not in possession of information regarding the design of

18   plaintiffs' refrigerator.    Query - how did Dometic begin manufacturing gas absorption

19   refrigerators of the same design as plaintiffs in 2010, if they didn't have the design from

20   their affiliate company, Dometic AB?    The question answers itself - they have

21   possession, custody or control of all of the refrigerator design material that Dometic AB

22   used, and therefore have the ability to provide substantive responses to this discovery

23   request.    See, *Allen vs. Woodford*, 2007 WL 309945, at *2 (E.D. Cal. Jan. 30, 2007)

24   ["Property is deemed within a party's possession, custody or control if the party has

25   actual possession, custody or control thereof or the legal right to obtain the property on

26   _____

           [52]    See, e.g., Dometic's General Objection No. 9, discussed at Section A and B, *supra.*

27

28

1   demand"].

2          Dometic's boilerplate assertions of a lack of "possession, custody and control" of

3   documents from its affiliate companies is also contradicted by the fact that they have

4   produced such material in other actions, and also reproduced it in this action.[53]

5          Finally, Dometic's "lack of possession, custody and control" objections are

6   completely devoid of any evidentiary fact, and untethered to any specific discovery

7   request.[54]    At the very least - consistent with the specificity requirements of F. Rule 34,

8   outlined above, Dometic should be compelled to supplement their discovery responses

9   and explain what responsive docuents exits, who has them, what efforts Dometic has

10  made to obtain them, and specifically what response they received.

11  **Dometic's Position on Discovery Issue:**

12  **DOMETIC DOES NOT HAVE POSSESSION, CUSTODY OR CONTROL OF**
    **DOMETIC AB'S DOCUMENTS IN SWEDEN**

13

14  Dometic's Factual Background

15          Dometic, through its predecessor in interest, has sold gas absorption refrigerators

16  in the United States since 2001. Ex. 15 (Apr. 7, 2017 Declaration of Daniel R. Fuller

17  ("Fuller Decl.")) at ¶ 3. Dometic also began manufacturing gas absorption refrigerators

18

19  [53]    **Error! Main Document Only.**Dometic has access to whatever documents it wants
    when the documents suit their purposes.      A good example is *Franklin vs. Dometic* (E.D. Tenn.),
20  No.: 2:09-cv-268.   The *Franklin* case involved a RV fire alleged to have been caused by a Model
    2852 Dometic gas absorption refrigerator.      Dometic's defense involved claims of post-sale
21  alteration of the product, specifically, that the electric heaters on the refrigerator at the time of the
    fire were different from the electric heaters installed at the factory by Dometic AB in Sweden.
22  In aid of this defense, Dometic had no problem retrieving the manufacturing data for the
    refrigerator at issue - including "function and safety test data" specific to the plaintiffs' refrigerator
    - supported by an affidavit of Carl Lindhagen, the research and development coordinator for
23  Dometic Holding AB, yet another Dometic affiliated company in Sweden.     See, Affidavit of
    Carl Lindhagen, attached hereto as Exhibit E.     See, also, , Exhibits 8(19) [Dometic Labbe 3535
24  - 3540] and 8(24) [Dometic Labbe 3210 - 3218] to Ex. F [McConnell Depo.] - both of which are
    detailed reports to Dometic AB's Board of Directors regarding the recalls.      The exhibits were
25  retroactively designated confidential by Dometic in the Papasan Action.      Copies will be
    produced at the hearing for the Court's review.
26  [54]    See, e.g. Dometic's responses to plaintiffs' First Set of Requests for Production of
    Documents, Nos. 11, 12, 14, 22, 29.

27                                          58

28

in the United States in late 2009 (with cooling unit production beginning in 2010). *Id.* ¶ 4. However, between 2001 and 2009, Dometic did not design or manufacture any gas absorption refrigerators. *Id.* ¶ 3. Instead, it purchased the refrigerators it sold from a Swedish entity known as Dometic AB. *Id.* These transactions were effectuated via actual purchase orders and invoices between the two companies, pursuant to which Dometic would provide payment to AB as owed. *Id.* During this time period, AB was the entity that designed and manufactured the gas absorption refrigerator that Dometic purchased and sold, including the refrigerator at issue in this case. Am. Complaint at ¶ 50.

As has been established in other Dometic matters in which Plaintiffs' counsel acted as plaintiffs' counsel, AB is neither a parent nor a subsidiary of Dometic but is instead an attenuated corporate affiliate with many degrees of corporate separation. As is typical when products are purchased and sold from one corporate entity to another (regardless of corporate affiliation), AB provided certain documents to Dometic regarding the gas absorption refrigerators it sold, such as end-user operating manuals, and documents related to the NHTSA recalls and applicable U.S. safety standards. Ex. 15 (Fuller Decl.) ¶ 8. However, AB did not provide Dometic all the documents AB created and/or maintained in the course of its business, nor was Dometic provided with unfettered access to those documents—especially those related to design, manufacturing and testing of old versions of the gas absorption refrigerators. *Id.* at ¶¶ 7-8. Because Dometic did not have (and has never had) access to AB Documents, it lacks knowledge regarding what documents existed or may still exist, nor does it know the nature and scope of documents with which it was not provided. *Id.* ¶ 9. Moreover, Dometic and AB ceased these transactions in or around 2010, when AB began winding down its manufacturing operations. *Id.* ¶ 4. Dometic began manufacturing its own gas absorption refrigerators at that time and has not purchased refrigerators from AB since at least 2010. *Id.*

Certain of Plaintiffs' discovery requests ask for documents that Dometic believes

may be in the possession of AB or another entity within the Dometic family, but over which Dometic does not have possession, custody or control. In particular, between their four sets of document requests, Plaintiffs have asked for all documents relating to the design, testing and manufacturing of the gas absorption refrigerators since 1997.[55] Because Dometic did not design, test or manufacture any gas absorption refrigerators prior to 2009, Dometic does not have possession or control over many of these documents. Moreover, Dometic does not have any legal or contractual right to demand these documents from AB, or any other entity within the Dometic family, except and unless the entity to which the request is made is a subsidiary of Dometic. *Id*. ¶ 9. Accordingly, if Dometic requests documents from any other Dometic entity, it cannot control (a) whether it is provided any documents; (b) which documents it is provided; or (c) whether it is provided all responsive documents that may exist. *Id.* Dometic explained these issues at length in both its general and specific objections to Plaintiffs' discovery requests.[56]

Notably, this is not the first time Plaintiffs' counsel has attempted to obtain documents related to these allegations. In the *Varner* and *Papasan* actions, Plaintiffs' counsel (also plaintiffs' counsel in that matter) requested the same documents now sought here. Despite Dometic's lack of control over other Dometic entities, in response to those requests and in an effort to obtain additional responsive documents that might exist, Dometic requested that AB and individuals thought to have possession of the responsive documents—particularly those employed by AB during the time it manufactured the gas absorption refrigerators—provide Dometic with responsive

---

55 *See* Plaintiffs' First Requests for Production of Documents, Nos. 2, 8, 9, 11, 12, 14, 21, 29, 30, 56, 57, 58, and 59; and Plaintiffs' Fourth Request for Production of Documents, Nos. 65, 66, and 67.

56 *See, e.g.*, Dometic's Responses to Plaintiffs' First Request for Production of Documents, General Objection No. 9.

documents that Dometic did not otherwise possess. *Id*. ¶ 11.  Dometic was subsequently provided with less than fifty responsive documents that it did not previously possess, and Dometic produced those documents to plaintiffs in that litigation (subject to any privilege objections). *Id*. Plaintiffs' counsel (*i.e.*, plaintiffs' counsel in Papasan) never moved to compel the production of additional documents in AB's possession—despite years of opportunity to do so. Moreover, plaintiffs' counsel in *Varner* originally moved to compel these documents but then withdrew its motion following a corporate deposition on the issue. [ECF Nos. 117, 126, 128].

Notably, Dometic did not—and still does not—know the exact nature or location of all potentially responsive documents in the possession of other corporate entities. Dometic initially believed that AB possessed most responsive documents that Dometic did not otherwise possess. *Id.* ¶ 12.  However, it discovered that between 2010 and 2013, upon the winding down of AB's manufacturing operations, many of those documents were transferred to various locations and other entities within the Dometic family, and AB no longer possesses or maintains many of the AB Documents. *Id.*  Regardless, Dometic has no legal authority to obtain documents from any other entity in the Dometic family (other than its direct subsidiaries, none of which possess the AB Documents). *Id.* ¶ 9. Nor does it have any way to confirm that it has received all existing documents that may be in the possession of any entity in the Dometic family. *Id.*

Dometic's Argument

Pursuant to Federal Rule of Civil Procedure 34, a party must produce documents in response to a request for production when those documents are "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a). "Control is defined as the legal right to obtain documents upon demand." *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989). In the absence of control by a litigating corporation over documents in the physical possession of another corporation,

the litigating corporation has no duty to produce." *Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 140 (3d Cir. 1988), *citing Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). The party seeking production bears the burden of showing that the opposing party has control over the requested documents. *CAO Lighting, Inc. v. Feit Electric Co., Inc.*, 2021 WL 3376649, at *5-6 (C.D. Cal. June 2, 2021) (denying plaintiff's motion to compel core technical documents, despite defendant maintaining some core technical documents because maintaining some such documents did not prove defendant's control, custody, or a legal right to obtain the rest. Further finding plaintiff's "speculative claim that "defendant must have gotten technical documents from its manufacturers and suppliers" insufficient to satisfy its burden). Where the requesting party fails to provide evidence that the litigating subsidiary has the power to order the parent to turn over its documents, it cannot meet its burden of proof. *Ehrlich v. BMW of North America, LLC*, 2011 WL 3489105, at * 1 (C.D. Cal. May 2, 2011); *see also Princeton Digital Image Corp. v. Konami Digital Ent't Inc.*, No. 11- 62409-CIV, 316 F.R.D. 89, 91 (D. Del. 2016) (denying motion to compel because movant failed to present evidence, as was its burden, that party had control over documents possessed by corporate sibling). "[P]roof of theoretical control is insufficient; a showing of actual control is required." *In re Citric Acid Litigation*, 191 F.3d 1090, 1107 (9th Cir. 1999) (finding that a party lacks legal control over documents of its affiliates where the affiliates are legally separated entities and contract(s) governing the parties' relationship does not expressly provide the subpoenaed party the right to obtain the records upon demand).

As discussed above, Dometic does not have the legal right to obtain documents in the possession of AB or any other entity in the Dometic family. In fact, Dometic cannot even determine the current location and custodian of all AB Documents that may exist. Should corporate affiliates refuse to produce to Dometic documents that it requests, Dometic has no legal recourse other than through the same formal discovery procedures

available to Plaintiffs.

## H.      INTERROGATORY RESPONSES BASED ON FED. R. Civ. P. 34(d)

Dometic provided supplemental responses to a number of plaintiffs'
Interrogatories by referring to documents produced in response to plaintiffs' RFPs, and
asserting that "The answer to this Interrogatory may be determined by examining
documents and/or records previously produced by Dometic in this matter" and that " The
burden of determining the answer to this Interrogatory by examining those documents
and records is substantially the same for both parties."[57]   These objections are without
merit.

Fed. R. Civ. P. 34(d) provides a party responding to an interrogatory the option of
producing their business records as a response, but only if "...the answer to an
interrogatory may be determined by examining, auditing, compiling, abstracting or
summarizing a party's business records...and if the burden of deriving or ascertaining the
answer will be substantially the same for either party...".    This option is not available
to Dometic for at least two reasons.

First, the interrogatories at issue all seek verified discovery responses from
Dometic about their analysis of their own records.     Interrogatory No. 9, for example,
asks Dometic to identify each fire claim "...wherein *YOU determined* that the
SECONDARY BURNER HOUSING device was properly installed, but nevertheless
failed to prevent a fire".    The interrogatory necessarily seeks information exclusively
in the possession of Dometic, and which cannot be determined by plaintiffs' analysis of
Dometic's business records.

Second, the interrogatories seek to have Dometic *identify* all documents relevant
to the particular discovery request.     Simply pointing to a handful of documents is

---

[57]    See, Supplemental Responses to Interrogatories 7, 9, 10, 11, 12, 15, 17, 21, 23, 25,
29, 31, 33, and 35.

1  evasive, and does not fully answer the question.     Are the documents Dometic cites the

2  only documents that exist responsive to the particular interrogatory?     There is no way

3  to tell based on Dometic's responses.

4         Third, the objections lack specificity, and fails to explain how plaintiffs are to

5  determine the *identity* of all relevant documents by a review of the few documents

6  produced.     The objections are therefore improper boilerplate, in violation of the

7  specificity requirements of Fed. R. Civ. Proc. 33.

8  **Dometic's Position on Discovery Issue:**

9            **DOMETIC'S INTERROGATORY ANSWERS MEET RULE 33(D)'S**
                                **REQUIREMENTS**
10

11         When answering an interrogatory, "a responding party is not required to conduct

12  extensive research in order to answer an interrogatory, but a reasonable effort to respond

13  must be made." *Gorrell v. Sneath*, 292 F.R.D. 629, 632 (E.D. Cal. 2013). When the burden

14  of deriving or ascertaining the information requested in an interrogatory is substantially the

15  same for the interrogating and responding parties, the responding party has the option of

16  "specifying the records that must be reviewed, in sufficient detail to enable the

17  interrogating party to locate and identify them as readily as the responding party could."

18  Fed R. Civ. P. 33(d). This court has found interrogatory answers utilizing this option to be

19  adequate and proper. *Owens v. Degazio*, No. 2:16-cv-2750-JAM, 2020 WL 4437468, at

20  *4-5 (E.D. Cal. Aug. 3, 2020); *Berster Techs., LLC v. Christmas*, No. 2:11-cv-1541-KJM,

21  2011 WL 4710801, at *3 (E.D. Cal. Oct. 4, 2011). Dometic has done just that in its Answers

22  and Supplemental Answers to Plaintiffs' Interrogatories. *See, e.g.*, Joint Statement Vol. 2,

23  Dometic's Supp. Answer to Interrogatory No. 7. Dometic's responses in this regard are

24  therefore permissible and adequate.

25  **I.     REQUESTS FOR "ALL" DOCUMENTS**

26  **Plaintiffs' Position on Discovery:**     Plaintiffs' discovery - both interrogatories and

27

28

document production requests - uses the word "all".    Dometic has seized on the use of the word to assert boilerplate objections of that the discovery is "overbroad", "unduly burdensome", etc.    However, Dometic never explains in all of their voluminous objections/responses how any particular discovery request is unduly burdensome, or how Dometic would be prejudiced by responding.    Their failure to support their objections with specifics renders the objections impermissible boilerplate, which should be summarily overruled.[58]

**Dometic's Position on Discovery Issue:**

<u>**DOMETIC PROPERLY OBJECTED TO PLAINTIFFS' DISCOVERY REQUESTS FOR PRODUCTION OR IDENTIFICATION OF "ALL DOCUMENTS"**</u>

A party may only discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts have held "[t]he right to discovery, while broad, is not limitless." *Reflex Media, Inc. v. Luxy Ltd.*, No. CV 20-423-RGK, 2021 WL 5937644, at *2 (C.D. Cal. Oct. 18, 2021) (citing *United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165-GHK, 2015 WL 12731923 (C.D. Cal. July 24, 2015)). A plaintiff has the burden to establish that its discovery requests (i) satisfy the relevance requirements of Rule 26(b)(1), and (ii) show that the discovery requested is proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1); *Bryant*, 2009 WL 1390794, at *1; *Gilead Scis., Inc.*, 2016 WL 146574, at *1.

Here, however, Plaintiffs issued numerous document requests and interrogatories that far exceed the scope of this discovery standard. Amongst the numerous other issues discussed herein, the vast majority of Plaintiffs' discovery requests seek the production of "all" responsive documents rather than documents "sufficient to show." *See, e.g.,* Request for Production Nos. 1-7, 10-12, 14-19, 21, 24-30, 32-36, 38-46, and 48-61; Plaintiffs' Interrogatory Nos. 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 37, 39, 41 and 43. For example,

---

[58]    See, Section A.

Request for Production No. 24 seeks "[a]ll DOCUMENTS used and/or relied upon by [Dometic's] customer service representatives to respond to inquiries/complaints/claims regarding DGARs and/or COOLING UNITS, between January 1, 1997 and the date of [Dometic's] responses to this request, including all scripts used and/or relied upon by the Dometic Refrigerator Retail Recall Line, and further including the factual basis for each statement made therein." Likewise, Interrogatory No. 29 asks Dometic to "IDENTIFY all DOCUMENTS relating to the 2006 RECALL, INCLUDING all CORRESPONDENCE regarding the factual basis upon which the recall was initiated, and all testing upon which the recall was based." In response, Dometic objected that—amongst other issues— a request for "all documents" in the context of these and other requests is highly overbroad as written, has no bearing on the claims or defenses in this individual case, and bears little to no proportionality to the needs of the case. Dometic's objections are precisely the type of "sufficiently particularized objection[s]" this court has found permissible in the context of requests seeking "all documents" on a particular subject matter. *See, e.g.*, *Sanchez v. Cnty. of Sacramento*, No. 2:19-cv-01545-MCE, 2020 WL 605882, at *2-3 (E.D. Cal. Feb. 7, 2020) (sustaining the responding party's objections that a document request seeking "all documents" was overbroad and exceeded the relevance standard).

Accordingly, putting aside all the other issues at hand, Plaintiffs' discovery requests are overbroad in that they seek the production of "all documents" rather than documents "sufficient to show."

**J.      EXCESSIVE INTERROGATORY REQUESTS**

**Plaintiffs' Position on Discovery Issue:** Plaintiffs' propounded their First Set of Interrogatories - consisting of 45 separate interrogatories - to Dometic in April, 2021. Dometic provided responses to all of the interrogatories in May, 2021, without objection to the number of discovery requests.      Dometic thereafter provided supplemental responses to plaintiffs' First Set of Interrogatories on June 10, 2022 - again with no

objection based on the number of interrogatories propounded, notwithstanding the fact that Dometic raised their objection to the number of interrogatories for the first time during the parties meet and confer conference the day before - June 9, 2022.

Dometic's failure to object to the number of interrogatories when first served with them in 2021 - and their subsequent response to every interrogatory propounded - constitutes a waiver of any objection Dometic wants to retroactively assert now to plaintiffs' First Set of Interrogatories.     A finding of waiver on the part of Dometic is particularly appropriate in this case, where a Scheduling Order has not yet been entered, and the parties have not yet had an opportunity to address the nature and scope of discovery in light of the factual and legal complexities of the action.

**Dometic's Position on Discovery Issue:**

**PLAINTIFFS EXCEEDED RULE 33'S 25-INTERROGARY LIMIT**

Rule 33 limits the number of interrogatories a party may issue: "Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). Without a stipulation between the parties or a court, courts enforce this 25-interrogatory limit. *Gorrell v. Sneath*, No. 1:12-cv-0554-JLT, 2013 WL 4517909, at *6 (E.D. Cal. Aug. 26, 2013); *see also Pangborn v. Los Angeles Cnty. Deputy Sheriffs Lieutenant Baudino*, No. 15-cv-6812-AB(JC), 2018 WL 6265055, at *8 (C.D. Cal. Sept. 27, 2018); *Superior Commc'ns v. Earhugger, Inc.*, 257 F.R.D. 215, 219 (C.D. Cal. 2009). Nevertheless, Plaintiffs asserts that they are somehow excused from the requirements of Rule 33 and can propound as many interrogatories as they see fit. Indeed, following their first set of interrogatories, Plaintiffs served a second set—totaling more than 14 additional interrogatories. Plaintiffs' attempt to sidestep the plain language of Rule 33 should be readily rejected by this Court, and Dometic should have no obligation to provide any additional responses or any additional argument in support of its objections to any of the interrogatories beyond the initial 25.

1    **K.      DOMETIC 30(b)(6) DEPOSITION:**

2    **Plaintiffs' Position on Discovery Issue:** Fed. R. Civ. P 30 does not impose any duty to

3    clear a deposition date with the opposing side before noticing a deposition.      However,

4    once a deposition is properly noticed, the parties have an obligation to work

5    cooperatively together to iron out any scheduling problems.

6         Here, plaintiffs properly noticed Dometic's deposition pursuant to Fed. R. Civ.

7    Proc. 30(b)(6), setting the deposition for May 16, 2022.[59]     When Dometic's counsel

8    raised objections to the deposition date, plaintiffs' counsel repeatedly offered to move the

9    deposition to a mutually agreeable date.      Rather than resolve the issue by simply

10   picking a new date, Dometic announced that they would not produce anybody for the

11   deposition, regardless of the date.[60]

12        Dometic's ultimate objections to the scope of the deposition is simply an

13   egregious case of stonewalling.      Dometic produced a number of spreadsheets and

14   databases in discovery in this action.      The metadata for most of these electronic

15   documents was erased, and most of the documents were untitled.      While plaintiffs'

16   counsel could make an educated guess about what each database/spreadsheet was,

17   *plaintiffs' counsel is not going to be a witness in this case.*      The purpose of the

18   deposition, therefore, was to obtain sworn testimony from *Dometic's* corporate witness

19   authenticating the documents and laying the foundation for their admissibility at trial.

20        Given this context, Dometic's objections to the scope of the 30(b)(6) deposition,

21   and their refusal to produce a witness to testify about documents *they produced in*

22   *discovery in this case,*   is simply a bad faith abuse of the discovery process, intended for

23   the purpose of delay and to drive up the costs and complexities of the litigation in

24   violation of Fed. R. Civ. P. 1, and that the wrongful conduct will continue unless nipped

25

26        [59]   See, 30(b)(6) deposition notice for Dometic, attached hereto as Ex. F.
           [60]   See, Ex. A, at A-1; A-4 - A-6; A-9.

27

1    in the bud now.      Plaintiffs request that the Court overrule Dometic's objections to the

2    30(b)(6) deposition in their entirety and in no uncertain terms, and order that they comply

3    with the Federal Rules and provide a corporate witness to testify on their behalf at

4    deposition.

5    **Dometic's Position on Discovery Issue:**

6    **DOMETIC PROPERLY OBJECTED TO RULE 30(B)(6) DEPOSITION NOTICE**

7    Dometic's Factual Background

8        On April 27, 2022, Plaintiffs issued a Notice of FRCP 30(b)(6) Deposition of

9    Defendant Dometic Corporation (the "Notice" or "Deposition") to Dometic. On May 12,

10   2022, Dometic properly objected to the Notice on the grounds that it was procedurally

11   defective and sought information that is far beyond the scope of permissible discovery in

12   this individual products liability case.

13       Importantly, the Notice itself is convoluted and excessive. The Notice includes

14   twelve definitions—the first eleven of which refer to specific documents produced in this

15   litigation. The twelfth definition defines all eleven of those documents, collectively, as the

16   "DOCUMENTS." Plaintiffs then identify seven categories of examination asking for

17   various information about the "DOCUMENTS," as collectively defined. Thus, while only

18   framed as seven categories of examination, the Notice actually contains 77 distinct Rule

19   30(b)(6) topics.

20   Dometic Properly Objected to the Specific Categories of Examination

21       The permissible scope of discovery is limited by the scope of the issues and the

22   amount in controversy in the case. *See* Fed. R. Civ. P. 26(b)(1). All of the documents

23   referenced in the definitions—and thus all the categories of examination—relate to

24   information that is not discoverable in this case. As explained below, Plaintiffs seek

25   discovery that is not relevant, attempts to impose a burden disproportional to the needs of

26   this individual products liability case, and/or is unreasonably cumulative and duplicative

27

28

1   and could be obtained from another less expensive and more convenient source.

2   The Notice Seeks Discovery Concerning Non-responsive, Irrelevant Documents

3       The Court must impose limitations on discovery upon finding the proposed

4   discovery seeks information concerning matters that are not relevant to a party's claim or

5   defense. Fed. R. Civ. P. 26(b)(1), (2)(C)(iii); *see also Bridgewater v. Sweeny*, No. 2:11-

6   CV-1216-CMK-P, 2012 WL 5387968, at *4 (E.D. Cal. Nov. 1, 2012) (sustaining

7   defendant's objections to requests for production of documents where "[n]one of the

8   documents plaintiff requested [were] relevant to the claims" at issue).

9       Certain of the documents identified in the topics of the Notice, particularly those

10  identified in Definitions 1, 2, 3, 4, and 12, contain information about a refrigerator serial

11  number (specifically serial number 24503181) that Plaintiffs erroneously identified in their

12  First Request for Production as reflecting the serial number of the refrigerator at issue in

13  this case (collectively, the "Serial Number Documents"). Dometic produced the Serial

14  Number Documents to demonstrate that Plaintiffs' discovery requests sought information

15  about a refrigerator that never belonged to Plaintiffs. Following receipt of the Serial

16  Number Documents, Plaintiffs recognized and corrected their error. *See* Pls.' Am. Compl.

17  ¶ 50 (revising alleged serial number of Plaintiffs' refrigerator to "Serial Number

18  24503151").

19      Given Plaintiffs' acknowledgement that the Serial Number Documents refer to a

20  refrigerator the Plaintiffs did not own, Dometic properly objected to the respective

21  definitions and the corresponding categories of examination on the grounds that they seek

22  information about documents that are neither responsive nor relevant to this case. This

23  issue is further compounded by the broad scope of the information Plaintiffs seek

24  concerning these irrelevant documents. For example, Plaintiffs have not and cannot explain

25  why "[t]he identity of the person or persons who created and/or retrieved" the Serial

26  Number Documents is relevant to this case. As such, Dometic's objections to the topics

27

28

1 regarding the Serial Number Documents are proper.

2 <u>The Notice Seeks Discovery That is Not Proportional and Unreasonably Cumulative,</u>
3 <u>Duplicative, and Burdensome</u>

4        The Court must impose limitations on discovery where the discovery proposed

5 seeks information that is not proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1),

6 (2)(C)(iii); *see also EEOC v. Sensient Dehydrated Flavors Co.*, No.

7 115CV01431DADBAM, 2016 WL 4399367, at *4 (E.D. Cal. Aug. 17, 2016) (deeming

8 discovery concerning current employees disproportional where plaintiff's claims related

9 exclusively to discharged employees).

10        Aside from the Serial Number Documents, the documents identified in Definitions

11 (particularly Definitions 5, 6, 7, 8, 9, 10, and 12) are databases reflecting all warranty

12 claims and all property/personal injury claims related to all Dometic-branded gas

13 absorption refrigerators sold in the United States since 1997 (collectively, the "Claims

14 Database Documents"). With the exception of the single claim made by Plaintiffs in this

15 litigation, the Claims Database Documents are wholly unrelated to Plaintiffs' refrigerator.

16 In fact, most of the information in the Claims Database Documents relates to refrigerators

17 that are of a completely different model than Plaintiffs' refrigerator and were made by

18 different entities at different times using different manufacturing and design specifications.

19 While Dometic agreed to produce the Claims Database Documents in good faith, the

20 breadth and extent of information sought concerning them in the Notice is overly broad,

21 unduly burdensome, and not proportional to the needs of the case. Dometic properly lodged

22 these objections in its formal response to the 30(b)(6) Notice. There is simply no need for

23 Dometic to produce a witness to provide testimony regarding twenty-five years of database

24 data unrelated to Plaintiffs' claims.

25        Furthermore, the Court must also impose limitations on discovery where "the

26 discovery sought is unreasonably cumulative or duplicative, or can be obtained from some

27

28

other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i); *see also Jordan v. Wonderful Citrus Packing LLC*, No. 118CV00401AWISAB, 2019 WL 176264, at *7 (E.D. Cal. Jan. 11, 2019) (denying request to take deposition where the testimony sought would be "largely duplicative of previous deposition testimony"); *Garcia v. Cnty. of San Diego*, No. 15CV189-JLS (NLS), 2017 WL 3923682, at *2 (S.D. Cal. Sept. 7, 2017) (denying plaintiff's request to re-depose defendant where the information sought was unreasonably duplicative of information plaintiff had already obtained or would obtain from other depositions); *Negotiated Data Sols. LLC v. Dell, Inc.*, No. C09-80012MISC, 2009 WL 733876, at *4 (N.D. Cal. Mar. 17, 2009) (deeming deposition testimony requested "merely to confirm what kinds of documents [a party] has or whether there is anything else to be produced" unreasonably cumulative, duplicative, and burdensome).

Plaintiffs' counsel Mr. Terrence Beard is also counsel for the putative class in the *Papasan* class action. The Plaintiffs in this case are members of the putative class named in the *Papasan* class action (including both in the complaint and in the pending motion for class certification). Mr. Beard, acting on behalf of Plaintiffs as members of the putative class in *Papasan*, already took a full-day deposition of Dometic's corporate witness concerning the Claims Database Documents. Indeed, the only reason Plaintiffs' counsel was able to obtain such broad discovery in *Papasan* is because that case (unlike this one) was brought as a putative class action on behalf of millions of consumers who owned Dometic-branded gas absorption refrigerators over a more than two-decade period. At the deposition, Plaintiffs' counsel had an ample opportunity to question Dometic's corporate witness about these same documents based on the exact same allegations repeated by Plaintiffs in this case. Plaintiffs' counsel never argued in *Papasan* that Dometic's Rule 30(b)(6) witness was not properly educated about the scope of these topics or that he did not provide adequate testimony concerning them. Dometic has willingly produced that

deposition transcript and its exhibits in this action in lieu of yet another corporate deposition. The Notice therefore seeks discovery that is unreasonably cumulative, duplicative and can be obtained from another source that is more convenient and less burdensome. Dometic properly lodged these objections in its formal response to the 30(b)(6) Notice. There is simply no need or justification for yet another corporate deposition by Plaintiffs' counsel on these same topics on behalf of the same individuals.

Dometic Properly Objected that the Notice Was Untimely

The Notice is also objectionable because it included a request for production of documents without providing the requisite temporal notice. Where a deposition notice includes a request that the deponent produce documents, the notice must be served at least thirty days before the date of the deposition. *See* Fed. R. Civ. P. 30(b)(2), 34(b)(2)(A). Plaintiffs served the Notice on April 27, 2022, only nineteen days—thirteen business days—before May 16, 2022, the date Plaintiffs unilaterally selected for the deposition. Thus, Dometic properly objected to the Notice on the grounds that it violates Rules 30 and 34. *See Van Scoy v. New Albertson's Inc.*, No. 2:08-CV-02237-MCE, 2011 WL 1079914, at *4 n.4 (E.D. Cal. Mar. 21, 2011) ("Although Rule 30(b) by its terms provides only that 'reasonable' notice of a deposition has to be provided to the parties, when a deposition notice … is accompanied by a production request, a minimum of 30 days' notice is required."); *Guzman v. Bridgepoint Educ., Inc.*, No. 11-0069-WQH WVG, 2014 WL 1670094, at *2–3 (S.D. Cal. Apr. 28, 2014). Plaintiffs had no right to proceed with the improperly noticed deposition, much less demand that Dometic provide its objections by a deadline arbitrarily set by Plaintiffs' counsel. [61] For this reason alone, Dometic's

---

[61] When, on Dometic's initiative, the parties met and conferred regarding the Notice, Dometic explained its objections and indicated it would serve formal, written objections. Plaintiffs' counsel demanded that Dometic submit its objections by the next day. In response to Dometic's position, Plaintiffs' counsel subsequently agreed to extend that deadline by one day. Notwithstanding the fact that Plaintiffs' unilateral demands did not constitute a good faith effort to meet and confer, Dometic submitted its objections by the date requested, May 12, 2022.

1  objections to the Notice should be sustained.

2  **L.    DOMETIC'S NHTSA DRAFTS**

3  **Plaintiffs' Position:**

4          Dometic produced in discovery in the Papasan class action a series of drafts of the

5  Chronology of Events ultimately filed with NHTSA as part of the initiation of the 2006

6  recall, as well as the final version that was ultimately publicly filed with NHTSA.      The

7  drafts and final version were marked as exhibits to Mr. McConnell's deposition in the

8  Papasan action, and plaintiffs' counsel attempted to examine Mr. McConnell regarding

9  the development of the final version of the Chronology, and differences between the

10  drafts and the final version.62    Dometic's counsel prevented any questioning on the

11  drafts by claiming that they were "inadvertently produced", and constituted attorney-

12  client and work product material.

13          In the present action, plaintiffs specifically sought the production of both the final

14  and drafts of the Chronology.63      Dometic produced the public version, albeit stamped

15  "confidential", but refused to produce the drafts.      The drafts are both relevant and

16  proportional to the needs of the case in that they are direct evidence of the nature and

17  extent of Dometic's notice/knowledge of safety-related defects in their gas absorption

18  refrigerators at the time of the initiation of the first recall.      When compared with the

19  notice actually made public, the drafts are also direct evidence of Dometic's active

20  concealment and misrepresentation of the existence, nature, scope and risks associated

21  with the safety related defects in their refrigrators.      What Dometic knew about their

22

23  62    The drafts of the Chronology were marked Exhibits 15, 16 and 17 to the McConnel deposition.    The final
    version was marked as Exhibit 18 and identified as the final version.    See, Ex. F [McConnell Depo.], at 257:15 –
24  23.
    63    See, RFP No. 23:
25              "23. All DOCUMENTS YOU submitted to NHTSA to initiate the 2006
                RECALL and 2008 RECALL, including, but not by way of limitation,
26              all chronologies of events, and all drafts of DOCUMENTS, including
                chronologies, submitted to NHTSA."
27
                                              74
28

refrigerators at the time they initiated their recalls – and what they told other people, including federal regulators, about defects in the refrigerators, is relevant to resolve the disputed issues of liability for all of plaintiffs' negligence-based and post-sale duty to warn/recall causes of action, as well as plaintiffs' claim for punitive damages.

Dometic's attempts to nevertheless shield otherwise relevant information behind attorney-client or attorney work product objections should be rejected for the same reasons set forth in the discussion of the BUC TESTING MATERIAL.   Dometic should not be allowed to argue the benefits of initiating the recalls – i.e. that they acted reasonably in conducting the recalls – and at the same time shield from any scrutiny evidence that the recalls were essentially fraudulent, and simply a continuation of their pattern of concealment of dangerous safety-related defects in their products.

Further, Dometic's insistence that their attorney's participation in coming up with the drafts necessarily creates an attorney-client/work product shield that precludes discovery misses the entire point.      As described in Section F, supra., the attorney client privilege is not all encompassing or absolute.   Where, as here, Dometic has used their attorneys to provide false, misleading and incomplete information to NHTSA, they have not just perpetrated a fraud – but a crime as well.      The crime/fraud exception therefore applies to the drafts of the NHTSA Chronology, rendering them discoverable in this action.

**Dometic's Position on Discovery Issue:**

## THE NHTSA DRAFTS ARE NOT DISCOVERABLE

Dometic's Factual Background

In 2006, Dometic conducted a recall of certain Dometic-branded gas absorption refrigerators. Dometic's outside-counsel, Barnes & Thornburg LLP, assisted Dometic in complying with the relevant federal regulations governing the recall, including the necessary disclosures to NHTSA. Ex. 16 (Nov. 20, 2019 Declaration of Patrick McConnell

1   ("McConnell Decl.")) ¶ 2. Patrick McConnell, then an employee of Dometic who was long

2   responsible for product safety related to Dometic-branded refrigerators, worked directly

3   with Barnes & Thornburg to prepare the required disclosures. *Id.* ¶ 3. As part of this

4   process, Mr. McConnell provided Barnes & Thornburg with information that he thought

5   could be potentially relevant to the disclosures so that Barnes & Thornburg could provide

6   legal advice and input to Dometic with respect to the nature and content of the disclosures.

7   *Id.* Both Barnes & Thornburg and Mr. McConnell assisted with preparing, commenting on,

8   and editing various drafts of the disclosures so Dometic could properly comply with its

9   legal obligations (the "NHTSA Drafts"). *Id.*

10       As explained below, the NHTSA Drafts are not discoverable because those

11   documents are not relevant to any claim or defense at issue in this case. Moreover, even if

12   the NHTSA Drafts were relevant, Plaintiffs fail to acknowledge that the scope of discovery

13   is limited to matters that are both "relevant to any party's claim or defense **and** proportional

14   to the needs of the case … ." Fed. R. Civ. P. 26(b)(1) (emphasis added). The NHTSA Drafts

15   include information relating to approximately 926,877 refrigerators, many of which are not

16   even the same model as Plaintiffs' refrigerator. *See* Dometic's Answer to Am. Compl. ¶ 38

17   [ECF 42]. Finally, even if the NHTSA Drafts were relevant and Plaintiffs' request was

18   proportional, Plaintiffs would still not be entitled to discovery concerning those documents

19   because they are protected from disclosure by attorney-client privilege and the work

20   product doctrine.

21   The NHTSA Drafts Are Not Relevant

22       Plaintiffs argue the NHTSA Drafts are relevant to their claims "regarding

23   concealment/ minimizing defects and risks in [Dometic's] gas absorption refrigerators, and

24   the accuracy/credibility of [Dometic's] statements to NHTSA." As discussed, through the

25   2006 recall, Dometic voluntarily disclosed that it had conducted testing which revealed

26   there was a potential risk of fire in Plaintiffs' refrigerator and other refrigerators like it. *See*

27

28

Complaint ¶¶ 40, 53; Ex. 6 (2006 Defect Notification). As such, Dometic has stipulated to the presence of a potential defect in Plaintiffs' refrigerator which could cause fires under certain circumstances. Furthermore, Dometic has no intention of relying on the NHTSA Drafts as a part of its defense, and it has never disclosed these documents to its experts in this or any other case. Dometic also has no intention of relying on the elements identified in the recall notices as a basis for arguing that the refrigerator did not cause the fire. As such, the NHTSA Drafts would not add anything to Plaintiffs' claims or advance any additional theory of liability. Simply put, Plaintiffs do not need drafts of these documents to establish a fact that is not in dispute.

The NHTSA Drafts Are Privileged

Plaintiffs seek discovery of information concerning the nature and content of the NHTSA Drafts—documents that were prepared in conjunction with Dometic's outside counsel in anticipation of litigation—without addressing Dometic's assertions of privilege over those documents. The NHTSA Drafts are protected from disclosure by attorney-client privilege and the work product doctrine for the same reasons the Buc Testing Documents are protected. *See supra*, §§ VI.F. At all times, Mr. McConnell understood and intended that this collaborative drafting process was for the purpose of obtaining Barnes & Thornburg's legal advice about, *inter alia*, Dometic's recall obligations. Ex. 16 (McConnell Decl.) ¶ 4. Mr. McConnell, Dometic, and Barnes & Thornburg all shared the expectation that these communications would be kept confidential, consistent with appropriate privileges and protections, including the attorney-client privilege. *Id.* And these communications have, at all times, been kept confidential by Mr. McConnell. *Id.*

As such, the NHTSA Drafts underlying this process are clearly protected by the attorney-client privilege and work product doctrine. *See, e.g.*, *Helm v. Alderwoods Grp., Inc.*, No. C 08-01184, 2010 WL 2951871, at *2 n.2 (N.D. Cal. July 27, 2010) ("[Defendant] assert attorney-client privilege for undistributed documents, such as drafts of

communications which were created with the intention of confidentiality … .”); *Gen-Probe Inc. v. Becton, Dickinson & Co.*, No. 09CV2319, 2012 WL 3762447, at *2 (S.D. Cal. Aug. 29, 2012) (determining draft documents were protected from disclosure upon finding “no indication that the communications … were ever intended to be disclosed.”); *see also United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020); *Ins. Co. of N. Am. v. Superior Ct.*, 108 Cal. App. 3d 758, 767 (1980); *Arfa v. Zionist Org. of Am.*, No. CV 13-2942-ABC, 2014 WL 815496, at *4 (C.D. Cal. Mar. 3, 2014) (citing *Fox v. Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 525 (N.D. Cal. 1988)).

DATED:                          **LAW OFFICES OF TERRENCE A. BEARD**

                                By:    */s/ Terrence A. Beard*
                                _____
                                       Terrence A. Beard
                                       P.O. Box 1599
                                       Sutter Creek, CA    95685
                                       Telephone: (925) 778-1060
                                       Email: TBeard1053@aol.com

                                       *Counsel for Plaintiffs*

                                **HAIGHT BROWN & BONESTEEL LLP**
                                **MOORE & LEE, LLP**

                                By:    */s/ Erica Rutner*
                                _____
                                       Krsto Mijanovic
                                       Leah B. Mason
                                       Erica W. Rutner

                                       *Attorneys for Defendant*
                                       DOMETIC CORPORATION