1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LANE LABBE', et al.,                  No.  2:20-cv-01975-DAD-DMC

12            Plaintiffs,                  ORDER GRANTING IN PART AND
                                           DENYING IN PART PLAINTIFFS' AND
13        v.                               DEFENDANT'S MOTIONS TO EXCLUDE
                                           EXPERT OPINIONS PURSUANT TO
14   DOMETIC CORPORATION,                  *DAUBERT*

15            Defendant.                   (Doc. Nos. 135, 137, 140, 141)

16

17

18        This matter is before the court on the motions *in limine* filed by plaintiffs to exclude from

19   evidence the expert opinions of defense experts Nicholas J. Spruill and Patrick McConnell (Doc.

20   Nos. 135, 137) and the motions *in limine* filed by defendant seeking  to exclude from evidence the

21   expert reports of plaintiff experts Orion Keifer and Peter Layson of Applications Engineering

22   Group, Inc. (collectively, the "AEGI experts") and Stuart Baker (Doc. Nos. 140, 141).  For the

23   reasons explained below, the court will grant in part and deny in part the motions of both parties

24                              **BACKGROUND**

25        This case stems from a fire in a recreational vehicle ("RV") leased by plaintiffs Lane

26   Labbe, Lisa Labbe, and June Labbe to plaintiff April Tomczak which was allegedly caused by a

27   defective refrigerator manufactured by defendant Dometic Corporation.

28   /////

                                    1

**B.      Factual Background**

      1.      <u>The Fire</u>

On April 22, 2022, plaintiffs filed their first amended complaint ("FAC").  (Doc. No. 40.) In that FAC, plaintiffs allege the following.

Defendant designed, manufactured, sold, and distributed a series of gas absorption refrigerators.  (*Id.* at ¶ 7.)  Defendant's gas absorption refrigerators were initially sold to RV manufacturers and distributed through retail RV dealerships.  (*Id.* at ¶ 10.)  The design of these refrigerators uses a weld design which transfers heat from the electric heating elements to the boiler tube.  (*Id.* at ¶¶ 23, 24.)  This design leads to a concentration of heat adjacent to the weld, which leads to cyclic stress as the refrigerator continues to operate.  (*Id.* at ¶ 25.)  Eventually, the concentration of heat leads the protective layer along the boiler tube to fail which causes the cooling solution to corrode the then-unprotected boiler tube and to create a small leak in the boiler tube.  (*Id.* at ¶ 26.)  In short, this design can result in fires caused by the leak in the boiler tube.  (*Id.* at ¶ 29.)

In July 2019, plaintiffs purchased an RV which was equipped with one of defendant's gas absorption refrigerators.  (*Id.* at ¶ 50.)  The RV was located at plaintiffs Lane and Lisa Labbe's ranch in Quincy, California.  (*Id.* at ¶ 52.)  On October 25, 2019, plaintiff April Tomczak was renting the RV as student housing from the other plaintiffs.  (*Id.* at ¶ 53.)  Plaintiff Tomczak realized that her hair dryer stopped working mid-use and that her phone was not charging.  (*Id.*)  While moving her phone to another outlet, plaintiff Tomczak smelled an odd odor and saw smoke coming from the refrigerator.  (*Id.*)  She opened the refrigerator and saw smoke coming from the inside.  (*Id.*)  Plaintiff Tomczak left the RV to call for help but a fire spread through the RV before the Quincy Volunteer Fire Department was able to respond.  (*Id.* at ¶ 54.)  Before the fire was extinguished, plaintiffs' RV, neighboring barn, various vehicles, and nearby farm equipment were completely destroyed by the fire.  (*Id.* at ¶ 56.)

/////

/////

/////

2.    The Experts' Reports[1]

Plaintiffs and defendant participated in a joint inspection of the site of the fire on December 4, 2019. (*Id.* at ¶ 59; Doc. No. 147-1 at 14.)  Defendant's retained expert, Nicholas J. Spruill, was present for this fire scene analysis to determine the cause and origin of the fire in plaintiffs' RV. (Doc. No. 136-2 at 7.)  Plaintiffs' retained expert, Stuart Baker, was also present to determine the cause and origin of the fire. (Doc. No. 141-2 at 3, 31.)  Both Mr. Spruill and Mr. Baker prepared expert reports regarding the cause of the fire. (Doc. Nos. 138-2 at 3; 141-2 at 2.)

After the fire inspection, various materials were gathered from the scene, including the refrigerator, and shipped for a materials examination at AEGI Labs. (Doc. Nos. 40 at ¶ 60; 141-2 at 41.)  That examination was conducted on February 18 and 19, 2020 by plaintiffs' experts Orion Keifer and Peter Layson who are engineers employed by AEGI Labs. (Doc. No. 138-5 at 10–13, 24.)  Also present at the materials examination were Dr. Amy Gray and Kim May, who were retained by defendant. (*Id.* at 24.)  The AEGI experts had previously worked with defendant's refrigerators and formed an opinion that those refrigerators contain a common design defect, which informed their analysis of the refrigerator in this case. (Doc. No. 140-2 at 69–70.)  The AEGI experts prepared an expert report regarding:  (1) whether every refrigerator of the same model as the one at issue in this case had a common design defect and the feasibility of alternative designs (the "common defect opinions"); (2) whether defendant was aware of a design defect; and (3) whether the fire in plaintiffs' RV was caused by a defect in plaintiffs' refrigerator (the "particular defect opinion"). (Doc. No. 140-2 at 30–32.)

Following disclosure of plaintiffs' and defendant's experts, on January 22, 2024 defendant disclosed Patrick McConnell, a former director of product safety, compliance, and engineering services for defendant, as a rebuttal expert witness. (Doc. No. 138-12 at 2–3.)  On May 21, 2024, defendant served plaintiffs with an amended disclosure of Mr. McConnell's status as a rebuttal expert witness. (Doc. No. 138-17 at 2–4.)  Therein, defendant disclosed that Mr. McConnell

---

[1]  The facts in this section are drawn from allegations in the FAC, the deposition testimony of both parties expert witnesses, the *curriculum vitae* of those expert witnesses, and their expert reports. (Doc. Nos. 40, 136, 138, 140-2, 141-2, 147-1.)

1   would testify that, in his opinion:  (1) Mr. Baker's conclusion about the fire cause was not

2   consistent with witness testimony as to the "presence, location, timing, and nature of the smoke

3   and flames observed;" (2) Mr. Baker's conclusion was not consistent with witness testimony

4   regarding the lack of any ammonia odor; (3) Mr. Baker's conclusion regarding the lack of other

5   ignition sources was inconsistent with what was observed at the scene; and (4) the AEGI experts'

6   opinion about the presence of a retrofit kit in the refrigerator was not consistent with the design

7   and manufacturing history of that refrigerator.  (Doc. No. 138-17 at 2–3.)

8   **B.    Procedural Background**

9         On April 22, 2022, plaintiffs filed their operative first amended complaint ("FAC") in

10  which they asserted the following claims:  (1) strict product liability on a theory of design defect;

11  (2) strict product liability on a theory of failure to warn; (3) negligence; (4) negligent failure to

12  warn; (5) negligence *per se*; and (6) negligent failure to conduct adequate recall or retrofit of a

13  defective product.  (Doc. No. 40 at 42–50.)

14        On November 6, 2024, plaintiffs filed their pending motions *in limine* and defendant filed

15  its pending motions *in limine* as well as a motion seeking summary judgment in its favor as to all

16  of plaintiffs' claims.  (Doc. Nos. 135, 137, 139, 140, 141.)  On November 7, 2024, the court

17  denied defendant's motion for summary judgment without prejudice due to defendant's failure to

18  comply with the meet and confer requirement imposed by the court's standing order.  (Doc. No.

19  142.)  On November 8, 2024, the parties filed a joint stipulation in which defendant declined to

20  file a renewed motion for summary judgment.  (Doc. No. 143.)  The parties instead jointly

21  requested that the court first rule on the now pending motions *in limine* (the "*Daubert* motions")[2].

22  (*Id.*)  On December 3, 2024, the court held a status conference at which time a briefing schedule

23  as to the *Daubert* motions was established and the parties' proposal that any motion for summary

24  /////

25  /////

26

27  _____

28  [2]  These motions seek to exclude expert testimony pursuant to Federal Rule of Evidence 702
    under the standard identified by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals,
    Inc.*, 509 U.S. 579 (1993).

1  judgment should be filed within thirty days of the court's order resolving those pending motions

2  was adopted.[3] (Doc. No. 145.)

3      On December 13, 2024, plaintiffs and defendant filed their oppositions to the *Daubert*

4  motions. (Doc. Nos. 146, 147, 149, 150.) On January 10, 2025, plaintiffs and defendant filed

5  their replies thereto. (Doc. Nos. 152, 153, 154, 155.)

6                                    **LEGAL STANDARD**

7      The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which

8  provides:

9           A witness who is qualified as an expert by knowledge, skill,
10          experience, training, or education may testify in the form of an
            opinion or otherwise if:

11          (a) the expert's scientific, technical, or other specialized knowledge
            will help the trier of fact to understand the evidence or to determine
12          a fact in issue;

13          (b) the testimony is based on sufficient facts or data;

14          (c) the testimony is the product of reliable principles and methods;
            and
15

16          (d) the expert has reliably applied the principles and methods to the
            facts of the case.

17  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589 (1993)

18  (noting that Rule 702 is the primary locus of the trial court's obligation to "ensure that any and all

19  scientific testimony or evidence admitted is not only relevant, but reliable").

20      As the Ninth Circuit has recently stated:

21          *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),
            and Federal Rule of Evidence 702 ("FRE 702") impose a
22          gatekeeping duty on a district court reviewing a challenge to the

23  ─────────────────────────────
24  [3] Although motions *in limine* are typically brought to exclude evidence from admission at trial,
    parties may file motions pursuant to Federal Rule of Evidence 702 to exclude expert opinion
25  evidence from consideration at the summary judgment stage. *See Hobus v. Howmedica Osteonics
    Corp.*, 699 F. Supp. 3d 1122, 1129–30 (D. Or. 2023) (addressing motions *in limine* to exclude
26  evidence pursuant to Federal Rule of Evidence 702 prior to addressing motion for summary
    judgment); *but see Arrowood Indem. Co. v. City of W. Sacramento*, No. 2:21-cv-00397-WBS-
27  JDP, 2021 WL 5760980, at *1 (E.D. Cal. Dec. 3, 2021) (construing a motion *in limine* as a
    motion "to strike [expert] testimony from consideration" and observing that *Daubert* hearings are
28  properly requested at the summary judgment stage of litigation).

opinion of an expert witness. *Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010). In exercising its role as a gatekeeper, a district court must determine whether a challenged expert opinion is relevant and reliable. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (*en banc*). A district court has "considerable leeway" in deciding whether an expert's testimony is reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's opinion will be excluded if it does not have a "reliable foundation" or if it is not based "in the knowledge and experience of [the relevant] discipline." *Id.* at 141, 149 (quoting *Daubert*, 509 U.S. at 592). A district court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

*Sonneveldt v. Mazda Motor of America, Inc.*, 2024 WL 5242611, at *1 (9th Cir. Dec. 30, 2024).[4]

In short, "[e]xpert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citation omitted). "It is the proponent of the expert who has the burden of proving admissibility." *Id.* (quoting *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

The court's gatekeeping role applies to "all forms of expert testimony, not just scientific testimony." *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003). When non-scientific expert testimony is proffered, "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (noting that "[t]he *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of [police gang expert's] testimony").

## DISCUSSION

**A.    Plaintiffs' Motion to Exclude Expert Opinion of Nicholas J. Spruill**

In their first *Daubert* motion, plaintiffs argue that Mr. Spruill lacks the requisite training and experience to render an opinion regarding the cause of the fire in this case. (Doc. No. 135 at 5–6.) Additionally, plaintiffs contend that Mr. Spruill's opinion must be excluded because he did not base his opinion on a reliable methodology. (*Id.* at 8–12.) Plaintiffs also argue that Mr. Spruill's conclusion that the cause of the fire is "undetermined" would not be helpful to the jury

---

[4] Citation to unpublished Ninth Circuit opinions throughout this order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

at trial and therefore should be excluded. (*Id.* at 13–14.) Finally, plaintiffs contend that Mr. Spruill improperly opines on the credibility of an eyewitness and such testimony should not be considered because it falls outside the scope of proper expert testimony. (*Id.* at 14–15.) The court will address each of these arguments below.

        1.     <u>Qualifications</u>

Plaintiffs contend that Mr. Spruill is not qualified to render an opinion on the cause of the fire in this case because he has no background in analyzing gas absorption refrigerators, did not attend the laboratory examination of the evidence collected from the scene of the fire, and had never before investigated an actual fire scene. (*Id.* at 6.) In their reply brief, plaintiffs refer to Mr. Spruill's deposition where he testified that he had no experience working with gas absorption refrigerators prior to his current position. (Doc. No. 147-1 at 11.) Mr. Spruill also testified that he had only worked on "one or two" other cases involving gas absorption refrigerators and could not recall whether this was the first fire case he worked on. (*Id.*) He further testified that he had not previously conducted a fire scene inspection prior to his inspection conducted in this case. (*Id.*) Finally, he confirmed he did not attend the materials examination. (*Id.* at 31.)

Defendant disputes the characterization of Mr. Spruill as lacking expertise with the refrigerator technology at issue in this case. (Doc. No. 147 at 4–5.) Specifically, defendant refers to Mr. Spruill's deposition where he testified that he had spoken to the experts who conducted the laboratory examination and also reviewed relevant deposition testimony. (Doc. No. 147-1 at 30–31.) Defendant argues that, even if Mr. Spruill does not have specific knowledge of "gas absorption refrigerator technology," he is still qualified to render an expert opinion on the cause and origin of the fire based on his qualifications as a certified fire and explosion investigator with fifteen years of experience in that field. (Doc. Nos. 147 at 4–5, 137–142.)

The court is persuaded by defendant's arguments in this regard. Mr. Spruill is a member of the National Association of Fire Investigators ("NAFI") with which he is a certified fire and explosion investigator. (Doc. No. 147-1 at 138.) He has several years of training related to the investigation of fire origins. (*Id.* at 138–141.) This is sufficient to establish that Mr. Spruill is qualified to provide expert testimony on fire origins and causation. *See Lancaster v. Samsung*

1    *Elecs. Am., Inc.*, No. 2:20-cv-00794-GMN-EJY, 2022 WL 18998608, at *4 (D. Nev. Dec. 5,

2    2022) (holding that the witness had sufficient knowledge and experience to testify about a battery

3    failure causing an electrical fire based on his "background in electrical fire origin and causation").

4    Plaintiffs' objections based on Mr. Spruill's lack of experience with refrigerator technology in

5    particular instead go to the weight of his testimony. *See In re Silicone Gel Breast Implants Prods.*

6    *Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) ("A lack of specialization affects the

7    weight of the expert's testimony, not its admissibility."); *see also Moribe v. Am. Water Heater*

8    *Co.*, No. 21-cv-00254-HG-WRP, 2023 WL 8998745, at *6 (D. Haw. Dec. 28, 2023) ("Courts

9    generally do not require that a witness's expertise be precisely matched to the questions at

10   issue. . . . Gaps in an expert witness's knowledge or specialization affects the weight of the

11   testimony, not its admissibility.") (citing *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385–86

12   (9th Cir. 1992). The court therefore concludes that Mr. Spruill is qualified to offer an expert

13   opinion on the fire origin and causation in this case.

14           2.    Reliability of Methodology

15           Plaintiffs next argue that Mr. Spruill's methodology is not reliable and therefore his

16   opinion should be excluded from consideration. (Doc. No. 135 at 8–12.) Plaintiffs contend that

17   although he claims to apply the protocols found in National Fire Protection Association

18   ("NFPA") 921, Mr. Spruill failed to abide by that methodology in rendering his opinion in this

19   case. (*Id.*) Plaintiffs concede that NFPA 921 provides a reliable methodology to determine the

20   cause of a fire. (*Id.* at 8.) The concession is well-taken since courts have also recognized the

21   same. *See Allstate Ins. Co. v. Ford Motor Co.*, No. 08-cv-02276-PHX-NVW, 2010 WL 1654145,

22   at *5 (D. Ariz. Apr. 21, 2010) (recognizing NFPA 921 as being a reliable methodology under

23   *Daubert*) (citing *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057–58 (8th

24   Cir. 2005)). Plaintiffs instead contend that Mr. Spruill did not properly apply provision 19.6.5.1

25   that appears within NFPA 921 in forming his opinion that the cause of the fire here was

26   undetermined. (Doc. No. 135 at 9.)

27   /////

28   /////

8

1     NFPA 921's provision 19.6.5.1 states as follows:

2           19.6.5.1 Cause Undetermined.   In the circumstance where all
      hypothesized fire causes have been eliminated and the investigator is
3     left with no hypothesis that is evidenced by the facts of the
      investigation, the only choice for the investigator is to conclude that
4     the fire cause or specific causal factors, remains undetermined.  It is
      improper to base hypotheses on the absence of any supportive
5     evidence.   That is, it is improper to opine a specific fire cause,
      ignition source, fuel or cause classification that has no evidence to
6     support it even though all other such hypothesized elements were
      eliminated.
7

8     (Doc. No. 136-7 at 6–7) (excerpted from the 2017 NFPA 921 guide for fire and explosion

9     investigations).  Plaintiffs argue that the evidence Mr. Spruill considered could only indicate the

10    refrigerator as the origin of the fire and that he instead improperly hypothesized a second

11    potential electrical source for the fire despite the lack of any supporting evidence.  (*Id.* at 9–11.)

12    Defendant counters that this argument challenges only the conclusion reached by Mr. Spruill and

13    not his methodology.  (Doc. No. 147 at 6.)  Defendant also argues that Mr. Spruill did have

14    evidence upon which to hypothesize an electrical source for the fire based on witness testimony.

15    (*Id.* at 7–8.)

16          "Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but

17    the soundness of his methodology."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th

18    Cir. 2022) (internal quotation marks omitted).  Accordingly, the court rejects plaintiffs'

19    contention that Mr. Spruill's testimony should be excluded solely because he did not find that the

20    refrigerator was the cause of the fire.  (Doc. No. 135 at 12) (arguing that Mr. Spruill's conclusion

21    was too "convenient" to defendant to be believed).  Plaintiffs' argument that there was no

22    evidence upon which Mr. Spruill could base a hypothesis of an electrical source for the fire is

23    similarly unavailing.  Mr. Spruill stated that he had reviewed a witness statement describing the

24    events precipitating the fire that acknowledged there were "electrical issues that were being had

25    right prior to the fire."  (Doc. No. 147-1 at 27.)  Based upon this, the court cannot conclude that

26    there was "no evidence" supporting a hypothesis of an electrical cause of the fire.  Therefore, the

27    court rejects plaintiffs' argument that Mr. Spruill incorrectly applied NFPA 921 and finds his

28    methodology to be sufficiently reliable.

### 3.    Helpfulness to the Jury

Plaintiffs next argue that Mr. Spruill's opinion would not be helpful to a jury because a conclusion that the fire's cause was undetermined simply would not provide the jury with any useful information.  (Doc. No. 135 at 13–14.)  Defendant responds that Mr. Spruill's opinion—that the cause of the fire cannot be determined based upon the evidence he reviewed—directly bears on whether plaintiffs can meet their burden of proof to show that the refrigerator caused the fire.  (Doc. No. 147 at 8.)  Plaintiffs reply that another judge in this district in *Johnson v. Natural Gas Fuel Systems, Inc.*, No. 1:19-cv-00105-SAB, 2024 WL 3718097 (E.D. Cal. Aug. 8, 2024) has recently excluded expert testimony on the basis that the inability to draw a conclusion would be unhelpful to the jury.  (Doc. No. 154 at 8–9.)

To the extent that plaintiffs rely on the decision in *Johnson*, they misstate the reasoning upon which the decision in that case was based.  In *Johnson*, the court observed that an expert was unable to conclusively and independently determine what caused the rupture of a gas cylinder and concluded that his testimony—that a certain cause could not be ruled out—was an improper attempt to join the opinions of other experts.  2024 WL 3718097, at *8.  In other words, the plaintiffs in *Johnson* had offered other expert testimony regarding the cause of a rupture and the court found the testimony of an additional expert merely stating that such a conclusion could not be ruled out, would not be helpful.  *Id.* at *10.  Thus, the decision in *Johnson* does not support the argument advanced by plaintiffs here.  Moreover, contrary to plaintiffs' contention, courts routinely permit experts to testify with a lack of certainty.  *See, e.g., Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1033 (E.D. Cal. 2011) ("Cross' lack of certainty does not mean that his analysis is not factually based or methodically sound."); *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1131 (N.D. Cal. 2018) (permitting expert testimony where the expert concluded that the evidence "supported a credible causal interpretation but could not definitively rule out chance, bias, or confounding.").  Accordingly, the court rejects plaintiffs' contention that Mr. Spruill's testimony would be unhelpful to a jury merely because he could not reach a certain conclusion as to the cause of the fire.

/////

### 4.    Opinion On Witness Credibility

Finally, plaintiffs argue that Mr. Spruill's expert rebuttal report improperly challenges the credibility of an eyewitness because he offers an opinion regarding what the witness must have seen based on her testimony.  (Doc. No. 135 at 14–15.)  In response, defendant correctly states that proffering a potential explanation as to why a witness would have seen some phenomenon does not interfere with a jury performing their fact-finding role.  (Doc. No. 147 at 9); *see also In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-md-02670-DMS-MSB, 2024 WL 1269863, at *15 (S.D. Cal. Mar. 25, 2024) (holding that the plaintiff experts' interpretation of lay witness testimony was admissible because the trier of fact would decide the disputed facts and, in doing so, the weight to be accorded to the experts' interpretation of those facts).  Therefore, the court will not exclude Mr. Spruill's testimony on the basis that it improperly challenges the credibility of a lay witness.

Because defendant has met its burden to establish that Mr. Spruill is qualified to render an expert opinion in this case and that he has applied a reliable methodology in reaching his opinions, the court will deny plaintiffs' motion to exclude Mr. Spruill's testimony under *Daubert*.

**B.    Plaintiffs' Motion to Exclude Defense Expert Opinion of Patrick McConnell**

In their second *Daubert* motion, plaintiffs argue that Mr. McConnell, though characterized as a rebuttal witness, is a non-disclosed expert whose testimony should be stricken as untimely. (Doc. No. 137 at 11–12.)  Plaintiffs further argue that Mr. McConnell is "not a certified fire origin and cause investigator or an electoral [sic] engineer" and therefore lacks the qualifications to provide an expert opinion in this case.  (*Id.* at 13–14.)  Finally, plaintiffs argue that Mr. McConnell's testimony is unreliable and unhelpful and should be excluded on those grounds.  (*Id.* at 14–17.)  The court will address each of these arguments below.

### 1.    Improper Rebuttal Opinion

Plaintiffs first contend that Mr. McConnell is improperly described as a rebuttal witness because he offered an affirmative opinion that the fire was caused by rodent infestation and offered an opinion about the movement of smoke inside plaintiffs' RV.  (Doc. No. 137 at 12.)  In opposition, defendant states that Mr. McConnell will not offer any opinion about the cause of the

1    fire in his testimony and only offered such an opinion when plaintiffs' counsel questioned him on

2    that subject during his deposition.  (Doc. No. 146 at 3.)  Defendant also contends that Mr.

3    McConnell's opinion regarding the movement of smoke in the RV is offered only to rebut the

4    expert opinion of Mr. Baker regarding causation of the fire.  (*Id.* at 3–4.)  In reply, plaintiffs argue

5    that Mr. McConnell's testimony will only concern purported inconsistencies between the

6    statement of an eyewitness and plaintiffs' theory of causation.  (Doc. No. 155 at 3.)  However,

7    plaintiffs fail to persuasively explain in what way Mr. McConnell's testimony is not proper

8    rebuttal testimony.  Indeed, "opining on methods and facts plaintiffs' experts did not consider are

9    precisely the type of rebuttal testimony the court would expect." *Laflamme v. Safeway, Inc.*, No.

10   3:09-cv-00514-ECR-VPC, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010) (allowing rebuttal

11   expert testimony where such testimony questioned the assumptions and methods of the opposing

12   expert).  Therefore, the court will not strike or exclude Mr. McConnell's testimony as improper

13   expert rebuttal.

14         2.    Qualifications

15        Next, plaintiffs argue that Mr. McConnell is not qualified to offer rebuttal testimony

16   regarding the cause of the fire because he is not a "certified fire origin and cause investigator or

17   an electoral [sic] engineer."  (Doc. No. 137 at 13.)  In opposition, defendant argues that Mr.

18   McConnell's experience overseeing the recall of defendant's refrigerators, investigating

19   numerous fires involving those refrigerators, and hands-on experience with the design and

20   engineering of those refrigerators renders him qualified to testify as a rebuttal expert.  (Doc. No.

21   146 at 5–6.)  Specifically, defendant contends that Mr. McConnell's experience permits him to

22   describe how a lack of ammonia odor is inconsistent with a fire caused by one of defendant's

23   refrigerators and how the refrigerator at issue did not have a retrofit kit.[5]  (*Id.*)

24   --------

25   [5]  Plaintiffs reply that Mr. McConnell's testimony is not proper rebuttal because it would instead
     support an affirmative opinion that the refrigerator was not the cause of the fire.  (Doc. No. 155 at

26   5–6.)  The court disagrees.  Mr. McConnell reviewed the same evidence as plaintiffs' fire origin
     expert and concluded that it does not support Mr. Baker's finding.  This is proper rebuttal.

27   *Czuchaj v. Conair Corp.*, No. 3:13-cv-01901-BEN-RBB, 2016 WL 4414673, at *5 (S.D. Cal.
     Aug. 19, 2016) (admitting rebuttal expert opinion that the plaintiffs' expert had come to an

28   unsupported conclusion about causation without stating an alternative conclusion as to cause).

The court first observes that, according to defendant's amended expert disclosures, Mr. McConnell has previously worked for defendant for over 35 years as its director of product safety, compliance, and engineering services. (Doc. No. 148-1 at 3.) The court finds that Mr. McConnell, based on his experience, would be qualified to provide an expert opinion about defendant's refrigerators, including as to the design and manufacturing history of that product and whether there would be an odor of ammonia when such a refrigerator burns. *See Martinez v. Terex Corp.*, 241 F.R.D. 631, 637 (D. Ariz. 2007) (finding that an expert was qualified to testify about the overall design of a cement mixer based on his experience as an engineer).

However, plaintiffs also argue that Mr. McConnell is not qualified to testify as an expert regarding the behavior of smoke movement or the presence of other possible ignition sources in the RV. (Doc. No. 137 at 14; *see also* Doc. No. 138-18 at 6) (Mr. McConnell testifying at deposition that he conducted a smoke bomb test which did not replicate the movement of smoke described by a witness). Defendant completely fails to demonstrate Mr. McConnell's training or experience which would render him qualified to describe how smoke behaves during a fire. Moreover, defendant has merely stated in conclusory fashion that Mr. McConnell is "uniquely qualified to testify" that there were "numerous ignition sources" near the refrigerator but has not shown that Mr. McConnell has any relevant experience or training in identifying potential "ignition sources." (Doc. No. 146 at 6.) In short, defendant has only shown that Mr. McConnell is qualified to testify as an expert on the design and behavior of defendant's refrigerators. Therefore, the court concludes that defendant has only met its burden of establishing the reliability of Mr. McConnell's expert testimony as to the design and behavior of defendant's refrigerators.

       3.      <u>Unhelpful to the Jury</u>

Plaintiffs next argue that Mr. McConnell's opinion that the fire was caused by a rodent infestation should be excluded as unreliable and unhelpful. (Doc. No. 137 at 14–18.) As mentioned above, in opposition defendant states that Mr. McConnell does not intend to offer any affirmative opinion about the cause of the fire but will only rebut testimony offered by plaintiffs that the refrigerator was the cause of the fire. (Doc. No. 146 at 7.) Because Mr. McConnell does

1   not intend to offer an ultimate opinion that the cause of the fire was due to rodent infestation, the

2   court rejects plaintiffs' argument that his testimony must be excluded on this ground. *See*

3   *Czuchaj*, 2016 WL 4414673, at *5 (admitting rebuttal expert testimony that failed to reach an

4   ultimate conclusion on causation of an accident because rebuttal experts are not required to reach

5   an ultimate conclusion).

6          For the reasons explained above, the court will grant plaintiffs' motion *in limine* in part

7   and will exclude from evidence any testimony by Mr. McConnell regarding the behavior or

8   nature of the smoke that was observed by witnesses to the fire or as to the presence of numerous

9   "ignition sources" near the refrigerator.[6]  The court will otherwise deny plaintiffs' motion *in*

10  *limine* to exclude Mr. McConnell's rebuttal testimony.

11  **C.     Defendant's Motion to Exclude Expert Opinion of AEGI**

12         **P**laintiffs have proffered the AEGI experts—Orion Keifer and Peter Layson—to offer

13  their opinion as to several matters.  Defendant seeks to exclude each of those opinions under

14  *Daubert*.  First, defendant argues that the AEGI's experts opinions regarding a common design

15  defect in defendant's refrigerators, a common safety hazard in those refrigerators, and a common

16  alternative design and repair option for those refrigerators are unreliable because the AEGI

17  experts did not comport with the "scientific method" in forming their opinions.  (Doc. No. 140 at

18  11–17.)  Defendant also contends that the AEGI experts intend to testify as to defendant's

19  knowledge of a design defect, which is improper expert testimony and should be excluded.  (*Id.* at

20  17–18.)  Finally, defendant argues that the AEGI experts' particular defect opinion regarding

21  plaintiffs' refrigerator should be excluded as unreliable.  (*Id.* at 18–19.)  The court will address

22  each of these arguments below.

23         1.      The Common Defect Opinions

24         First, defendant contends that the AEGI experts' opinions on the design of defendant's

25  refrigerators in general, as opposed to the analysis of the particular refrigerator at issue in this

26  ────────────────

27  [6]   The court notes that exclusion of this one aspect of Mr. McConnell's testimony does not leave
      the defense without a witness addressing this subject matter.  Defendant's fire expert, Nicholas

28  Spruill, has offered his opinion disagreeing with plaintiff's expert Stuart Baker's conclusion that
      there were no other ignition sources for the fire other than the refrigerator.

1    case, are based on analyses that do not comport with the scientific method. (*Id.* at 11–17.)

2    Specifically, defendant argues that the AEGI experts' opinion that the single weld design used in

3    defendant's refrigerators gives rise to a common defect (referred to as the experts' "design defect

4    opinion"), improperly relies on observations of a non-representative sample of refrigerators. (*Id.*

5    at 11–14.) According to defendant, the only refrigerator units analyzed by the AEGI experts had

6    already failed prior to the analysis being undertaken. (*Id.*) Second, defendant argues that the

7    AEGI experts should not be permitted to testify as to whether the safety remedy that defendant

8    has installed in refrigerators, a piece of thermal shielding, was safe (referred to as the experts'

9    "safety hazard opinion") because those experts never tested the efficacy of that remedy. (*Id.* at

10   15.) Third, defendant contends that the AEGI experts' proposed repair options (referred to as the

11   experts' "repair options opinion") is unreliable because they never tested those options nor did

12   they rely upon peer-reviewed studies to determine their efficacy. (*Id.* at 15–17.) In support of

13   these arguments, defendant cites to the decision in *Varner v. Dometic Corporation*, No. 16-cv-

14   22482-AOR, 2022 WL 2307025 (S.D. Fla. Feb. 2, 2022), *objections overruled sub nom. Papasan*

15   *v. Dometic Corporation*, 2022 WL 1222817 (S.D. Fla. Apr. 26, 2022), in which the court

16   excluded from evidence as unreliable an expert report by the AEGI experts which defendant

17   contends is similar in all material respects to the AEGI experts' report prepared in this case.[7]

18                          a.    *Design Defect Opinion*

19           In the AEGI experts' report they opine that defendant's refrigerators have a design defect

20   such that increased corrosion and fatigue is seen close to specific welds along a piece of tubing.

21   (Doc. No. 140-2 at 22–24.) It appears that the AEGI experts assert that this design defect is

22   present in all refrigerators of a certain model, if not all refrigerators, which are produced by

23   defendant. (*Id.*) Though it is not apparent from the expert report what the AEGI experts base this

24   conclusion on, since their report does not disclose any documents or sample inspections with

---

[7]  Plaintiffs present several arguments in support of their position that the AEGI experts are
qualified to testify about refrigerator design defects and that such testimony would be helpful to
the jury. (Doc. No. 149.) However, defendant does not dispute the AEGI experts' qualifications
or whether their testimony would be helpful, instead only arguing that their opinion testimony in
this regard is based on unreliable and unscientific methods. (Doc. No. 140.) Accordingly, these
arguments advanced by plaintiffs are misdirected and need not be addressed further.

1    regard to this design defect conclusion, defendant contends that the AEGI experts formed this

2    opinion based on the same analysis performed by the AEGI experts in *Varner*.  (Doc. Nos. 140 at

3    11; 140-2 at 9–18.)  In support of this contention, defendant identifies deposition testimony in

4    which AEGI expert Keifer confirmed that their conclusions were based on prior inspections of

5    defendant's refrigerators.[8]  (Doc. Nos. 140 at 11; 140-2 at 245–47) (stating that the AEGI experts

6    had not conducted further testing of Dometic refrigerators following the decision in *Varner*).

7    Defendant argues that the same flaws which the magistrate judge identified in *Varner* are

8    reflected in the AEGI experts' analysis here.  (Doc. No. 140 at 11–14.)

9        The court first observes that AEGI experts' report does not clearly set out the data or

10    methodology underlying the design defect opinion.  Specifically, the expert report provides no

11    citations in support of its conclusion that "the design of the Dometic cooling unit causes a

12    common failure of the cooling unit boiler tubes in the vicinity of welds[.]"  (Doc. No. 140-2 at

13    22.)  Though not cited in the report, the court has reviewed the two-part peer-reviewed paper

14    regarding prior inspections of defendant's refrigerators which is attached to the report.  (Doc. No.

15    151-1 at 90–101.)  That paper was written "to give the fire investigator insight into the methods

16    and techniques used to evaluate absorption refrigerators as a potential cause of fire."  (*Id.* at 100.)

17    The paper does not, however, provide data or analysis supporting a conclusion that there is a

18    design defect across all of defendant's refrigerators.  Further, the AEGI experts' report discloses

19    documents reviewed and inspections conducted in creating that report, but none of those

20    disclosures refer to analyses of other units of defendant's refrigerators.  (*Id.* at 9–18.)  The AEGI

21    experts state that they have previously conducted investigations of defendant's refrigerators.  (*Id.*

22    at 6.)  However, they do not state how many of those investigations involved a physical

23    inspection of the refrigerator nor do they attach any findings from those other investigations to

24    /////

25    /////

26    ─────────────────

27    [8]  Defendant has also attached depositions, which were not taken in this case, regarding AEGI's
      expert reports in prior cases involving defendant.  (Doc. No. 140-1 at 2.)  Although plaintiffs do
      not object to the use of those depositions in resolving the pending motions, the court does not rely

28    upon them in resolving the pending motions.

16

1    their expert report.[9]  (*Id.*)  In short, the AEGI experts do not identify any data or methodology

2    whatsoever which could serve as a reliable basis for their design defect opinion offered here.

3            In their opposition, plaintiffs argue that the design defect opinion is based "on the

4    education and background AEGI has regarding boiler systems" and their previous investigations.

5    (Doc. No. 149 at 11.)  At deposition, Mr. Keifer testified that the basis for the AEGI experts'

6    opinion is their "education, and training, and experience" and their past analyses of defendant's

7    refrigerators in other litigation.  (Doc. No. 140-2 at 70.)  Accordingly, the court will consider the

8    prior decision in *Varner* in determining whether the AEGI experts' past investigations provide a

9    reliable basis for their common design defect opinion proffered in this case.

10            In concluding that the AEGI Experts' opinion that the Dometic gas absorption

11    refrigerators have a design defect in the boiler tube which causes corrosion-induced leaks and is a

12    common cause of fires was not admissible under *Daubert*, the magistrate judge in *Varner*

13    explained as follows:

14            AEGI limited its testing to the cooling units in 14 Dometic gas
             absorption refrigerators ranging in age from 2 to 16 years, 13 of
15            which had already been part of an RV fire and 1 of which had
             allegedly leaked. . . . Thus, none of the 14 sample cooling units were
16            operational at the time of testing.  . . .  Courts have repeatedly
             recognized that using already-failed products to argue that a class-
17            wide defect exists is methodologically unsound. . . . Moreover, the
             use of a sample size consisting of only 14 cooling units in relation to
18            millions of cooling units made by Dometic is also problematic.  *See,
             e.g., In re Pella Corp.*, 214 F. Supp. 3d [478], 491 [(D.S.C. 2016)]
19            (testing 477 windows was insufficient to conclude that 7.5 million
             windows shared a common defect); *Groditzky* [sic] *v. Am. Honda
20            Motor Co.*, 2017 WL 8943159, at *4 (C.D. Cal. Oct. 30, 2017)
             (examination of 26 window regulators could not show common
21            defect among 441,600 products in class).  Applying these principles,
             the undersigned concludes that the AEGI Representatives' reliance
22            on a small sample of already-failed cooling units to show a common
             defect among an exponentially larger population of cooling units
23            renders their methodology insufficiently reliable under *Daubert*.

24                                * * *

25            From    studying    these    already-damaged    units,    the    AEGI
             Representatives hypothesized that the alleged design defect in the
26

27    ─────────────────────
      [9]  The court notes that the AEGI experts did provide a summary of the refrigerators they have
      previously investigated and their findings as to those refrigerators in the *Varner* case.  (Doc. No.
28    140-2 at 125–29) (expert report in *Varner* detailing previous inspections).

                                17

boiler tube caused "excess corrosion" and corrosion-induced leaks, whose [sic] root causes were cyclic thermal stresses caused by a concentration of heat at the boiler tube in the cooling unit. . . . However, the AEGI Representatives never sought to validate this hypothesis by actually testing the stress levels in any of Dometic's cooling units, testing the rate of corrosion in Dometic refrigerators, or conducting any sort of accelerated corrosion testing. . . . Nor did the AEGI Representatives test any new or used operational units or attempt to gather any empirical data to evaluate how long the "excess corrosion" process would take to cause a Dometic refrigerator to fail. . . . Instead, the AEGI Representatives "looked at many, many of these cooling units, and [saw] the damage that is indicative of what our opinions are." . . . Such backtracking fails to comport with scientific testing standards. *See Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 555 (D. Md. 2011) ("It should be obvious that no set of observations can serve both to generate and to test the same hypothesis."); *In re Denture Cream Prods. Liab. Litig.*, No. 09-2051, 2015 WL 392021, at *25 n.37 (S.D. Fla. Jan. 28, 2015) ("after-the-fact attempt to bolster [the expert's] opinion does not instill confidence in [his] methodology."); *see also Daubert*, 509 U.S. at 593 (the scientific method requires "generating hypotheses and testing them to see if they can be falsified.").

*Varner*, 2022 WL 2307025, at *3. The undersigned finds this analysis of the reliability of the methodology employed by the AEGI Experts in coming to their design defect opinion to be appropriate and consistent with the court's gatekeeping role under *Daubert*.

It appears that the AEGI experts have not tested any additional refrigerators manufactured by defendant since their expert report in the *Varner* case was prepared, apart from the refrigerator owned by plaintiffs. (Doc. No. 140-2 at 244.) The AEGI experts have also not conducted testing of stress levels in any of defendant's refrigerators. (*Id.* at 245) ("Q. Okay. Do you know if AEGI ever conducted any testing to analyze the stress levels in a single Dometic cooling unit? A. We have not. Q. Okay. Since that time in September '21, do you know if AEGI has conducted any testing of that sort? A. Not of stress levels, no.").

Moreover, the AEGI experts have not provided any additional information beyond what was before the district court in *Varner* regarding the testing they performed or the statistical significance of their findings. Without analysis showing that the sample of refrigerators the AEGI experts analyzed is representative of all of defendant's refrigerators, it appears that in forming their opinion in this regard the AEGI experts are extrapolating from that small sample to all of defendant's refrigerators without a basis for doing so. *Grodzitsky v. Am. Honda Motor Co.*,

18

No. 2:12-cv-01142-SVW-PLA, 2017 WL 8943159, at *4 (C.D. Cal. Oct. 30, 2017) (finding that the plaintiffs' expert was baselessly extrapolating from a small and unrepresentative sample and emphasizing that "[b]esides the regulators he inspected personally, Plaintiffs' expert has no idea why any other regulators may have failed."), *aff'd*, 957 F.3d 979 (9th Cir. 2020); *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *8 (N.D. Cal. Jan. 7, 2022) (finding that an expert could not testify that there was a common design defect in all vehicles of a class because he had not shown that the sample relied on was representative nor any other basis for extrapolation).  Here, the AEGI experts have also not detailed how they ruled out other possible causes for failures in the refrigerators they examined.  The court cannot find that there exists a reliable basis for the AEGI experts' conclusion that there is a common design defect here, without a systematic analysis explaining how possible failure causes other than a defect were ruled out.  *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2023 WL 2292600, at *10 (C.D. Cal. Feb. 23, 2023) ("Even if the Court were to credit White's claim that the Defect is present in all the Class Vehicles because it is a design defect and the Class Vehicles' water pumps share substantially the same design, White's failure to address other causes and factors that lead to . . . failure fatally undermines his attempt to extrapolate[.]"), *aff'd*, No. 23-55325 2024 WL 5242611 (9th Cir. Dec. 30, 2024).

The court finds plaintiffs' assertion that the AEGI experts' experience may serve as a basis for their opinion to be unpersuasive.  (Doc. No. 149 at 11.)  The AEGI experts' experience as engineers allows them to testify regarding standard principles of engineering in the analysis of a design.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999) (finding that engineering experience can provide a basis for an expert opinion); *see also Beaty v. Ford Motor Co.*, No. 17-cv-05201-TSZ, 2021 WL 3109661, at *3–4 (W.D. Wash. July 22, 2021) (admitting expert testimony regarding the design of a windshield based on the expert's background as an engineer and his ability to estimate incidence rates of the defect from data), *amended*, 2023 WL 1879534 (W.D. Wash. Feb. 10, 2023).  That experience does not, without empirical testing, provide a reliable basis for concluding that all of defendant's refrigerators contain a design defect, much less that the design defect *would be* the root cause of a fire in a random refrigerator unit.

1   *Siqueiros*, 2022 WL 74182, at *7 (excluding expert testimony that there is a common design

2   defect where the expert only "generally alludes to the fact that he applied standard engineering

3   principles" and finding that the expert "reason[ed] backwards, by starting with the conclusion that

4   the piston rings were defective, and then showing how the evidence in the record is

5   consistent[.]"); *Sonneveldt*, 2023 WL 2292600, at *8–10 (excluding expert testimony regarding a

6   design defect where the expert relied only on a hypothetical engineering analysis and after-the-

7   fact inspections, but did not conduct any empirical testing).  The court concludes that the

8   analytical gap between the data which the AEGI experts only implicitly relied upon and the

9   conclusion they reached that there is a common design defect in defendant's refrigerators is

10  simply too great.  *Gen. Elec. Co.*, 522 U.S. at 146; *see also Laux v. Mentor Worldwide, LLC*, 295

11  F. Supp. 3d 1094, 1103 (C.D. Cal. 2017) (excluding the expert's testimony where he provided

12  "no support for his 'because I said so' conclusion").[10]

13          Plaintiffs argue without citation to authority that this court should not follow the court's

14  reasoning in *Varner* because that case involved a putative class action and because plaintiffs "are

15  not bound by any decision" in that case.  This argument is unpersuasive:  In both *Varner* and this

16  case, the proffered expert testimony addressed the issue of whether defendant's refrigerators

17  generally have a design defect.  *See Varner*, 2022 WL 2307025, at *1 (detailing proposed expert

18  testimony that all of defendant's refrigerators share the "same design defect in the boiler tube");

19  (Doc. No. 140-2 at 22) (expert report stating "design of the Dometic cooling unit causes a

20  common failure of the cooling unit boiler tubes[.]").  Moreover, the fact that the AEGI experts'

21  testimony has been excluded by another district court provides support for excluding their

22  testimony as to a common design defect in this case as well.  *See Georges v. Novartis Pharms.*

23

24  [10]  The court's conclusion is only that plaintiffs have failed to demonstrate a reliable basis for the
     AEGI experts' common design defect opinion.  As explained below, the court concludes that the
25  experience and engineering knowledge of those same AEGI experts does provide a sufficient
     basis for their opinion as to how the design of the specific refrigerator unit at issue in this case
26  could have caused a fire.  *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 988 (9th Cir.
     2020) (Murguia, J., dissenting) (distinguishing between testimony regarding whether other
27  vehicles in a class would have similar failures caused by a defect from testimony regarding
     whether a particular design could lead to a specific failure).
28

1   *Corp.*, No. 06-cv-05207-SJO-VBK, 2012 WL 9064768, at *9 (C.D. Cal. Nov. 2, 2012)

2   (excluding portions of an expert's testimony in part based on that expert's exclusion by other

3   courts); *Beaty*, 2021 WL 3109661, at *7 (excluding expert testimony concerning a particular issue

4   where other courts had recently excluded that testimony as well).

5          Plaintiffs also argue that, although defendant criticizes the lack of testing by the AEGI

6   experts defendant, does not propose an alternative methodology.  The court finds this argument to

7   be unavailing as well.  Plaintiffs bear the burden of demonstrating that the AEGI experts'

8   methodology is reliable.  *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 995

9   (C.D. Cal. 1996).  Moreover, courts often exclude expert testimony on the basis that the experts

10  improperly relied on insufficiently small sample sizes of already-failed products, as the AEGI

11  experts did here.  *See Grodzitsky*, 2017 WL 8943159, at *4 (holding that the expert's testimony

12  was inadmissible because his design defect opinion was based on "an extremely small sample of

13  window regulators" where he could not determine "if the failures were attributable" to a design

14  defect specifically); *see also Sonneveldt*, 2023 WL 2292600, at *12 (excluding expert testimony

15  on the basis that the expert had not examined a statistically significant sample of failed water

16  pumps),

17         Accordingly, the court concludes that plaintiffs have not satisfied their burden of

18  demonstrating that the AEGI experts' testimony regarding a design defect in defendant's

19  refrigerators is based upon a reliable methodology.  The court will therefore grant defendant's

20  motion to exclude the AEGI experts' testimony regarding their design defect opinion.

21              b.    *Safety Hazard Opinion*

22         Defendant next argues that the AEGI experts have provided no basis for their opinion that

23  defendant's refrigerators, which have been retrofitted with a piece of thermal shielding, pose a

24  continuing safety hazard.  (Doc. Nos. 140 at 14–15; 140-2 at 26) (expert report stating

25  "Dometic's chosen 'remedy' completely fails to address the defective boiler assembly design or

26  the root cause of boiler tube failure, much less actually fix the design of the cooling units to

27  prevent leaks and fires.")  The magistrate judge in *Varner* found that the AEGI experts had, at

28  that time, not conducted any testing on defendant's refrigerators that had been "retrofitted with a

21

1   metal heat shielding" to determine whether those refrigerators would continue to pose a

2   substantial risk of fire.  *Varner*, 2022 WL 2307025, at *3.  Plaintiffs respond by arguing that the

3   testimony of other experts supports the proposition that this thermal shielding does not address

4   the design defect present in defendant's products.  (Doc. No. 149 at 17–18.)  However, the

5   testimony of other experts does not address whether the AEGI experts reached their conclusion in

6   this regard using a reliable methodology.  *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625,

7   630 (W.D. Wash. 2011) ("The rules do not permit an expert to rely upon opinions developed by

8   another expert for purposes of litigation without independent verification of the underlying

9   expert's work.")  Plaintiffs' argument does not identify what, if any, basis the AEGI experts had

10  for reaching their conclusion, much less establish that their opinion in this regard was based upon

11  a reliable methodology.  The court also cannot independently determine the basis upon which the

12  AEGI experts drew their conclusion regarding the continuing safety hazard posed by defendant's

13  refrigerators.  Therefore, the court concludes that plaintiffs have not satisfied their burden to

14  demonstrate that the AEGI experts' methodology in reaching this conclusion was reliable.

15  Accordingly, the court will also grant defendant's motion to exclude the AEGI experts' testimony

16  regarding the safety hazard opinion.

17              c.      *Repair Options Opinion*

18      Defendant argues that the testimony of the AEGI experts regarding potential repairs to

19  correct the alleged design defect in defendant's refrigerators is unreliable because those repair

20  options were never tested nor were they based upon peer-reviewed publications or research.

21  (Doc. Nos. 140 at 15–17; 240-2 at 27–29) (expert report detailing repair options).  Plaintiffs argue

22  that failing to test an alternative design or otherwise cite to any peer-reviewed study is not

23  dispositive in this regard.  (Doc. No. 149 at 18.)  Plaintiffs also contend that the repair options

24  which the AEGI experts propose are in part properly based on a competitor's refrigerator design.

25  (*Id.*)

26      Plaintiffs are correct that a failure to test alternative designs or subject the proposed design

27  to peer review does not compel a finding of non-reliability.  *Ramirez v. ITW Food Equip. Grp.*,

28  686 Fed. App'x 435, 440–41 (9th Cir. 2017) (holding that the district court erred in excluding the

1   plaintiffs' expert testimony regarding an alternative design despite the lack of testing or peer

2   review because the defendant bore the burden to show the alternative design was not feasible).  A

3   lack of testing or peer review of an alternative design does, however, weigh against reliability

4   under *Daubert*.  *Clayton v. Heil Co.*, No. 19-cv-04724-PHX-GMS, 2022 WL 17404792, at *4 (D.

5   Ariz. Dec. 2, 2022) (excluding an expert's testimony regarding the possibility of alternative

6   designs where those designs were not tested nor peer-reviewed); *Pooshs v. Philip Morris USA,*

7   *Inc.*, 904 F. Supp. 2d 1009, 1023 (N.D. Cal. 2012) (same).  Nevertheless, the court notes that the

8   AEGI experts' report disclosed that one of defendant's competitors used alternative designs

9   similar to those described in the report.  (Doc. No. 140-2 at 27–28.)  The court therefore finds that

10  the AEGI experts' undisputed qualifications as mechanical engineers and the existence of the

11  alternative design in a competitor's products provides a sufficient basis for the proffered expert

12  testimony in this regard.  *See M.G. v. Bodum USA, Inc.*, No. 19-cv-01069-JCS, 2021 WL 718839,

13  at *17 (N.D. Cal. Feb. 24, 2021) (permitting expert testimony regarding an alternative design

14  where a competitor's product implemented that design and the expert had sufficient training as an

15  expert to opine on that design); *see also Chong v. STL Int'l, Inc.*, 152 F. Supp. 3d 1305, 1314–15

16  (D. Or. 2016) (same); *Conroy v. Ridge Tool Co.*, No. 4:20-cv-05882-YGR, 2022 WL 911138, at

17  *8 (N.D. Cal. Feb. 3, 2022) (admitting expert testimony where the proposed expert was qualified

18  and had provided design proposals which were "clear, detailed, and capable of being tested").

19         Accordingly, the court concludes that plaintiffs have satisfied their burden of showing that

20  the AEGI experts' testimony as to potential repair options is reliable.  Therefore, the court will

21  deny defendant's motion to exclude the testimony of the AEGI experts regarding their repair

22  options opinion.

23         2.    Knowledge of Defect

24         Defendant next argues that the AEGI experts' opinion that defendant was "aware of the

25  need to protect their cooling units from internal corrosion" is improper because expert witnesses

26  cannot opine on the intent or state of mind of a corporation.  (Doc. Nos. 140 at 17–18; 140-2 at

27  24–25.)  Plaintiffs counter by arguing that this is not "opinion" testimony governed by *Daubert*

28  but instead is fact testimony gleaned from the deposition of another witness.  (Doc. No. 149 at

                                              23

18.)  "Generally, 'state of mind' and 'intent' objections are better ruled on at trial:  the context of the testimony and the purposes for which it is offered are critical."  *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 19-md-02913-WHO, 2022 WL 1814440, at *14 (N.D. Cal. June 2, 2022); *see also Bettencourt v. SharkNinja Operating LLC*, No. 22-cv-09091-CRB, 2024 WL 3187148, at *7 (N.D. Cal. June 25, 2024) (permitting expert opinion regarding whether a warning label indicated that the defendant corporation was aware of a risk).  The court will therefore deny defendant's motion to exclude the AEGI experts' testimony regarding defendant's knowledge of a potential product defect without prejudice to a renewal of its objection at trial.

### 3. Particular Defect Opinion[11]

Defendant argues that the AEGI experts' opinion as to the root cause of the fire at issue in this case relies on "unsupported and untested theories about how the fire began."  (Doc. No. 140 at 18.)  In support of this argument, defendant relies on the expert report of Mr. Baron in which he describes how a certain type of rupture tends to be associated with a certain kind of fire.  (*Id.* at 19.)  Plaintiffs respond that defendant's argument amounts to a challenge to the conclusions reached by the AEGI experts regarding the root cause of the fire which, plaintiffs contend, goes only to the weight of their testimony rather than its admissibility.  (Doc. No. 149 at 19–20.)  Defendant replies that an expert cannot proffer a novel theory of causation without performing the necessary testing and that allowing an expert to do so would permit expert testimony not "based on sufficient facts or data" in contravention of the Supreme Court's decision in *Daubert*.  (Doc. No. 153 at 12–13.)

"In performing its gatekeeping function, a district court 'is not tasked with deciding whether [an expert] is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.'"  *Elosu*, 26 F.4th at 1028 (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013)).  "An expert's specialized knowledge and experience

---

[11]  Defendant argues that the AEGI experts' opinion regarding a particular defect in plaintiffs' refrigerator relies upon, and is derivative of, their common defect opinions.  (Doc. No. 140 at 18.)  However, defendant appears to concede that the AEGI experts' "Root Cause Opinion stands separate and apart from their sweeping Design Defect Opinion."  (Doc. No. 153 at 4.)  Accordingly, the court considers whether the AEGI experts had a reliable basis specifically for their particular defect (or "root cause") opinion.

1    can serve as the requisite 'facts or data' on which they render an opinion." *Id.* at 1024.  Here,

2    defendant does not challenge the qualifications of the AEGI experts or the methodology they

3    applied, but rather only whether they provided a sufficient basis for their opinions as to the cause

4    of the fire in the RV.  (Doc. No. 153 at 2.)  Defendant's contention is based primarily on the

5    AEGI experts' failure to conduct testing to determine whether their theory of how the refrigerator

6    in this case failed could, in fact, have happened.

7         The court observes that the AEGI experts frequently stated conclusions in their report

8    regarding the behavior of the refrigerator in this case without explaining how they reached those

9    conclusions.  (Doc. No. 140-2 at 18–19.)  For example, the AEGI experts state that the outwards

10   dimple observed in the boiler section of the refrigerator at issue here indicates that "a portion of

11   the lower part of the cooling unit containing liquid would have to be heated," but they do not

12   provide any calculations or data to support this conclusion.  (*Id.* at 19.)  A lack of such

13   explanation in an expert report can indicate that the expert opinion is not sufficiently reliable to

14   be admitted into evidence.  *See Fahmy v. Jay Z*, No. 2:07-cv-05715-CAS-PJW, 2015 WL

15   5680299, at *4 (C.D. Cal. Sept. 24, 2015) (finding that an expert report was not sufficiently

16   reliable for admission where it did not explain how certain percentage values were calculated);

17   *see also Microsoft Corp. v. Corel Corp.*, No. 5:15-cv-05836-EJD, 2017 WL 6492468, at *2–3

18   (N.D. Cal. Dec. 19, 2017) (excluding expert testimony where the expert did not explain in his

19   report why he reached a specific conclusion) (citing *Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing

20   in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

21   evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may

22   conclude there is simply too great an analytical gap between the data and the opinion

23   proffered.")); *Walsh v. LG Chem Am.*, No. 18-cv-01545-PHX-SPL, 2021 WL 4859990, at *3–4

24   (D. Ariz. Oct. 19, 2021) (excluding expert testimony because the expert report and deposition

25   testimony failed to explain the basis of the expert's causation conclusion) (quoting *Riegel v.*

26   *Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation

27   as to how the expert came to his conclusion and what methodologies or evidence substantiate that

28   conclusion.")).

However, Mr. Keifer, one of the AEGI experts, has provided further explanation for their conclusions in his deposition testimony. Specifically, Mr. Keifer testified as to how the presence of the popped dimple caused him to reject the possibility of a fire in the rear of the refrigerator because a fire in that area would not have created sufficient pressure to pop the dimple out. (Doc. No. 140-2 at 218.) Mr. Keifer also eliminated other possible sources for the fire because such fires would either cause destruction of the fuse plug or ruptures in the absorber coils, neither of which were observed in this case. (*Id.*) Mr. Keifer then drew from the existence of the popped out dimple, a high rupture in the refrigerator, and the breach in the boiler tube, to conclude that the fire in the refrigerator occurred in the boiler area and he did so by ruling out the other possible positions from which the fire could have emanated. (*Id.* at 229–30.) Though defendant argues that the AEGI experts have not tested their own specific theory of how the fire started, "experts are permitted wide latitude to offer opinions, even when not based on firsthand knowledge or observation." *Johnson*, 2024 WL 3718097, at *5 (concluding that the defendants' arguments that the experts "have not tested their theory, point to no prior cases where a rupture was caused by a leaking cylinder, or any manufacturer that warns that a leaking cylinder could cause an explosion" went to the weight of their testimony because in forming their opinion the experts had extrapolated from the then-existing data).

The court finds that Mr. Keifer's testimony adequately explains the basis for the AEGI experts' conclusion regarding how the refrigerator at issue in this case failed. *See Encompass Ins. Co. v. Norcold, Inc.*, No. 2:23-cv-00231-JNW, 2025 WL 36025, at *3–4 (W.D. Wash. Jan. 6, 2025) (considering the expert's explanation at deposition of the basis for his opinion in deciding a *Daubert* motion); *Ralston v. Mortgage Invs. Grp.*, No. 08-cv-00536-JF-PSG, 2011 WL 6002640, at *6 n.50 (same); *cf. Walsh*, 2021 WL 4859990, at *4 (excluding expert testimony where neither the expert report nor the expert's deposition testimony explained the basis for his opinion). The court concludes that defendant's objection that the challenged particular defect opinion testimony is based on untested theories goes to the weight of the AEGI experts' opinion and not to its admissibility.

/////

1    Defendant alternatively argues that the AEGI experts had no basis on which to claim that

2    the design of defendant's refrigerator could cause a leak and therefore could not opine that a leak

3    was the root cause of the fire in this refrigerator.  (Doc. No. 140 at 18.)  It appears that, in this

4    regard, defendants are asserting that, regardless of whether the AEGI experts can rule out other

5    causes of the fire, they cannot "rule in" a fire in the boiler tube without relying on their

6    inadmissible design defect opinion.  *See In re Roundup Prods. Liab. Litig.*, 737 F. Supp. 3d 893,

7    897 (N.D. Cal. 2024) ("Without being able to offer his general causation opinion, Vogel has no

8    basis for 'ruling in' Roundup as a causal factor in Beckfield's case, so he can't conclude that

9    Roundup was what actually caused Vogel's [injury].").  However, Mr. Keifer has explained the

10    basis upon which he considered the possibility of a fire in the boiler tube:  He had observed

11    corrosion and penetration in the boiler tube during his inspection of the particular refrigerator in

12    this case, which caused him to hypothesize that a leak in the boiler tube was present.  (Doc. No.

13    140-2 at 217.)  He then determined that sufficient amounts of flammable gases present in the

14    boiler tube could lead to a fire, based in part on his knowledge of a previous recall of this kind of

15    refrigerator.[12]  (*Id.* at 217–18.)

16    Based upon Mr. Keifer's explanation at deposition for the basis of his opinion, the court

17    concludes that the AEGI experts' opinion which rules in the possibility that a leak in the boiler

18    tube caused the fire in question is sufficiently supported as to be admissible under *Daubert*.

19    Defendant's arguments seeking to exclude such testimony goes to the weight of that evidence and

20    not to its admissibility.

21    In summary as to the AEGI experts, for all of the reasons explained above, the court will

22    grant defendant's motion to exclude the AEGI experts' opinion as to (1) a general design defect

23

_____

24    [12]  Defendant argues in its reply that the AEGI experts cannot use a previous recall as a basis for a causal opinion, citing *Brezinski v. Graco Childrens Products, Inc.*, No. 5:20-cv-00347-SVW-
25    SHK, 2020 WL 6049934, at *1 (C.D. Cal. July 20, 2020).  (Doc. No. 153 at 12.)  The cited decision is inapposite.  In *Brezinski*, the court concluded that the plaintiffs did not state a
26    cognizable claim as to products that they failed to allege they had ever used or been injured by. *Id.*  While the plaintiffs in that case had alleged there was a recall of all of the challenged
27    products, the district court noted that a product's recall alone does not establish harm but must be supported by specific allegations that the product caused the plaintiff some actual harm.  *Id.*  The
28    district court did not address whether a recall can form part of the basis for an expert's opinion.

1    in defendant's refrigerator; and (2) that the refrigerators constituted a safety hazard, and will

2    otherwise deny defendant's motion to exclude the testimony of those experts.

3    **D.    Defendant's Motion to Exclude Expert Opinion of Stuart Baker**

4            Defendant argues that the testimony of plaintiffs' expert Stuart Baker, who investigated

5    the cause and origin of the fire in plaintiffs' RV, should be excluded because he did not properly

6    apply his stated methodology—NFPA 921—to the facts of this case.  (Doc. No.  141 at 8–11.)

7    Defendant also argues that Mr. Baker's testimony must be excluded because he did not

8    independently validate the grounds upon which he based his opinion.  (*Id.* at 11–12.)  The court

9    will consider each argument below.

10            1.    Improper Application of Methodology

11            Defendant first asserts that Mr. Baker's investigation departed from the standards of

12    NFPA 921 because he could not reliably rule out other possible ignition sources, specifically

13    other appliances, for the fire.  (*Id.* at 10.)  Defendant contends that Mr. Baker reached his

14    conclusion ruling out the other appliances as possible ignition sources based on the materials

15    testing that the AEGI experts conducted and the later explanation of the results of that testing to

16    Mr. Baker.  (*Id.* at 9–10.)  Defendant further contends that no testing was performed on any other

17    potential ignition source because they were so damaged by the fire that no testing of them beyond

18    a visual inspection was possible.  (*Id.*)  Therefore, defendant argues, the materials test could not

19    serve as a basis to rule out the possibility of those other appliances as possible ignition sources.

20    (*Id.*)  In opposition, plaintiffs argue that Mr. Baker did not deviate from NFPA 921 by relying on

21    the conclusions that other experts reached.  (Doc. No. 150 at 8–10.)  Plaintiffs cite to a portion of

22    Mr. Baker's deposition where he testified that he understood the AEGI experts' explanation to

23    him as being that there was no evidence of "problems" with any of the other appliances.  (*Id.*;

24    Doc. No. 141-2 at 41.)  Defendant replies that Mr. Baker testified he did not know what testing

25    had been conducted on the other appliances in the RV and that one of the AEGI experts, Mr.

26    Layson, testified that the visual observation of those appliances was inconclusive.  (Doc. No. 152

27    at 5; 141-2 at 162–63.)

28    /////

28

1    Again, defendant's arguments in this regard go to the weight of Mr. Baker's testimony

2    and not its admissibility.  "[O]nly a faulty methodology or theory, as opposed to imperfect

3    execution of laboratory techniques, is a valid basis to exclude expert testimony."  *City of Pomona*

4    *v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014) (citing *United States v. Chischilly*, 30

5    F.3d 1144, 1154 (9th Cir. 1994), *overruled on other grounds by United States v. Preston*, 751

6    F.3d 1008 (9th Cir. 2014)).  "A deviation from NFPA 921 does not render [an expert's] testimony

7    unreliable."  *Kendall Dealership Holdings, LLC v. Warren Distrib., Inc.*, 561 F. Supp. 3d 854,

8    861 (D. Alaska 2021); *see also State Farm Fire & Cas. Co. v. Hewlett-Packard Co.*, No. 13-cv-

9    00328-TOR, 2015 WL 5821898, at *4–5 (E.D. Wash. Oct. 5, 2015) ("Moreover, as a case cited

10   by Hewlett-Packard explains, any purported flaws in Mr. Zambryski's NFPA 921 methodology

11   goes to the weight of his testimonial evidence, not to the question of its admissibility.") (citing

12   *Schlesinger v. United States*, 898 F. Supp. 2d 489, 505 (E.D.N.Y. 2012)); *United States v. Idaho*

13   *Cnty. Light and Power Coop. Ass'n*, No. 3:17-cv-00391-CWD, 2020 WL 603478, at *7–9 (D.

14   Idaho Feb. 7, 2020) (noting that while other circuits have excluded expert testimony for failure to

15   comply with NFPA 921, Ninth Circuit precedent and the NFPA's language stating that its

16   provisions are merely guidelines required admission of expert testimony which deviated from

17   NFPA 921 in application); *Phila. Indem. Ins. Co. v. Hewlett-Packard Co.*, No. 2:19-cv-00138-TL,

18   2023 WL 5717025, at *10 (W.D. Wash. Sept. 5, 2023) ("As an initial matter, Plaintiff is correct

19   that deviations from NFPA 921 methodology create questions of weight, not admissibility.").

20   Therefore, the court rejects defendant's arguments that Mr. Baker's testimony should be excluded

21   for improperly applying the methodology of NFPA 921 because those arguments go to the weight

22   of his testimony rather than its admissibility under Federal Rule of Evidence 702.

23        2.    Independent Verification of Other Experts' Findings

24    Defendant alternatively argues that Mr. Baker was required to independently verify the

25   AEGI experts' opinion that the other appliances present in the RV did not appear to suffer from

26   any defects which could cause a fire.  (Doc. No. 141 at 11–12.)  Plaintiffs respond that Mr. Baker

27   was relying on the opinions of experts with a different specialty than his own, which is

28   appropriate under *Daubert*.  (Doc. No. 150 at 7–8.)  Defendant replies that Mr. Baker was

1   required to take some action to independently verify what he was told to avoid merely parroting

2   the opinion of another expert.  (Doc. No. 152 at 4.)  It also contends that Mr. Baker's apparent

3   misinterpretation of the AEGI experts' conclusions underscores how unreliable Mr. Baker's

4   opinion in this regard is.  (*Id.* at 5.)

5          "[W]hen an expert does not assess the validity of the opinions of another expert that [the

6   expert] relies on and shows unblinking reliance on another's opinions, that demonstrates that the

7   methodology [the expert] used to formulate [the expert's] opinion was flawed under *Daubert* as it

8   was not calculated to produce reliable results."  *Maney v. Oregon*, No. 6:20-cv-00570-SB, 2024

9   WL 1695083, at *12 (D. Or. Apr. 19, 2024) (internal quotation marks omitted) (alterations in

10  original) (quoting *Pascal v. Nissan N. Am., Inc.*, No. 8:20-cv-00492-JLS-JDE, 2022 WL

11  19076763, at *16 (C.D. Cal. Dec. 21, 2022)).  "However, it is also well established that an expert

12  may rely on the opinions of other experts in formulating the expert's own opinions."  *Id.* at *13

13  (internal quotation marks omitted).  Indeed, "[e]xperts in fire cases *often* rely upon the

14  observations of other experts in reaching their conclusions."  *Peerless Ins. Co. v. Marley*

15  *Engineered Prods. LLC*, No. 05-cv-04848-AKT, 2008 WL 7440158, at *6 (E.D.N.Y. June 12,

16  2008) (permitting expert testimony regarding whether a heater had malfunctioned where the

17  experts relied upon a fire cause expert to exclude other potential causes of the fire).  Nevertheless,

18  it has been acknowledged that generally "[a]n expert's sole or primary reliance on the opinions of

19  other experts raises serious reliability questions."  *Walker v. Conagra Brands, Inc.*, No. 8:20-cv-

20  01679-FWS-KES, 2023 WL 8885148, at *10 (C.D. Cal. Sept. 21, 2023) (internal quotation marks

21  omitted) (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014)).

22         Here, Mr. Baker stated that, when he was drawing his conclusions, he was provided a

23  summary by the AEGI experts of their findings from the material examination.  (Doc. No. 141-2

24  at 45.)  Mr. Baker also stated that this was a verbal report and that he reviewed "some of the

25  documents" that related to results of the testing of the other appliances.  (*Id.* at 49.)  Mr. Baker

26  indicated that he does not possess the expertise to independently verify the conclusions that the

27  AEGI experts reached in this regard.  (*Id.*)  "In the field of fire cause and origin investigations, it

28  is well established that reliance on the expertise of others is standard industry practice."  *Hoog v.*

1   *Dometic Corp.*, No. 20-cv-00272-JD, 2024 WL 1234951, at *6 (W.D. Okla. Mar. 22, 2024)

2   (collecting cases and noting that NFPA 921 specifically recognizes that a fire cause investigator

3   may need to rely on an outside expert).  Mr. Baker's report reflects that he independently

4   concluded that a failure in plaintiffs' refrigerator unit was the "most probable cause" of the fire

5   based on witness statements, review of photographs, and a fire scene examination.  (Doc. No.

6   141-2 at 2–8.)  The only reference in Mr. Baker's report to the AEGI experts' report is where he

7   states that they had "found a leak in the boiler tube that was consistent with a known fire cause."

8   (*Id.* at 8.)  There is no reference in Mr. Baker's report to their findings regarding other appliances.

9   (*Id.*)

10          Based upon this information, the court concludes that Mr. Baker has a sufficient

11   independent basis for his opinion and that he is not merely parroting the conclusions of other

12   experts.  *See Ford v. Ford Motor Co.*, 311 F. Supp. 3d 667, 677–78 (D.N.J. 2017) (admitting

13   expert testimony which relied in part on investigators' findings because the expert's conclusions

14   were based on his own investigation); *Hoang v. Funai Corp.*, 652 F. Supp. 2d 564, 569 (M.D. Pa.

15   2009) (admitting fire cause expert testimony where the expert detailed efforts to make an

16   independent origin determination that did not reflect "unblinking reliance" on the results of other

17   investigations).  Moreover, Mr. Baker testified at his deposition that he ruled out items outside of

18   the refrigerator cabinet as the cause of the fire based on the placement of items within the RV and

19   the layout of the fire.  (Doc. No. 141-2 at 42–44, 46); *cf. Romans v. Ford Motor Co.*, No. 2:16-cv-

20   00068-MHW, 2018 WL 2970741, at *5–6 (S.D. Ohio Mar. 16, 2018) (excluding the fire origin

21   expert's testimony where he testified at deposition that he relied exclusively on another expert's

22   report in ruling out other causes of the fire).  Therefore, the court concludes that defendant's

23   argument that Mr. Baker improperly entirely relied on the AEGI expert's summary goes to the

24   weight of his testimony rather than its admissibility.  *See Maney*, 2024 WL 1695083, at *13

25   (finding that the expert's reliance on another expert to cover a gap in his knowledge goes to the

26   weight of his testimony).

27          Accordingly, the court will deny defendant's motion to exclude Mr. Baker's testimony

28   under *Daubert*.

**CONCLUSION**

For the reasons explained above,

1.     Plaintiffs' motion to exclude the expert opinion of Nicholas Spruill (Doc. No. 135) is DENIED;

2.     Plaintiffs' motion to exclude the rebuttal expert opinion (Doc. No. 137) of Patrick McConnell is GRANTED IN PART as follows:

        a.     Plaintiffs' motion to exclude Mr. McConnell's testimony regarding the consistency of Mr. Baker's conclusion with the behavior of smoke and flames during the fire is GRANTED;

        b.     Plaintiffs' motion to exclude Mr. McConnell's testimony regarding the presence of other ignition sources in plaintiffs' RV is GRANTED;

        c.     Plaintiffs' motion is otherwise DENIED;

3.     Defendant's motion to exclude the expert opinions of the AEGI experts (Doc. No. 140) is GRANTED IN PART as follows:

        a.     Defendant's motion to exclude the AEGI experts' opinion regarding a common design defect in defendant's refrigerators is GRANTED;

        b.     Defendant's motion to exclude the AEGI experts' opinion regarding the common design defect constituting a safety hazard is GRANTED;

        c.     Defendant's motion is otherwise DENIED;

4.     Defendant's motion to exclude the expert opinion of Stuart Baker (Doc. No. 141) is DENIED;

5.     Pursuant to the court's December 3, 2024 order (Doc. No. 145), the parties are directed to file motions for summary judgment or notices of their intent not to do so no later than thirty (30) days after the date of entry of this order; and

6.     If both parties file notices of their intent not to file motions for summary judgment, the parties are directed to meet and confer regarding agreeable dates for Final Pretrial Conference and Jury Trial.  Within fourteen (14) days of the filing of any such notices, the parties are directed to contact courtroom deputy Pete Buzo by

phone, (916) 930-4016, or email, pbuzo@caed.uscourts.gov, with multiple

proposed dates for Final Pretrial Conference and Jury Trial.  If either party files a

motion for summary judgment, the court will address Final Pretrial Conference

and Jury Trial dates in the order resolving the motion(s).

IT IS SO ORDERED.

Dated:  **June 24, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

33